UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>ex rel. PAUL A. CIMINO )<br>20801 Crofton Ct. )<br>Ashburn, VA 20147 )<br> )<br> )<br>                    PLAINTIFF )<br> )<br> )<br>        v.                         )<br> )<br> )<br>INTERNATIONAL BUSINESS )<br>MACHINES CORPORATION, )<br>a Delaware corporation, )<br>1 New Orchard Road )<br>Armonk, NY 10504-1722 )<br> )<br> )<br>                    DEFENDANT )| FILED UNDER SEAL<br>PURSUANT TO 31<br>U.S.C. § 3730(b)(2)<br><br>JURY TRIAL<br>DEMANDED |

**COMPLAINT FOR VIOLATIONS
OF FEDERAL FALSE CLAIMS ACT (Title 31, U.S.C. §§ 3729, et seq.)**

Plaintiff PAUL A. CIMINO ("Relator") files this Complaint on behalf of the United States and himself against DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION ("IBM") and alleges as follows:

**INTRODUCTION**

1.      This is an action to recover damages and civil penalties on behalf of Relator and the United States of America arising from false statements and false or fraudulent claims made, or caused to be made, by the Defendant, IBM, to the United States in violation of the False Claims Act, Title 31 U.S.C. §§ 3729 *et seq.*, as amended ("FCA").

1

**A.      FEDERAL FALSE CLAIMS ACT**

2.      The FCA was originally enacted in 1863 during the Civil War.  In 1986, finding that fraud in federal programs was pervasive and that the FCA was in need of modernization, Congress substantially revised the FCA by passing the False Claims Amendments Act. Characterizing the FCA as a primary tool for combating government fraud, Congress used the 1986 amendments to enhance the government's ability to recover losses sustained as a result of fraud against the United States.  Congress intended that the amendments create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or government inaction.

3.      The FCA provides that any person who knowingly submits, or causes the submission of, a false or fraudulent claim to the government for payment or approval is liable for a civil penalty from $5,500 up to $11,000 for each such claim, plus three times the amount of the damages sustained by the government.  The Act empowers persons having information regarding a false or fraudulent claim against the government to bring an action on behalf of the government and to share in any recovery.  The Complaint must be filed under seal for 60 days (without service to the Defendant during that time to allow the government time to conduct its own investigation and to determine whether to join the action).

4.      Pursuant to the FCA, Relator seeks to recover damages and civil penalties arising from the Defendant IBM's materially false and inflated audit findings presented to the United States Department of Treasury – Internal Revenue Service ("the IRS") that caused, in substantial and material part, the IRS to renew a software enterprise license between IBM and the IRS in 2012 that it otherwise would not have renewed.

5.     The software enterprise license at issue (the "License") was renewed by the IRS with IBM on or about the last day of 2012 for a five year period at a total cost to the United States Government and the IRS of approximately $265,000,000.

6.     In connection with its efforts to sell the License to the IRS, and at a time when the IRS was inclined not to renew, or fully renew, the License, IBM — through the knowing and intentional acts of its employees, agents, and co-conspirators — presented the IRS with false audit results and findings prepared by the accounting firm Deloitte, LLP ("Deloitte"). These false findings were intentionally and fraudulently used by IBM to claim that the IRS had "overused" or "overdeployed" its existing software enterprise license ("Existing Enterprise License") with IBM and that such alleged overuse or overdeployment by the IRS would cost the IRS and the United States Government approximately $80,000,000 above and beyond what the IRS had already paid IBM.

7.     The audit findings presented to the IRS by IBM in connection with IBM's License sale and renewal efforts were false, misleading, and fraudulent and IBM knew they were false, misleading, and fraudulent at the time and times IBM presented them to the IRS. These audit findings were presented by IBM and multiple co-conspirators within IBM to the IRS in an effort to induce the IRS into purchasing the License. The IRS did purchase the License in 2012, under threat by IBM of otherwise having to pay at least $80,000,000 in false and fabricated charges if the IRS did not purchase it.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to §§ 3729 and 3730 of Title 31.

9.    This Court has personal jurisdiction over the Defendant IBM pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because the Defendant can be found in, resides or transacts, or has transacted business in the District of Columbia.

10.   Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the Defendant can be found in, resides or transacts, or has transacted business in the District of Columbia, and because some of the acts complained of herein occurred in the District of Columbia.

## NATURE OF THE CASE

11.   This case is brought for violations of the False Claims Act, 31 U.S.C. §§ 3729(a) et seq., for false or fraudulent claims made to the IRS, an agency of the United States Department of Treasury, in the solicitation and inducement by IBM, and the ultimate sale and execution, of the License by and between IBM and the IRS.

12.   The License at issue is a software enterprise license issued by IBM to the IRS for use by the IRS of multiple IBM software brands, including IBM's Rational, WebSphere, Tivoli and other software brands, for a period of five years commencing on January 1, 2013.

13.   The License was a renewal license executed by the IRS and IBM in late December, 2012.  It renewed the prior Existing Enterprise License that expired on or about September 30, 2012, but that was extended by IBM through December 31, 2012.

14.   IBM booked this deal with the IRS in 2012 as a "compliance deal," meaning that the deal was consummated as a result of alleged compliance or audit findings, which are more fully described herein.

15.    The IRS was fraudulently induced to enter into the License based on the material fraudulent acts and statements further set forth and described in this Complaint.

## THE PARTIES

16.    Relator Paul A. Cimino ("Mr. Cimino") was, at all relevant times, a senior sales representative in IBM's Federal Sector.  Since July 2011, Mr. Cimino has been primarily responsible for promoting sales of IBM's "Rational" brand of software to federal government agencies including the Department of Treasury.  In this capacity, Mr. Cimino was, at all relevant times, primarily responsible for sales of IBM's Rational brand of software to the U.S. Treasury/IRS account.

17.    Mr. Cimino has a comprehensive knowledge of the federal marketplace from the perspective of direct sales to government agencies, system integrators, professional service partners, and value-added resellers.  He has successfully sold software and related products to commercial accounts and government agencies for many years.  He has broad experience with enterprise software solutions, including network/systems management, application development, business intelligence, "e-training," deployment, and usage audits.

18.    IBM is a multi-national corporation that is known worldwide for its computers, software and enterprise solutions, among other things.  It is a publicly traded company on the New York Stock Exchange, and is also listed among the Fortune 100.  It is registered as a Delaware corporation and is headquartered in Armonk, NY.

19.    IBM offers organizations, businesses, and government agencies a wide variety of computer hardware, mainframes, software, and business solutions.  Specifically with respect to its software offerings, IBM has a large variety of license types that it offers to clients and customers.

20.     One software application offered by IBM, the "Rational" brand ("Rational"), is particularly useful to organizations and government agencies in the development and application of their own customized software.  Other software brands offered by IBM include Tivoli, which provides information technology infrastructure management solutions, and Websphere, which is IBM's application and integration software platform.

## THE FACTS

21.     All of these IBM software brands and others were being used by the IRS in 2011 and 2012 under the Existing Enterprise License.

22.     In September 2011, Mr. Cimino began working on the enterprise renewal opportunity at the IRS for the Existing Enterprise License that was set to expire on September 30, 2012.  Mr. Cimino's component of that effort on behalf of IBM was the Rational brand of IBM software.

23.     In late 2011, Mr. Cimino was appointed by the IRS to what IBM initially called the IRS Development Center for Excellence Team, and subsequently called the Development Tools Assessment Group.  This was a board comprised of approximately 15 members who evaluated the IRS's continuing needs for software and enterprise licenses.  As a result, Mr. Cimino and his colleague at IBM, David Cruley ("Cruley"), who was also appointed to this board, were privy to a substantial amount of information and thinking at the IRS about their software and licensing needs.

24.     Other members of this board included Carol Huber and Don Princiotta ("Princiotta"). Princiotta, a consultant to the IRS, was primarily responsible for a majority of the relevant software licenses at issue in this case on behalf of the IRS.

25.     In this capacity, as well as in his capacity as Rational brand software sales representative for IBM, Mr. Cimino and IRS employees and contractors helped to construct a five-year plan for development and implementation of IRS's Rational software and licensing needs.  Accordingly, Mr. Cimino was aware of the IRS's plan for all software and licenses for the next five years.

26.     Mr. Cimino, through communications with employees of the IRS and as a member of the Development Tools Assessment Group, came to learn that (a) the IRS was interested in continuing to use the Rational brand of IBM software after the expiration of the Existing Enterprise License, but (b) was not interested in renewing the entire Existing Enterprise License and other IBM software brands licensed to the IRS under it.  Mr. Cimino learned that the IRS wanted to migrate its software development programs to a different software application, away from IBM's software other than Rational.  The IRS had already begun migrating IBM products such as WebSphere to certain Open Source software, such as J-Boss.

27.     By late 2011, Defendant IBM and the co-conspirators were also aware that the IRS was not interested in renewing its Existing Enterprise License with IBM, and had not renewed it.

28.     In 2012, the expiration of the Existing Enterprise License impending, IBM granted the IRS a three month extension of the Existing Enterprise License, though December 31, 2012.

### THE FALSE AUDIT FINDINGS

29.     In late October and early November, 2012, Mr. Cimino learned that IBM had the accounting firm Deloitte complete a deployment audit allegedly reflecting the number of IBM licenses being used by the IRS in comparison to the number of licenses that the IRS had been

authorized to use under the Existing Enterprise License (the "Deloitte Findings"). The Deloitte Findings pertained to all IBM software brands under the Existing Enterprise License, and relied upon false and fictitious assumptions provided to Deloitte by IBM.

30.     In fact, Deloitte had completed the Deloitte Findings for IBM in late October, 2012.

31.     The Deloitte Findings falsely showed that the IRS had substantially overdeployed the number of licenses it was authorized to use under the Existing Enterprise License, and that the cost to the IRS of its alleged overdeployment and overuse of the IBM licenses was approximately $80 million.

32.     Shortly after the false Deloitte Findings were completed, IBM presented them to the IRS. This was done in an effort to convince the IRS that it had substantially overdeployed the number of IBM licenses it was authorized to use under the Existing Enterprise License, and that as a result, the IRS would owe IBM a substantial overdeployment fee, i.e. approximately $80 million, if it did not renew its Existing Enterprise License. IBM told the IRS that the fabricated $80 million fee would be waived only if the IRS renewed its Existing Enterprise License. IBM thus was using the Deloitte Findings to fraudulently induce the IRS to purchase the new License.

33.     The Deloitte Findings and the resulting overdeployment charge of approximately $80 million associated therewith were false, fabricated, and fraudulent when presented by IBM to the IRS. IBM knew that the resulting $80 million overdeployment charge was false, fabricated, and fraudulent when IBM presented it to the IRS.

## THE INTERNAL AUDIT TEAM

34.     Ann Marie Somerville ("Somerville") is IBM's Brand Manager for Rational software.

35.     Dermott Murray ("Murray") was Senior Director of Federal Civilian Software for IBM.  He has since been promoted by IBM to Vice President of IBM's Federal Sector.

36.     On November 13, 2012, Mr. Cimino's supervisors within IBM, including Somerville, instructed Mr. Cimino to convene and lead a team of four IBM employees to review and attempt to validate the Deloitte Findings with respect to the Rational brand of IBM software, namely by determining the level of the IRS's usage and deployment of IBM Rational software under the Existing Enterprise License.

37.     Somerville provided Mr. Cimino a copy of the portion of the Deloitte Findings that pertained to the Rational brand of IBM software (the "Deloitte Rational Findings").  The Deloitte Rational Findings were a portion of the overall Deloitte Findings.  A copy of the Deloitte Rational Findings contained on an Excel spreadsheet is attached hereto as Exhibit 1.

38.     The four individuals on the internal IBM team conducting this review (the "Internal Audit Team") were Mr. Cimino, Cruley, Kristin Davis, and Alan Maloney.  All were employees of IBM at the time.  Mr. Cimino was the head of the Internal Audit Team.

39.     The Internal Audit Team was instructed by Somerville and Murray to: (1) determine the number of licenses that had been issued to the IRS under the Existing Enterprise License for the Rational brand and (2) compare that to the number of licenses physically deployed and actually in use by the IRS for the Rational brand, in order to claim that the IRS had violated its Existing Enterprise License by overdeploying or overusing the number of permitted licenses or users of software under those licenses.

9

40.     The Internal Audit Team at IBM was instructed by Murray and Somerville to compare its findings to the Deloitte Rational Findings in an effort to validate and support the Deloitte Rational Findings.

41.     The copy of the Deloitte Rational Findings that Somerville provided on November 13, 2012 to the Internal Audit Team falsely showed that the IRS was overdeployed with respect to its use of the Rational software and related licenses by approximately $27 million.

42.     That same day, the Internal Audit Team completed their original review of the Deloitte Rational Findings and concluded that, in a best case scenario from IBM's standpoint, the IRS might be overdeployed under the Existing Enterprise License with respect to the Rational brand software by an amount less than $3 million, not the $27 million claimed in the Deloitte Rational Findings. A copy of this initial analysis conducted by the Internal Audit Team is attached hereto as Exhibit 2.

43.     Mr. Cimino had the lead role in preparing this review for the Internal Audit Team.

44.     The Internal Audit Team concluded that the alleged $27 million overusage or overdeployment fee asserted in the Deloitte Rational Findings was false, fabricated, and an impossibility.

45.     The Internal Audit Team concluded that the Deloitte Rational Findings were replete with inaccuracies. For example, the Deloitte Rational Findings allege that a particular license was attributed as having 700 users. In reality, only three users were actually identified. See Exhibit 1. This instance alone resulted in an asserted overdeployment fee of $3,938,000 that was false and fabricated.

46.   Mr. Cimino sent the Internal Audit Team's review to Somerville electronically on November 13, 2012.

47.   Upon receiving the Internal Audit Team's review, Somerville forwarded it to Murray.

48.   On November 13, 2012, after receiving the review completed by the Internal Audit Team, Somerville called Mr. Cimino and told him that the overdeployment numbers reached by the Internal Audit Team were insufficient, and specifically told him that co-conspirator "Dermott [Murray] needs these numbers to be bigger." Somerville explained to Mr. Cimino that the internal review numbers needed to be artificially inflated to support the Deloitte Rational Findings and to make the renewal of the Existing Enterprise License a "more compelling deal for the IRS" due to the approximately $80 million overdeployment fee that would be charged to the IRS by IBM if the IRS did not renew its license.

49.   IBM and specifically Somerville and Murray directed Mr. Cimino to falsely and artificially inflate the Internal Audit Team review so that it could be used to support the substantially inflated Deloitte Rational Findings. IBM and the other co-conspirators knew the Deloitte Findings were grossly inflated. The co-conspirators intended to, and did, use the false findings as leverage against the IRS in the Existing Enterprise License renewal negotiations and to induce the IRS to sign the new License.

50.   Somerville told Mr. Cimino on November 13, 2012 to falsify the Internal Audit Team's review findings so that they showed a severe penalty and fee to the IRS for overdeployment of the Rational software, to help convince the IRS that it should renew its Existing Enterprise License instead of paying an exorbitant and false overdeployment fee.

51.     Somerville, at the direction of Murray, told Mr. Cimino on November 13, 2012 that he should envision and apply unrealistic and impossible hypothetical scenarios in revising the Internal Audit Team findings. For instance, she said the team should assume that every license was being used *simultaneously* by numerous individuals at the IRS, whether or not they were even responsible for software development at the IRS (the only user-base within the IRS that would have used the Rational brand software).   Somerville and Murray knew that such a scenario could not exist in reality because, as a technical matter, each license permits only one user at a time.   Thus, Somerville and Murray were instructing Mr. Cimino to incorporate assumptions into the Internal Audit Team's review that were physically impossible to achieve or that violated the terms of the IBM licenses in order to further their scheme of defrauding and misleading the IRS.

52.     Additionally, Somerville, at the direction of Murray, specifically instructed Mr. Cimino to inflate the numbers of the Internal Audit Team's internal review to the point where all 4,500 software developers employed by or contracted to the IRS were contrived to use the Rational brand software simultaneously, thereby creating a substantial, but fictitious, hypothetical, and impossible overusage and overdeployment scenario that had no basis in reality and that IBM knew to be false.   Somerville and Murray did this in furtherance of their scheme to defraud and mislead the IRS.

53.     Somerville, Murray, and IBM gave Mr. Cimino these instructions knowing they had no basis in reality, and otherwise represented impossible scenarios, in order to artificially inflate the overusage or overdeployment fee that IBM asserted against the IRS in software renewal negotiations with respect to the Existing Enterprise License, and to support the false Deloitte Rational Findings.

54.     Mr. Cimino resisted these instructions by stating that they presented an unrealistic scenario and that it was impossible that the IRS could have used and deployed so many licenses for Rational software, in part because its software development community was not as large as what Somerville and IBM had instructed him to assume.   In addition, Mr. Cimino had been provided actual usage numbers by the IRS itself which were vastly lower than any of the numbers that Somerville and IBM had instructed him to use.   Somerville and IBM were aware that the IRS had provided Mr. Cimino with vastly lower actual usage numbers.   Somerville's and IBM's instructions were dramatically inconsistent with the Internal Audit Team's own findings of very modest overdeployment, if any.

55.     Each license issued by IBM under the Existing Enterprise License had a "license ratio" that reflected the number of non-simultaneous users per license.   A standard user ratio for the license and in the industry, which was communicated to the IRS by IBM and known to and relied on by both IBM and the IRS, was 5:1.   This ratio meant that for each software license issued by IBM under the Existing Enterprise License, up to five users at the IRS could activate, use, and deploy that software, one user at a time.

56.     Co-conspirators Somerville and Murray, still not satisfied with the Internal Audit Team's review results, instructed Mr. Cimino to inflate further the overusage numbers reached by the Internal Audit Team by artificially and fraudulently reducing the "license ratios" from 5:1 to 3:1 (thereby automatically increasing the number of "unauthorized" users and "overdeployments"), and to increase the size of the software developer community at the IRS beyond the size that the IRS had reported even existed within the agency.   In this manner, Somerville and Murray were violating what IBM knew and understood to be their license ratios under their Existing Enterprise License, and what was the accepted industry practice, to further

support the fabricated and fraudulent information they presented to the IRS in order to sell the IRS the new software License.

57.    Mr. Cimino resisted the instructions of Somerville and Murray because they represented virtually impossible scenarios, were not based in reality, were inconsistent with the Internal Audit Team's review, and because Mr. Cimino realized that Murray and Somerville were engaged in intentionally deceitful and fraudulent conduct directed at the IRS.

58.    Upon direction of Somerville and Murray, however, Mr. Cimino ultimately created another Excel spreadsheet that showed a potential overdeployment of Rational brand software at a cost of approximately $9.3 million to the IRS, based on the instructions he had been given by Somerville, Murray, and IBM.  See Exhibit 3.

59.    Somerville told Mr. Cimino that Murray said the number was still far too low.

60.    Ultimately, none of the review findings prepared by Mr. Cimino and the Internal Audit Team were provided by IBM to the IRS because the "overdeployment" numbers that they showed were insufficient to create bargaining leverage over the IRS in connection with License renewal negotiations.  Because the internal audits did not support the false Deloitte Rational Findings or the false overall Deloitte Findings, the internal audits were suppressed and hidden from the IRS.  Only the unsupported, unsubstantiated, and false Deloitte Findings were used by IBM to induce the IRS to renew the License agreement.

61.    The Deloitte Findings resulted in a total overusage and overdeployment fee of approximately $80 million, which was known by IBM to be a fabricated and fraudulent figure.

**CLOSING THE DEAL**

62.     On December 19, 2012, Mark Gruzin, Chris Schumm and other IBM employees met with the IRS at the IRS's headquarters in Washington, D.C.  They met with the IRS's head of software acquisitions, Jim McGrain, and convinced the IRS to renew the Existing Enterprise License by signing the new License.  At this meeting, IBM fraudulently used the false Deloitte Findings to induce the IRS to sign the new License.

63.     IBM deceitfully and fraudulently explained to the IRS at this meeting that if the IRS declined to renew the agreement, the IRS would owe an approximately $80 million penalty, and said that IBM had already retained lawyers to sue the IRS for the money.  IBM told the IRS that if the IRS entered into the new License, however, IBM would waive the penalty.

64.     Chris Schumm, an IBM employee and member of the IBM negotiating team, met with the IRS and was present along with other senior employees of IBM's Federal Software sector when IBM presented the false Deloitte Findings to the IRS on December 19, 2012.  During the course of his employment with IBM, Schumm stated that the IRS was very concerned and "scared" of the false Deloitte Findings and that those findings were a substantial factor in the IRS's decision to renew the Existing Enterprise License by entering into the new License.

65.     The License that IBM ultimately sold to the IRS covered a period of five years and cost in excess of $265,000,000.  This transaction closed on or about December 31, 2012, the day the Existing Enterprise License was set to expire.

66.     All or a substantial portion of the License fee has been presented as a claim by IBM to the IRS, and has been paid by the IRS to IBM.  This is demonstrated in part by the attached Field Management System report of Mr. Cimino, which shows that for the

compensation plan period ending December 31, 2012, IBM was paid in excess of $45,000,000 for the Rational software sale to the IRS alone.  See Exhibit 4.  The Rational software was a component of the License sold to the IRS.

67.    The IRS's decision to enter into the License was materially influenced by the false Deloitte Findings, which were developed and conceived by IBM and fraudulently used to induce the IRS to enter into the new License.

68.    The transaction between the IRS and IBM was touted within IBM as the single largest Rational brand software sale ever made by IBM.

69.    Numerous individuals within IBM were aware of the false nature of the Deloitte Findings and were aware that those findings were used to induce the IRS to enter into the new License.  Those individuals, co-conspirators, and employees of IBM included, but are not limited to, Ann Marie Somerville, Mark Gruzin, Chris Schumm, and Dermott Murray.

70.    In 2012, IBM sold the License to the IRS under which IBM was and is to provide software, software licenses, and technical support to the IRS for the next five years.

71.    The License cost the IRS $265,000,000.  All or a substantial portion of that amount has been paid by the IRS after presentment of claims by IBM.

72.    The IRS's decision to enter into the License was materially influenced by the Deloitte Findings, which IBM presented to the IRS and which IBM knew were false and fraudulent.  Using the false Deloitte Findings, IBM threatened to charge the IRS for fictitious and fraudulent "overdeployments" and "overusages" of IBM's software licenses to induce the IRS to renew the Existing Enterprise License by entering into the new License.

## COUNT ONE
### False Claims Act, 31 U.S.C. § 3729(a)(1)

**(Knowingly Presenting or Causing to be Presented a False or Fraudulent Claim)**

73.     Relator re-alleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 72.

74.     Defendant IBM, through the knowing acts of one or more of its individual employees or agents, knowingly presented or caused to be presented, to officers, employees or agents of the United States Government, false or fraudulent claims in connection with its efforts to have the IRS renew the Existing Enterprise License by entering into the new License, and in connection with receiving payment for the new License.

75.     By virtue of the false or fraudulent claims made or caused to be made by the Defendant IBM, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false or fraudulent claim presented or caused to be presented by a defendant.

## COUNT TWO
### False Claims Act, 31 U.S.C. § 3729(a)(2)

**(Making, Using, or Causing to be Made or Used a False Record or Statement)**

76.     Relator realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 72.

77.     Defendant IBM, through the knowing acts of one or more of its individual employees or agents, knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States in connection

17

with inducing the IRS to purchase the License that IBM sold to the IRS in 2012 and in seeking payment for this License. These false records and statements were material to the false and fraudulent claims submitted to the United States.

78.     By virtue of the false or fraudulent claims made or caused to be made by the Defendant IBM, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false or fraudulent claim presented or caused to be presented by Defendant IBM.

**COUNT THREE**
**False Claims Act, 31 U.S.C. § 3729(a)(3)**

**(Conspiring to Defraud the United States Government Through False or
Fraudulent Claims)**

79.     Relator and the United States reallege and incorporate herein by reference paragraphs 1 through 72.

80.     Defendant IBM knowingly and intentionally conspired, through the acts of one or more of its individual employees or agents, together with other conspirators known and unknown, including Ann Marie Somerville, Dermott Murray, Chris Schumm, and Mark Gruzin, to defraud the United States Government by getting false or fraudulent claims paid or approved through the knowing use of trickery, chicanery, deceit, and misrepresentation in connection with inducing the IRS to purchase the License that IBM sold to the IRS in 2012 and in seeking payment for this License. As part of this conspiracy, the conspirators presented false and fraudulent claims to the United States for payment and received payment for these claims. In addition, false records and statements used during this conspiracy were material to the false and fraudulent claims submitted to the United States.

81.     By virtue of the Defendant IBM and the co-conspirators' conspiracy to defraud the United States Government through false or fraudulent claims, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false or fraudulent claim presented or caused to be presented by Defendant IBM.

WHEREFORE, the Relator demands and prays that judgment be entered in favor of the United States and against the Defendant IBM as follows:

A.     On Counts One, Two and Three under the False Claims Act, as amended, for multiple of the amount of the United States' damages and civil penalties as are required by law, together with such further relief as may be just and proper;

B.     That Plaintiff be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

C.     That Plaintiff be awarded all costs of this action, including attorneys' fees and costs; and

D.     That Plaintiff recovers such other relief as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury.

Respectfully Submitted,

Louis E. Dolan, Jr. (D.C. Bar No. 442881)
Grayson Yeargin (D.C. Bar No.476324)
David Vicinanzo (*pro hac vice*)
Nixon Peabody LLP
401 9th Street, N.W., Suite 900
Washington, DC 20004-2128
(202) 585-8000
(202) 585-8080 (facsimile)

ldolan@nixonpeabody.com
gyeargin@nixonpeabody.com
dvicinanzo@nixonpeabody.com

*Attorneys for Plaintiff Paul A. Cimino*

## AFFIRMATION OF PAUL CIMINO

I, Paul Cimino, plaintiff herein, being duly sworn, affirm that I have read the foregoing Complaint and do hereby declare, under penalty of perjury, that the facts set forth therein are true and correct to the best of my knowledge, information and belief.

Given under my hand this _14_ day of _June_, 2013

Paul Cimino

14493861.5