UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>ex rel. PAUL A. CIMINO<br>20801 Crofton Ct.<br>Ashburn, VA 20147<br><br>PLAINTIFF<br><br>v.<br><br>INTERNATIONAL BUSINESS<br>MACHINES CORPORATION,<br>a Delaware corporation,<br>1 New Orchard Road<br>Armonk, NY 10504-1722<br><br>DEFENDANT | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 13 cv 0907

FILED UNDER SEAL
PURSUANT TO 31
U.S.C. § 3730(b)(2)

JURY TRIAL
DEMANDED

**FIRST AMENDED COMPLAINT FOR VIOLATIONS
OF FEDERAL FALSE CLAIMS ACT (Title 31, U.S.C. §§ 3729, et seq.)**

Plaintiff PAUL A. CIMINO ("Relator" or "Cimino") files this Amended Complaint on behalf of the United States and himself against DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION ("IBM") and alleges as follows:

**INTRODUCTION**

1.      This is an action brought to redress predatory, fraudulent sales and billing practices committed against the United States Government by what was once America's most-venerated high-technology company.  The conduct addressed here lies at the heart of the wrongs the False Claims Act was enacted to address: a fully-orchestrated scheme to fraudulently induce a $265,000,000 contract for the sale of unwanted, unneeded goods and services to the

Government—in this case software licenses that would sit unused for years, just as they had for years in the past, *i.e.* "shelfware."  The scheme was conceived and carried out at the highest corporate levels at a time when demand for IBM's formerly flagship products was sagging, IBM was struggling to make the quarterly and annual sales and profit numbers expected by Wall Street to keep its share price aloft, and it desperately needed to drive new sales by any means necessary.

2.     A key component of IBM's scheme was falsely inflating the Government's software usage data but presenting that data to the Government as truthful nonetheless, under the guise of an "independent audit" conducted and vouched for by one of the nation's highly-esteemed accounting firms.  Although proposed to the Government as a "cooperative baseline assessment" for the Government's benefit that would identify actual software usage and cost savings from under-usage, there was nothing independent about the audit and it was never intended to benefit the Government.  Instead, it was a Trojan horse controlled start to finish by IBM, which, upon its receipt of intentionally leaked initial audit findings, demanded the auditor fall in line with IBM's pre-determined requirements and expectations and alter the audit results. IBM needed the audit results to show substantial software over-usage, thereby allowing IBM to fabricate a compliance penalty at a "pain point" sufficient to force the Government to agree to a lucrative new contract to avoid the penalty.  IBM defrauded, cajoled and threatened its way to this new contract in multiple ways, including by falsely telling the Government it had to pay the penalty or resolve the issue in court if it did not agree to a new contract, even though IBM had no intention of suing its long-standing Government "partner" or trying to collect independently on the ever-changing penalty amounts it presented to the Government as true.  IBM also informed the Government that if it simply agreed to a new contract, the penalty would go away; but that

promise, like so many others made by IBM, turned out to be false as well.  The audit procedure IBM used as a driver for the new contract was not an exercise to find the truth, and IBM cut no square corners in its dealings with the Government throughout this year-long effort.  A compliance penalty of the magnitude IBM concocted here, if known, would objectively affect the decisions of any contracting officer or government official.

3.     Another key component of IBM's plot included IBM's predicate act of enticing the Government to opt out of the last year of its existing contract, thereby paving IBM's runway for a new contract.  IBM promised that being out of contract was the only way the Government could realize cost savings identified in the audit.  When the cost savings did not materialize and the Government realized it had been tricked into giving up its favorably priced final contract year, IBM quoted an exponentially higher price to reinstate that final contact year—nearly 500 percent higher—for the *exact same goods and services* in order to continue channeling the Government into the new multi-year contract for IBM's benefit.  By contrast, IBM's government shelf-list prices for this software had risen only minimally during the same time.

4.     Yet another fraudulent stratagem came to light only after the new deal IBM so desperately sought was struck.  IBM had promised the Government the compliance penalty would go away if a new deal was agreed upon, but IBM nonetheless billed the Government at least $86,000,000 in penalties—essentially billing the Government a second time for products the Government had paid for under its original contract, but was not using.

5.     IBM timed the culmination of its year-long amalgam of fraud perfectly:  the new deal was agreed upon during the 2012 holiday season—a time when IBM knew the key Government opponent of the new deal was on vacation and unavailable to block IBM's efforts, and when the key Government officer who agreed to the new deal to avoid the threatened

penalty, believing the Government would not have to pay compliance penalties if it entered into the deal, was himself days from his own retirement and would not remain in the Government's employ long enough to see the new contract documented, or witness the fact that the Government was paying the penalties he was told he had avoided by doing the new deal.

6.     At least one high level executive at IBM was so appalled by the company's tactics that he suggested giving money back to the Government.  Nevertheless, IBM booked the new contract internally as a compliance deal, accepted the $86 million in penalty payments from the Government, and then brazenly devised a formal program to deploy the same tactics against other unsuspecting Government agencies whose contracts were about to expire.   Ultimately, the individual perpetrators were relieved of their employment at IBM, and IBM's reseller and the contract itself later became the subject of hearings before the United States Congress for different reasons.  But IBM has not yet been held accountable for its actions.

## THE FALSE CLAIMS ACT

7.     This is an action to recover damages and civil penalties on behalf of Relator and the United States of America arising from false statements and false or fraudulent claims made, or caused to be made, by the Defendant, IBM, to the United States in violation of the False Claims Act, Title 31 U.S.C. §§ 3729 *et seq.*, as amended ("FCA").

8.     The FCA was originally enacted in 1863 during the Civil War.  In 1986, finding that fraud in federal programs was pervasive and that the FCA was in need of modernization, Congress substantially revised the FCA by passing the False Claims Amendments Act. Characterizing the FCA as a primary tool for combating government fraud, Congress used the 1986 amendments to enhance the government's ability to recover losses sustained as a result of fraud against the United States.  Congress intended that the amendments create incentives for

individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or government inaction.

9.      The FCA provides that any person who knowingly submits, or causes the submission of, a false or fraudulent claim to the government for payment or approval is liable for a civil penalty from $5,500 up to $11,000[1] for each such claim, plus three times the amount of the damages sustained by the government.  The FCA empowers persons having information regarding a false or fraudulent claim against the government to bring an action on behalf of the government and to share in any recovery.  The Complaint must be filed under seal for 60 days (without service to the Defendant during that time to allow the government time to conduct its own investigation and to determine whether to join the action).

10.     Pursuant to the FCA, Relator seeks to recover damages and civil penalties arising from the Defendant IBM's fraudulent conduct that has caused at least $265,000,000 of damage to the United States.

## SUMMARY OF ALLEGATIONS

11.     This case arises out of a fraudulent scheme perpetrated by Defendant IBM against the United States Department of Treasury – Internal Revenue Service (the "IRS") whereby IBM falsely and fraudulently represented to the IRS that the IRS owed IBM millions of dollars in compliance penalties in order to induce the IRS to give up its existing rights and to enter into a software agreement that the IRS did not need and did not want. Further, Defendant IBM told the IRS that if the IRS entered into the new deal any compliance penalties would be waived, but then billed the IRS for millions of dollars in penalties anyway.

---

[1]      For violations occurring prior to November 2, 2015.  *See* 31 U.S.C. § 3729(a); 28 C.F.R. §§ 85.3(a)(9), 85.5.

12.    The IRS had been a long-time customer of IBM's software products, but by 2011, the IRS had begun to migrate off of IBM's software, replacing it with other software, and wished to cease purchasing many of the products it was purchasing from IBM at the time, in part because the IRS was not using the products.

13.    At the time, the IRS was locked into a long-term license agreement obligating the IRS to purchase certain quantities of licenses from IBM (the "Existing Enterprise License") through at least September 30, 2012. The Existing Enterprise License was set to expire on September 30, 2012, but the IRS had the right to exercise at least one option year to extend the life of the contract.

14.    IBM was aware that the IRS was migrating off of IBM's software, and IBM stood to lose a substantial amount of revenue if that happened. The IRS was to pay at least $23 million to IBM in fiscal year 2012 alone under the Existing Enterprise License, and had paid similar amounts thereunder in each of the prior four years.

15.    Recognizing that the IRS wanted to minimize its purchase of IBM software, and that IBM did not have sufficient new software content to drive a large new deal, IBM devised a plan to create leverage over the IRS. First, IBM would convince the IRS to forego the final option year under the pretense that once the IRS was out of contract, the IRS would not have to continue purchasing all of the products in the Existing Enterprise License and would be free to purchase only the software it needed. Second, IBM would convince the IRS to have its use of IBM software audited under the guise of a "friendly audit" that would identify what software the IRS was using and should continue to purchase and where it could realize savings.

16.    At all relevant times, however, IBM's expectation and intent was that the audit would instead conclude that the IRS was over-using its licenses and owed substantial compliance

penalties, and that IBM would be able to hold those penalties over the IRS's head to force it into a new long-term deal with IBM for software that the IRS no longer wanted or needed. The substantial savings promised by IBM were, at all times, a blatant lie.

17.     Based on this lie, IBM succeeded in convincing the IRS to forgo the final option year of the Existing Enterprise License and to have its software usage audited by accounting firm Deloitte, LLP ("Deloitte").

18.     While, by contract, the audit was supposed to be performed by an independent auditor, Deloitte did not operate independently in reality; rather, IBM used Deloitte as its agent to carry out the audit.

19.     To IBM's surprise, the initial audit results prepared by Deloitte showed that the IRS owed very little in compliance—only $500,000—which was not nearly enough to create the leverage IBM needed for a new deal. Moreover, the audit results showed that the IRS was not using the software at issue and that the IRS's environment was "clean" of compliance issues.

20.     IBM suppressed these initial audit results and never released them to the IRS.

21.     Unsatisfied with the initial audit results, IBM then began to look for ways to artificially inflate them. Over the course of several months, IBM fraudulently manipulated the initial audit results by making false and impossible assumptions to come up with a "credible story" that they could use to convince the IRS that it owed significant compliance penalties.

22.     These manipulations of the audit were not a search for the truth, but a search to find a "pain point" that IBM could press until the IRS agreed to a deal.

23.     IBM's own internal communications disclose that IBM employees knew the results they were generating through these manipulations were false, not based on reality, and in IBM's own words, at times "ridiculous."

24.     After several iterations, IBM, through the knowing and intentional acts of its employees, agents, and co-conspirators, falsely and fraudulently asserted to the IRS that the IRS owed IBM approximately $91,000,000 in compliance penalties above and beyond what the IRS had already paid IBM under the Existing Enterprise License, based on the false and fraudulently manipulated audit results.

25.     Furthermore, Mark Gruzin, Dermot Murray, and others from IBM told Jim McGrane of the IRS that if the IRS purchased a new License, it would not have to pay the threatened, false, and fabricated compliance penalties.

26.     IBM's claim for $91,000,000 in compliance penalties and the audit findings presented to the IRS by IBM in connection with IBM's License sale and renewal efforts were false, misleading, and fraudulent and IBM knew they were false, misleading, and fraudulent at the times IBM presented them to the IRS.  They were presented by IBM and multiple co-conspirators within IBM to the IRS in an effort to induce the IRS into purchasing the License.

27.     Upon information and belief, in presenting this claim and the audit findings to the IRS, IBM did not disclose the false and fraudulent assumptions that were the basis for the audit results.

28.     Nevertheless, Adam Kravitz, the IRS employee who was IBM's point of contact in relation to the software licenses, rejected IBM's assertion that these compliance penalties were owed.

29.     Undeterred, IBM waited until Kravitz was on vacation to go over his head and present its fraudulent claim and the fraudulent audit results to Kravitz's superior at the IRS, James McGrane, the IRS's deputy-CIO and head of software acquisitions.

30.     To avoid having to pay the asserted penalties, the IRS agreed to enter into a new five-year deal with IBM (the "License") for software that the IRS was not using and did not want at a total cost to the United States Government and the IRS of approximately $265,000,000 because IBM represented it would waive the compliance penalties.

31.     The materially false and inflated audit findings presented to the IRS and IBM's representation that it would waive those penalties if the IRS entered into a new deal caused, in substantial and material part, the IRS to enter into the License when it otherwise would not have.

32.     IBM booked this deal with the IRS in 2012 as a "compliance deal," meaning that the deal was consummated as a result of alleged compliance or audit findings, which are more fully described herein.

33.     Further, despite IBM's representation that it would waive the compliance penalties, IBM surreptitiously billed the IRS for the compliance penalties by charging the IRS for new licenses in the exact amounts by which IBM had asserted the IRS was over-using the licenses but for which IBM stated IRS would not have to pay. These licenses are falsely and fraudulently identified in the License as being effective prospectively for the year after the deal was executed.

34.     Pleased with how successfully it defrauded the IRS, IBM then began training its employees internally on how to utilize the same fraudulent tactics against other federal agencies, and proceeded to use the same or similar fraudulent tactics against several other federal agencies over the course of the next several years.

35.     In August 2016, after the Government initiated document demands in connection with this matter, IBM terminated many of the employees involved in the scheme who were still

employed at IBM, including Dermot Murray, Kathleen O'Leary, and Len Fleischmann for unethical and fraudulent business practices.

36.     IBM's false assertions to the IRS that it owed significant compliance penalties, as described more fully herein, were material false statements and false claims for payment.

37.     The IRS was fraudulently induced to enter into the License based on the material fraudulent acts and statements further set forth and described in this Complaint.

38.     IBM's billing of the false and fraudulent compliance penalties to the IRS after representing that the IRS would not have to pay compliance penalties if the IRS entered into the License were false claims for payment, as more fully described herein.

## JURISDICTION AND VENUE

39.     This Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to §§ 3729 and 3730 of Title 31.

40.     This Court has personal jurisdiction over Defendant IBM pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because the Defendant can be found in, resides or transacts, or has transacted business in the District of Columbia.

41.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the Defendant can be found in, resides or transacts, or has transacted business in the District of Columbia, and because some of the acts complained of herein occurred in the District of Columbia.

## THE PARTIES

42.     Relator Paul A. Cimino was, at all relevant times, a senior sales representative in IBM's Federal Sector.  Since July 2011, Cimino had been primarily responsible for promoting

sales of IBM's Rational brand of software to federal government agencies including the Department of Treasury.   In this capacity, Cimino was, at all relevant times, primarily responsible for sales of IBM's Rational brand of software to the U.S. Treasury/IRS account.

43.     Cimino had a comprehensive knowledge of the federal marketplace from the perspective of direct sales to government agencies, system integrators, professional service partners, and value-added resellers.  He has successfully sold software and related products to commercial accounts and government agencies for many years.  He has broad experience with enterprise software solutions, including network/systems management, application development, business intelligence, "e-training," deployment, and usage audits.

44.     IBM is a multi-national corporation that is known worldwide for its computers, software and enterprise solutions, among other things.  It is a publicly traded company on the New York Stock Exchange, and is also listed among the Fortune 100.  It is registered as a Delaware corporation and is headquartered in Armonk, NY.

45.     IBM offers organizations, businesses, and government agencies a wide variety of computer hardware, mainframes, software, and business solutions.  Specifically, with respect to its software offerings, IBM has a large variety of license types that it offers to clients and customers.

46.     One software application offered by IBM, the "Rational" brand ("Rational"), is used by organizations and government agencies in the development and application of their own customized software.  Other software brands offered by IBM include Tivoli, which provides information technology infrastructure management solutions, and Websphere, which is IBM's application and integration software platform.  The Existing Enterprise License provided the IRS with licenses to use all of these IBM software brands and others.

11

47.     Shortly after the transaction described herein was closed, Cimino left the employment of IBM and is no longer employed there.

## THE FACTS

**A.     The Existing Enterprise License and the Development Tools Assessment Group**

48.     The Existing Enterprise License between the IRS and IBM took effect in 2007 and permitted the IRS to use software within multiple IBM software brands, including IBM's Rational, WebSphere, Tivoli, and certain other software brands.

49.     In addition to a base year, the IRS had the right to exercise several option years to extend the IRS's right to use the licenses. The IRS exercised the first few of those option years, such that the Existing Enterprise License was set to expire on September 30, 2012, and the IRS had the right to exercise at least one additional option year.

50.     In September 2011, Cimino began working on the enterprise renewal opportunity at the IRS for the Existing Enterprise License.  Cimino's component of that effort on behalf of IBM was the Rational brand of IBM software.

51.     In late 2011, Cimino was appointed by the IRS to what IBM initially called the IRS Development Center for Excellence Team, and subsequently called the Development Tools Assessment Group.  This was a board comprised of approximately 15 members who evaluated the IRS's continuing needs for software and enterprise licenses.  As a result, Cimino and his colleague at IBM, David Cruley, who also was appointed to this board, were privy to a substantial amount of information and thinking at the IRS about their software and licensing needs.

52.    Other members of this board included Carol Huber and Don Princiotta. Princiotta, a consultant to the IRS, was primarily responsible for a majority of the relevant software licenses at issue in this case on behalf of the IRS.

53.    In this capacity, as well as in his capacity as Rational brand software sales representative for IBM, Cimino and IRS employees and contractors helped to construct a five-year plan for development and implementation of the IRS's Rational software and licensing needs.  Accordingly, Cimino was aware of the IRS's plan for all software and licenses for the next five years.

**B.      The IRS No Longer Wanted to Use IBM's Products**

54.    Cimino, through communications with employees of the IRS and as a member of the Development Tools Assessment Group, came to learn that (a) the IRS was interested in renewing a small part of the Rational brand of IBM software after the expiration of the Existing Enterprise License in September 2012, but (b) was not interested in renewing the entire Existing Enterprise License and certain other IBM software brands licensed to the IRS under it.  Cimino learned that the IRS wanted to migrate its software development programs to a different software application, away from IBM's software.  The IRS had already begun migrating IBM products, such as WebSphere, to certain Open Source software, such as J-Boss.

55.    By late 2011, Defendant IBM and the co-conspirators were also aware that the IRS was not interested in renewing its Existing Enterprise License with IBM, and had not renewed it.

56.    IBM's understanding that the IRS did not want to continue using IBM's products was only reinforced as time went on:

a.   On or about March 2, 2012, an IBM employee stated that "we are in a stand still, where they [IRS] won't invest in more products because they feel they're in a bad deal . . . . Adam Kravitz seems content to wait it out and encourage the programs to move off of IBM."

b.   On or about April 27, 2012, an IRS employee contacted IBM to inquire whether they could drop all support for the Tivoli products.

c.   On or about July 18, 2012, an IBM employee stated with respect to getting the IRS to renew the Existing Enterprise License, "In truth, I am more concerned about not having enough content to be able to present a deal that makes sense financially."

d.   On or about August 13, 2012, an IBM employee recounted a meeting with Patricia Hoover and Kravitz of the IRS in which the "IRS once again wanted information related to an option that would allow them to not exercise the Option year 6 in the agreement . . . ."

57.   IBM stood to lose significant revenue if the IRS stopped purchasing the software licenses in the Existing Enterprise License and did not enter into a new deal.

## C.   IBM's Plan to Defraud the IRS

58.   Recognizing that the IRS was moving away from IBM's software and was unlikely to renew the Existing Enterprise License, IBM began formulating a plan to defraud the IRS in early 2012.

59.   IBM's plan consisted of two major components: (1) convincing the IRS to forego the upcoming option year on the Existing Enterprise License, so that the IRS would not have access to the software it was presently using as tax season began; and (2) performing a

compliance audit, which IBM anticipated would find that the IRS was over-using the licenses and owed significant amounts of money to IBM in compliance penalties as a result. Once the IRS was in this position, IBM believed it would have the leverage necessary to persuade the IRS to enter into a new, long-term license deal, even though the IRS did not want to continue using IBM's products.

60.     A "compliance audit" is an assessment that is supposed to determine how many licenses a customer owns and, for each license, whether the customer is using more or fewer licenses than the customer owns and by how much.  Under the terms of the Existing Enterprise License, any such audit was supposed to be performed by an "independent auditor." As described in detail elsewhere herein, however, the audit was anything but independent. IBM controlled the audit and the auditor and used that control to manufacture materially false and fraudulent audit results it presented to the IRS.

61.     Internal communications among IBM's executives confirm that IBM believed getting the IRS out of contract was essential to giving IBM the leverage it needed to force a new deal.   In July 2012, Murray, then the Senior Director of Federal Civilian Software for IBM (and, later, the Vice President of IBM's Federal Sector) wrote to Fleischmann, Manager of Enterprise Sales for IBM's Federal Sector: "Only way to work a new deal is for IRS to cancel the contract. . . . Having IRS out of contract provides the maximum leverage on getting the deal done." Fleischmann stated his agreement, and added that "[T]he sooner they [IRS] cancel the existing contract the more leverage we have in moving them to a new agreement."

62.     Internal discussions among IBM's employees in 2012 also show that IBM believed a compliance audit would reveal IRS was over-using licenses and owed compliance penalties to IBM.

15

a.      One IBM employee described a compliance audit as "the only way you and I have a shot at making money this year."

b.      In another instance, an IBM employee stated: "[R]ealistically, [I] think it gives us the necessary leverage to have a conversation around renegotiating the [Software Renewal Opportunity] prior to December." To which another IBM employee responded: "I do not disagree with you that we should probably do it."

c.      In April 2012, IBM employees described the compliance audit as a "hammer" they could use against the IRS.

d.      As described in detail below, IBM was astounded when the initial audit results came back and found the IRS owed virtually nothing in compliance penalties.

**D.      Putting IBM's Fraudulent Plan into Action: Getting the IRS out of Contract and Initiating an Audit**

63.     The IRS, in part because it was moving away from and ceasing to use IBM's software, believed that it was not using all of the licenses it had purchased under the Existing Enterprise License. However, under the terms of the Existing Enterprise License, the IRS was not entitled to refunds for the shelf-ware or licenses it did not use.

64.     IBM was aware of this fact.

65.     Accordingly, in May 2012—at the same time internal IBM emails show that IBM was discussing using a compliance audit as a "hammer" to drive a new contract, and well aware that IRS wanted to reduce its spending on IBM products—Michelle Adams of IBM told Patricia Hoover and Adam Kravitz of the IRS that the IRS could realize savings by (1) choosing not to exercise the upcoming option year on the Existing Enterprise License and (2) entering into a new deal with IBM in which the IRS could choose to purchase only the licenses it wanted to continue to use and not purchase those it was not using.

66.     In July 2012, when internal IBM emails show that Dermot Murray, Len Fleischmann, Michelle Adams, and others were concerned about creating "maximum leverage" by leading IRS out of contract, and about coercing IRS into a new "large [] deal," Michelle Adams of IBM told Patricia Hoover, Adam Kravitz, Greg Rosenman, and others with the IRS that a friendly baseline audit would be a mutually beneficial way to determine which licenses the IRS was actually using and how many it was using, so that the IRS could make an informed decision about how many licenses to purchase in a new deal and otherwise realize savings.

67.     In other words, despite the fact that IBM believed that an audit would conclude that the IRS was over using its licenses and owed compliance penalties to IBM and thereby create leverage for IBM, IBM falsely pitched the idea of an audit to the IRS as a means for the IRS to realize savings.

68.     Convinced by IBM's materially false and misleading statements, the IRS agreed to the audit.  The IRS then declined the option year that would have run through September 2013, in favor of a three-month "bridge" ending in December 2012.  Internal IBM emails show that IBM resisted the IRS's efforts for additional time because IBM wanted to "get action out of [IRS]" by the end of 2012.

69.     At the time, the cost for the 2012-2013 option year would have been approximately $30.5 million. Later, when it became clear to the IRS that it was not going to be realizing savings, and the IRS was out of contract, Patricia Hoover and others with the IRS sought to reinstate the option year on the Existing Enterprise License while the IRS continued the process of migrating to other software.  IBM discouraged this, and ultimately quoted the IRS the drastically inflated out-of-contract price of $147 million for one year.

70.     IBM knew that, by convincing the IRS not to exercise its option year and then agreeing to a bridge that would expire in December 2012 and no later, it was forcing the IRS into an extremely precarious position, and had effectively put the IRS's back flat against the wall. With tax season just around the corner, there was no time for the IRS to migrate software, and a lack of contract would mean that the IRS would have to purchase what products it did need at incredibly inflated out-of-contract prices, at the taxpayer's expense.  IBM's actions left the IRS with no option but to do a new deal with IBM, under immense time pressure and the threat of substantial compliance penalties—just as IBM intended it.  As a result of IBM's manipulation—including the false promise of cost savings through a right-sized contract, the hammer of false compliance penalty numbers, and the impending expiration of the limited contract bridge—the IRS had been manipulated into a desperate situation.

**E.      The Initial Audit Findings**

71.     During the summer of 2012, IBM had the accounting firm Deloitte perform an audit of the IRS's usage of IBM licenses. This audit pertained to IBM software brands under the Existing Enterprise License.

72.     Deloitte shared its initial findings with IBM in August 2012. Those initial findings concluded that the IRS was overusing certain Websphere licenses, and owed approximately $500,000 in penalties, but was otherwise in compliance.

73.     Deloitte's initial findings were not what IBM had been expecting.

74.     As stated by IBM employees in response to the initial findings:

> IBM Employee 1: "the numbers are at the moment in Websphere at the approx $500K that Chad [McClure of Deloitte] mentioned last week. [A]nd that's it."
> IBM Employee 2: "[T]his whole review has me stumped! Hard to believe they are this clean!!"
> IBM Employee 1: "[S]eriously"

> IBM Employee 2: "[I]t's really unbelievable"
> IBM Employee 1: "[A]greed"
> IBM Employee 2: "Deloitte has never seen anything like this before with
> an enterprise this large."

75.     IBM never provided the IRS with these initial findings and the IRS was never

made aware of them.

**F.     IBM's Fraudulent Manipulation of the Audit Findings**

76.     IBM was unhappy with Deloitte's initial findings because the relatively small

compliance penalty it found was not nearly large enough to leverage the IRS into a new deal.

77.     Accordingly, over the next few months, IBM repeatedly manipulated the audit

assumptions to artificially inflate the amount of the compliance penalty. As set forth below, these

manipulations were made at IBM's management's request, were not intended to improve the

accuracy of the audit, and were solely intended to increase the amount of the penalty. These

manipulations involved making audit assumptions that were either without basis or were

impossible. As IBM's management described it, the process was intended to do one thing: create

a "credible story around the deployed licenses" that IBM could sell to the IRS. At all relevant

times, IBM knew that these assumptions were false and IBM was not searching for the truth.

78.     One fraudulent manipulation IBM adopted to create the audit results ultimately

presented to the IRS as being true involved improperly calculating the compliance penalty based

on software installations rather than software usage for licenses that were not installation-based.

79.     A number of the Rational licenses owned by the IRS under the Existing

Enterprise License were "floating user licenses." These licenses could be installed on any

number of machines but for each license owned, only one user could use the license at any given

time. As explained on IBM's own website:

> An IBM Rational Floating license is a license for a single software product that
> can be shared among multiple team members; however, **the total number of**

**concurrent users cannot exceed the number of Floating licenses you purchase**. For example, if you purchased one Floating license for an IBM Rational product, then any user in your organization may use the product at any given time. Any other person who wants to access the product must wait until the original user logs off.

*Selecting the correct IBM Rational software product license*, IBM, available at: http://www-01.ibm.com/software/rational/howtobuy/licensing/ (last accessed June 7, 2018) (emphasis supplied).

80.    That is why, when conducting the audit, Deloitte obtained data on the number of concurrent users for the Rational products that were floating user licenses. That data showed that the IRS was not exceeding its allotted number of concurrent users on the Rational products and, with respect to most of the Rational licenses, the IRS was not using them at all. This information was concealed in a hidden column of the audit spreadsheet prepared by Deloitte and was not disclosed to the IRS. A hidden column in an Excel spreadsheet is not visible unless the viewer knows to look for it and can manually expand the spreadsheet columns. Upon information and belief, the Excel version of the spreadsheet, in which the hidden column could be accessed, was never provided to the IRS. Audit results were provided to the IRS in other formats in which the hidden column could not be accessed.

81.    Given that the IRS was not using the licenses, IBM realized that it would not be able to fabricate a meaningful compliance penalty if it relied upon usage. As one IBM employee stated, "We need to reach agreement [on] compliance strategy for something other then [sic] usage-based."  Again, IBM was not searching for the truth, but a way to manipulate results to its own benefit, and the Government's disadvantage.

82.    Tellingly, when an IBM employee later reached out to a Rational brand salesperson for guidance on which metric was appropriate, he received the following admonition

from Murray, strongly suggesting that IBM was interested in convincing the IRS that it owed

compliance penalties above all else:

> We do not need to ask permission from a brand on a compliance situation. . . . We
> need one thing from the Rational Team and one thing only and so far I have not
> seen it.
> 1) A credible story around deployment at the GV value for the compliance
> products in the report that makes sense when you talk about it – Adam [Kravitz at
> IRS] has his story which leads to $0 and we do not have our story. **When will we
> have our credible story around the deployed licenses**.

(Emphasis added).

83.     Another fraudulent manipulation, which was also adopted for the audit results that

were ultimately provided to the IRS as true, was to assume that licenses located on servers that

had been discontinued and replaced were constantly in use. The nature of this assumption was

described by Ann Marie Somerville, IBM's Brand Manager for Rational software, as follows:

> I spoke to the rational guy who was involved in the NY [name intentionally
> deleted] bank in 2009 he is no longer with rational but can assist us with
> messaging. my notes from the call i had with him. Two cases where rational
> compliance becomes an issue. 1) **replacing the license server, but not
> deactivating the old licenses from the old server** . Keeping the server active on
> the network with licenses running. 2) – the license file – customers upload the
> license file – but repeating the upload process – doubling the amount of licenses .
> (this happens more than we think!) NY [name intentionally deleted] bank – had
> both issues. Initially they said no way – and slammed the door in the Rational
> teams face. I spoke to the Rational guy who was involved with that - - **the key
> message is – it is up to the customer to prove that those licenses were never
> touched.. That our stance is – the extra licenses were out there and available
> – prove to us they were never used** and be very clear this is a compliance issue.
> **It is tough for customers to prove the usage or non-usage.** [Bank] did settle.

(Emphasis supplied, errors in original).

84.     Upon information and belief, the IRS was never informed that licenses on

discontinued servers were being counted against them in the audit. In an internal IBM

communication discussing basing the compliance penalties on this assumption, Somerville

expressly instructed her colleagues, "Do not share this with IRS."

85.     Worse, IBM knew that any licenses on discontinued servers were not being used. As stated later in a June 2013 meeting recounting the deal: "Compliance audit drove a large part of the ELA. These were licenses that were installed on License Servers and therefore deployed, but **there were no users**. . . . **The Servers were discontinued by the customer, so these licenses will never be used**." (Emphasis added).

86.     Early manipulations of the audit produced the false conclusion that the IRS owed approximately $3.8 million in compliance penalties. By September 2012, the audit had been fraudulently manipulated to conclude that the IRS owed approximately $18.9 million in compliance penalties, nearly 3800% more than what Deloitte had initially and concluded was owed.

87.     On or about September 18, 2012, IBM had its agent Deloitte present the audit results to Kravitz at IRS showing only the number of overdeployed licenses, not the dollar value of the associated compliance penalties so that they could come to agreement on baseline findings.

88.     Kravitz rejected the audit findings because, in his words, "IBM cannot substantiate that the IRS is out of compliance."

89.     When Deloitte did not defend the artificially-inflated audit results vigorously enough, IBM made clear to Deloitte that it was to act as IBM instructed. Several IBM employees communicated internally that Deloitte would need to get "in line with the compliance team" and that they would "put [D]eloitte in their place."

90.     Over the next two months, IBM continued to manipulate the audit results. In or around this time, IBM also granted the IRS a three-month extension on the Existing Enterprise License, such that the Existing Enterprise License would expire December 31, 2012, while IBM

tried to convince the IRS that it owed false and fraudulent compliance penalties in order to get the IRS to agree to a new long-term deal.

91.     During November 2012, IBM imposed materially false assumptions on the audit that IBM knew to be false, and that resulted in the audit concluding that the IRS owed $292,000,000 in compliance penalties. This number was communicated to the IRS as the amount actually owed by the IRS in compliance.

92.     Internally, Murray of IBM stated that the $292,000,000 number "is an error based on the number of developers the IRS has" and "a ridiculous number" and Fleischmann stated that he was "not comfortable representing" that number to the IRS. It was represented to the IRS anyway.

93.     In or around this time, IBM set up an "Internal Audit Team" tasked with performing a separate review of the IRS's license usage.

## G.     The Internal Audit Team

94.     Cimino learned of IBM's misconduct in large part because he was made a member of IBM's Internal Audit Team. Although the purpose of the Internal Audit Team was stated to be to validate and support Deloitte's audit findings, it was actually intended as a means for IBM to test various false assumptions in its ongoing attempts to find a "credible story" that IBM could use to convince the IRS that it owed substantial compliance penalties.

95.     The Internal Audit Team was repeatedly instructed to make false and impossible assumptions to artificially inflate the compliance penalties. Even when it did so, however, the compliance penalty was never large enough to satisfy IBM management, and accordingly, IBM never released any of the Internal Audit Team's work to the IRS.

96.     On November 13, 2012, Cimino's supervisors within IBM, including Somerville, instructed Cimino and a team of IBM employees from the Internal Audit Team (including Cruley, Kristin Davis, and Alan Maloney) to review and, ostensibly, attempt to validate Deloitte's findings with respect to the Rational brand of IBM software by determining the level of the IRS's usage and deployment of IBM Rational software under the Existing Enterprise License.

97.     Somerville provided Cimino with a copy of the portion of Deloitte's audit findings that pertained to the Rational brand of IBM software (the "Deloitte Rational Findings"). A copy of the Deloitte Rational Findings contained on an Excel spreadsheet is attached hereto as **Exhibit 1**.

98.     The Internal Audit Team was instructed by Somerville and Murray to: (1) determine the number of licenses that had been issued to the IRS under the Existing Enterprise License for the Rational brand; and (2) compare that to the number of licenses physically deployed and actually in use by the IRS for the Rational brand, in order to claim that the IRS had violated its Existing Enterprise License by overdeploying or overusing the number of permitted licenses or users of software under those licenses; (3) and to make other false and unrealistic assumptions about the software developer community and user ratios in order to create false audit results.

99.     The Internal Audit Team at IBM was instructed by Murray and Somerville to compare its findings to the Deloitte Rational Findings in an effort to validate and support the Deloitte Rational Findings.

100.    The copy of the Deloitte Rational Findings that Somerville provided on November 13, 2012, to the Internal Audit Team falsely showed that the IRS was overdeployed

with respect to its use of the Rational software and related licenses by approximately $27 million.

101.    That same day, the Internal Audit Team completed their original review of the Deloitte Rational Findings and concluded that, in a best case scenario from IBM's standpoint, the IRS might be overdeployed under the Existing Enterprise License with respect to the Rational brand software by an amount less than $3 million, not the $27 million claimed in the Deloitte Rational Findings.  A copy of this initial analysis conducted by the Internal Audit Team is attached hereto as **Exhibit 2**.

102.    Cimino had the lead role in preparing this review for the Internal Audit Team.

103.    The Internal Audit Team concluded that the alleged $27 million overusage or overdeployment fee asserted in the Deloitte Rational Findings was false, fabricated, and an impossibility.

104.    The Internal Audit Team concluded that the Deloitte Rational Findings were replete with inaccuracies.  For example, the Deloitte Rational Findings allege that a particular license was attributed as having 700 users.  In reality, only three users were actually identified. *See* Exhibit 1.  This instance alone resulted in an asserted overdeployment fee of $3,938,000 presented to IRS that was false and fabricated.

105.    Cimino sent the Internal Audit Team's review to Somerville electronically on November 13, 2012.

106.    Upon receiving the Internal Audit Team's review, Somerville forwarded it to Murray.

107.    On November 13, 2012, after receiving the review completed by the Internal Audit Team, Somerville called Cimino and told him that the overdeployment numbers reached

by the Internal Audit Team were insufficient, and specifically told him that co-conspirator "Dermot [Murray] needs these numbers to be bigger." Somerville explained to Cimino that the internal review numbers needed to be artificially inflated to support the Deloitte Rational Findings and to make the renewal of the Existing Enterprise License a "more compelling deal for the IRS" due to the overdeployment fees that would be charged to the IRS by IBM if the IRS did not renew its licenses.

108.     IBM and specifically Somerville and Murray directed Cimino to falsely and artificially inflate the Internal Audit Team review so that it could be used to support the substantially and falsely inflated Deloitte Rational Findings. IBM and the other co-conspirators knew the Deloitte audit findings were grossly inflated. The co-conspirators intended to, and did, use the false Deloitte findings as leverage against the IRS in the Existing Enterprise License renewal negotiations and to induce the IRS to sign the new License.

109.     Somerville told Cimino on November 13, 2012, to falsify the Internal Audit Team's review findings so that they showed a severe penalty and fee to the IRS for overdeployment of the Rational software to help convince the IRS that it should renew its Existing Enterprise License instead of paying an exorbitant and false overdeployment fee.

110.     Somerville, at the direction of Murray, told Cimino on November 13, 2012, that he should envision and apply unrealistic and impossible hypothetical scenarios in revising the Internal Audit Team findings. For instance, she said the team should assume that every license was being used *simultaneously* by numerous individuals at the IRS, whether or not they were even responsible for software development at the IRS (the user-base within the IRS that would have used the Rational brand software). Somerville and Murray knew that such a scenario was not only incredibly implausible—because IRS employees who did not develop software had no

reason to use the product—and unsupported by any basis in fact, they also knew that such a scenario should not be able to exist in reality because, as a technical matter, each floating user license is supposed to be limited to only one user at a time by the IBM license server.  Thus, Somerville and Murray were instructing Cimino to incorporate assumptions into the Internal Audit Team's review that were physically impossible in order to further their scheme of defrauding and misleading the IRS.

111.    Additionally, Somerville, at the direction of Murray, specifically instructed Cimino to inflate the numbers of the Internal Audit Team's internal review to the point where all 4,500 software developers employed by or contracted to the IRS were contrived to use the Rational brand software simultaneously, thereby creating a substantial, but fictitious, and hypothetical overusage and overdeployment scenario that had no basis in reality and that IBM knew to be false.  Somerville and Murray did this in furtherance of their scheme to defraud and mislead the IRS.

112.    Somerville, Murray, and IBM gave Cimino these instructions knowing they had no basis in reality, and otherwise represented impossible scenarios, in order to artificially inflate the overusage or overdeployment fee that IBM asserted against the IRS in software renewal negotiations with respect to the Existing Enterprise License, and to support the false Deloitte Rational Findings.

113.    Cimino resisted these instructions by stating that they presented an unrealistic scenario and that it was impossible that the IRS could have used and deployed so many licenses for Rational software, in part because its software development community was not as large as what Somerville and IBM had instructed him to assume.  In addition, Cimino had been provided actual usage numbers by the IRS itself which were vastly lower than any of the numbers that

Somerville and IBM had instructed him to use.  Somerville and IBM were aware that the IRS had provided Cimino with vastly lower actual usage numbers.  Somerville's and IBM's instructions were dramatically inconsistent with the Internal Audit Team's own findings of very modest overdeployment, if any.

114.    Co-conspirators Somerville and Murray, still not satisfied with the Internal Audit Team's review results, instructed Cimino to increase the size of the software developer community at the IRS beyond the size that the IRS had reported even existed within the agency. In this manner, Somerville and Murray were violating what IBM knew and understood to be true in reality to further support the fabricated and fraudulent information that they presented to the IRS in order to sell the IRS the new software License.

115.    Cimino resisted the instructions of Somerville and Murray because they represented impossible scenarios, were not based in reality, were inconsistent with the Internal Audit Team's review, and because Cimino realized that Murray and Somerville were engaged in intentionally deceitful and fraudulent conduct directed at the IRS.

116.    Upon direction of Somerville and Murray, however, Cimino ultimately created another Excel spreadsheet that showed a potential overdeployment of Rational brand software at a cost of approximately $9.3 million to the IRS, based on the instructions he had been given by Somerville, Murray, and IBM.  *See* **Exhibit 3.**

117.    Somerville told Cimino that Murray said the number was still far too low.

118.    Ultimately, these review findings prepared by Cimino and the Internal Audit Team were insufficient to create bargaining leverage over the IRS in connection with negotiation of the License.  Because the internal audits did not support the false Deloitte Rational Findings or the false overall Deloitte audit findings, the Internal Review Team's numbers – i.e. the team

created by IBM to identify the actual usage by IRS -- were suppressed and hidden from the IRS in furtherance of IBM's plan to defraud the agency.  Only the unsupported, unsubstantiated, materially false and fraudulently manipulated Deloitte audit findings were used by IBM to induce the IRS to renew the License agreement.

## H.    Closing the Deal

119.    By imposing false assumptions, as described above, IBM manipulated Deloitte's audit results to falsely and fraudulently conclude that the IRS owed at least $67,880,189 in compliance penalties on Rational brand licenses and $22,206,017.78 on licenses for other products (the "Deloitte Findings").

120.    The false compliance penalties in the Deloitte Findings included both licenses that the IRS allegedly over-used and technical support and maintenance for the allegedly over-used licenses. The latter is referred to as retroactive subscription and support or Retro-S&S. It is termed "retroactive" because it is support covering a period that has already occurred.

121.    IBM presented the false and fraudulent compliance penalties in the Deloitte Findings to the IRS as being actually owed to IBM. Specifically, IBM presented them to Kravitz, on or about November 29, 2012, as set forth in a PowerPoint presentation titled "IRS/IBM ELA Review Meeting" (misdated on its cover as November 29, 2011).

122.    Kravitz rejected the Deloitte Findings.

123.    Undeterred, IBM waited until Kravitz was on vacation to approach others at the IRS whom IBM thought would be less knowledgeable about the audit and more likely to accept IBM's false representations. As stated by one IBM employee, "Adam is out all next week and this is a good time to keep the pressure on."

124.    On December 11, 2012, while Kravitz was out of the office, Deloitte met with Jim McGrane, Patricia Hoover, and others of the IRS to review the audit findings at IBM's instruction, and as IBM's agent.  IBM, concerned about what Deloitte would present to the IRS, prepared Deloitte in advance.  During the meeting, Deloitte's Chad McClure made a PowerPoint presentation titled "IBM Software Effective License Position Summary for the Internal Revenue Service."   In that presentation, Deloitte fraudulently represented to the IRS that its audit had uncovered instances of "overutilization," as distinct from overdeployment.   Deloitte's presentation included a chart listing certain software products it claimed had been "overutiliz[ed]" by the IRS.   The hidden column in Deloitte's audit results spreadsheet—which was concealed from the IRS—showed that, in reality, there was minimal to no usage of these products by the IRS.

125.    A week later, IBM itself met with McGrane, then the IRS's deputy-CIO and head of software acquisitions.  On December 19, 2012, IBM employees Mark Gruzin (Vice President of IBM's U.S. Federal Software group), Murray, and others presented the Deloitte Findings to McGrane at the IRS's headquarters in Washington, D.C. At this meeting, IBM fraudulently used the materially false Deloitte Findings to induce the IRS to sign the new License.

126.    Mark Gruzin, Dermot Murray, and others from IBM deceitfully and fraudulently explained to Jim McGrane of the IRS at this meeting that if the IRS declined to enter into the License, the IRS would owe an approximately $91 million penalty, and said that IBM had already retained lawyers to sue the IRS for the money.  Gruzin, Murray, and others from IBM told McGrane that if the IRS entered into the new License, however, IBM would waive the compliance penalties and the IRS would not have to pay the compliance penalties, including Retro-S&S.

127.    Chris Schumm, an IBM employee, was present along with other senior employees of IBM's Federal Software sector when IBM presented the Deloitte Findings to the IRS on December 19, 2012.  During the course of his employment with IBM, Schumm was aware that the IRS was very concerned and "scared" of the false Deloitte Findings, and that those findings were a substantial factor in the IRS's decision to renew the Existing Enterprise License by entering into the new License.

128.    In 2012, IBM sold the License to the IRS under which IBM was to provide software, software licenses, and technical support to the IRS for the next five years. The License that IBM ultimately sold to the IRS covered a period of five years and cost in excess of $265,000,000.  This transaction closed on or about December 31, 2012, the day the three-month extension of the Existing Enterprise License was set to expire.

129.    The transaction between the IRS and IBM was touted within IBM as the single largest Rational brand software sale ever made by IBM.

130.    All of the License fee has been presented as a claim by IBM to the IRS, and has been paid by the IRS to IBM and was financed by IRS, meaning IRS paid not only the full contract amount, but interest thereon.  This is demonstrated in part by the attached Field Management System report of Cimino, which shows that for the compensation plan period ending December 31, 2012, IBM was paid in excess of $45,000,000 for the Rational software sale to the IRS alone.  *See* **Exhibit 4**.  The Rational software was a component of the License sold to the IRS.

131.    The IRS's decision to enter into the License was materially influenced by the Deloitte Findings, which were developed and conceived by IBM and fraudulently used to induce the IRS to enter into the new License. IBM knew the Deloitte Findings were false and fraudulent

and presented them to the IRS as true. Using the Deloitte Findings, IBM threatened to charge the IRS for fictitious and fraudulent "overdeployments" and "overusages" of IBM's software licenses to induce the IRS to renew the Existing Enterprise License by entering into the new License. These false representations were relied upon by the IRS when it agreed to enter into the License. These false representations were material to the IRS's decision to enter into the License and the IRS would not have entered into the License had it known that these representations were false.

132.    Numerous individuals within IBM were aware of the false nature of the Deloitte Findings and were aware that those findings were used to induce the IRS to enter into the new License and themselves made false and fraudulent statements to the IRS in furtherance of the scheme.  Those individuals, co-conspirators, and employees of IBM included, but are not limited to, Murray, Somerville, Gruzin, and Fleischmann.

133.    After the IRS agreed to the deal, IBM executive Fleischmann suggested internally that IBM should give the IRS some of its money back.

134.    The License cost the IRS $265,000,000. All or a substantial portion of that amount has been paid by the IRS after presentment of claims by IBM.

I.    **The Hidden Fraudulent Compliance Charges IBM Billed to the IRS**

135.    In addition to falsely asserting to the IRS that the IRS owed substantial compliance penalties to induce the IRS to enter into the License, IBM's representation to the IRS that it would waive the compliance penalties was false as well.

136.    The compliance penalties that IBM represented it would waive fell into two categories: first, the amounts that IBM asserted the IRS owed for over-using software licenses, *i.e.*, by using more licenses than the IRS had purchased; and, second, Retro-S&S, *i.e.*, the cost of

maintenance and support that the IRS would have been charged by IBM for the licenses the IRS allegedly over-used.

137.    Contrary to IBM's representations, IBM billed the IRS for the compliance penalties it said it would waive. IBM billed IRS at least $77.6 million in allegedly over-used licenses and $9.3 million in Retro-S&S.

138.    Presumably to conceal the fact that it was billing the IRS for licenses the IRS had allegedly over-used in previous years, IBM added those licenses to the bill as new, prospective licenses in the exact quantities that it had asserted the IRS owed as compliance. Likewise, IBM billed the IRS for the exact amount of support it claimed that the IRS owed in Retro-S&S, and did not have to pay for, but sold it as prospective support.

139.    For example, with respect to one license, "IBM Rational Lifecycle Package Floating User," IBM asserted that the IRS: owned 892 licenses; deployed 3,245 licenses prior to the expiration of the Existing Enterprise License in late 2012; and was, therefore, over-deployed by 2,353 licenses. In the License, IBM billed the IRS for exactly 2,353 of these licenses, with prospective S&S coverage for each license for the period from 12/31/2012 to 12/31/2013. For every subsequent year, however, the IRS purchased only 25 of that license per year.

140.    Not only was this fraudulent in that IBM had represented it would not bill the IRS for these licenses, it was also fraudulent in that the bill indicated the IRS would receive these licenses and support on a prospective basis, but such licenses and support were, upon information and belief, never actually provided to the IRS on a prospective basis as the License indicated.

141.    Notably, IBM booked this deal internally as a compliance penalty deal. As stated in an internal IBM communication: "IRS has a huge ELA that is being signed. Period revenue is

about $97mm and $74mm of compliance licenses for an overdeployment situation. **The compliance licenses are being sold to them as net new license with no retroactive S&S**." (Emphasis added).

142.   IBM's representations that it would waive the asserted compliance penalties and not bill the IRS for them if the IRS entered into the License were false, and IBM knew they were false when they were made. These false representations were relied upon by the IRS when it agreed to enter into the License. These false representations were material to the IRS's decision to enter into the License and the IRS would not have entered into the License had it known that these representations were false.

**J.    IBM Used This Deal as a Case Study for Defrauding Other Government Agencies**

143.   After defrauding the IRS, IBM began internally promoting the tactics it had used to defraud the IRS as a strategy to use more broadly.

144.   This promotion included a February 5, 2013, presentation titled "IRS ELA – IBM Lessons Learned."

145.   IBM then began to employ these tactics against other agencies of the federal government, including the United States Postal Service and the United States Customs and Border Protection Agency.

**K.    IBM Terminated its Employees Involved in the Fraud**

146.   Upon information and belief, in or about August 2016—after the Government initiated document demands in connection with this matter—IBM terminated the employment of the following individuals who were involved in using and promoting these fraudulent tactics: Murray, Gruzin, O'Leary, and Fleischmann.

147.   Upon information and belief, in connection with the terminations, IBM discontinued the use of compliance audits in the federal government sales space.

## COUNT ONE
## False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

### (Knowingly Presenting or Causing to be Presented
### a False or Fraudulent Claim)

148.    Relator re-alleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 147.

149.    Defendant IBM, through the knowing acts of one or more of its individual employees or agents, knowingly presented or caused to be presented, to officers, employees or agents of the United States Government, false or fraudulent claims in connection with its efforts to have the IRS renew the Existing Enterprise License by entering into the new License, in connection with receiving payment for the new License, and in the new License itself.

150.    Defendant IBM's statements and misrepresentations to the IRS were material to the IRS's decision to agree to enter into the new License.

151.    By virtue of the false or fraudulent claims made or caused to be made by Defendant IBM, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false or fraudulent claim presented or caused to be presented by a defendant.

## COUNT TWO
## False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

### (Making, Using, or Causing to be Made or Used
### a False Record or Statement)

152.    Relator realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 147.

153.    Defendant IBM, through the knowing acts of one or more of its individual employees or agents, knowingly made, used, or caused to be made or used, false records or

statements to get false or fraudulent claims paid or approved by the United States in connection with inducing the IRS to purchase the License that IBM sold to the IRS in 2012 and in seeking payment for this License. These false records and statements were material to the false and fraudulent claims submitted to the United States.

154.    Defendant IBM's statements and misrepresentations to the IRS were material to the IRS's decision to agree to enter into the new License.

155.    By virtue of the false or fraudulent claims made or caused to be made by the Defendant IBM, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false or fraudulent claim presented or caused to be presented by Defendant IBM.

**COUNT THREE**
**False Claims Act, 31 U.S.C. § 3729(a)(1)(C)**

**(Conspiring to Defraud the United States Government
Through False or Fraudulent Claims)**

156.    Relator realleges and incorporates herein by reference paragraphs 1 through 147.

157.    Defendant IBM knowingly and intentionally conspired, through the acts of one or more of its individual employees or agents, together with other conspirators known and unknown, including Somerville, Murray, Fleischmann, and Gruzin, to defraud the United States Government by getting false or fraudulent claims paid or approved through the knowing use of trickery, chicanery, deceit, and misrepresentation in connection with inducing the IRS to purchase the License that Defendant IBM sold to the IRS in 2012 and in seeking payment for this License. As part of this conspiracy, the conspirators presented false and fraudulent claims to the United States for payment and received payment for these claims. In addition, false records

and statements used during this conspiracy were material to the false and fraudulent claims submitted to the United States.

158.    By virtue of the Defendant IBM and the co-conspirators' conspiracy to defraud the United States Government through false or fraudulent claims, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false or fraudulent claim presented or caused to be presented by Defendant IBM.

WHEREFORE, the Relator demands and prays that judgment be entered in favor of the United States and against the Defendant IBM as follows:

A.    On Counts One, Two, and Three under the False Claims Act, as amended, for multiple of the amount of the United States' damages and civil penalties as are required by law, together with such further relief as may be just and proper;

B.    That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

C.    That Relator be awarded all costs of this action, including attorneys' fees and costs; and

D.    That Relator and the United States recover all such other legal and equitable relief as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury.

Respectfully Submitted,

_Louis E. Dolan Jr._

Louis E. Dolan, Jr. (D.C. Bar No. 442881)
David A. Vicinanzo (*pro hac vice*)
NIXON PEABODY LLP
799 9th Street, N.W., Suite 500
Washington, DC 20001
(202) 585-8000
ldolan@nixonpeabody.com
dvicinanzo@nixonpeabody.com

*Attorneys for Relator Paul A. Cimino*

## CERTIFICATE OF SERVICE

I hereby certify that on this day, July 27, 2018, a true and correct copy of the foregoing and the exhibits thereto was filed with the Court and served on the Government, in accordance with 31 U.S.C. § 3730(b), including via certified mail to the following:

> Civil Process Clerk
> United States Attorney's Office
> 555 Fourth Street, N.W.
> Washington, D.C. 20530
>
> Attorney General of the United States
> U.S. Department of Justice
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530-0001

Louis E. Dolan, Jr

39