**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel*. Paul A. Cimino<br><br>Plaintiff,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES<br>CORPORATION,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 1:13-cv-00907-APM

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
<u>IBM'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND.................................................................................. 2

    A.    The 2007 Agreement Between the IRS and IBM ............................. 2

    B.    The 2012 Agreement Between the IRS and IBM .............................. 3

    C.    Relator's Allegations ...................................................................... 4

    D.    Procedural History ......................................................................... 6

LEGAL STANDARD ........................................................................................... 7

    A.    Federal Rule of Civil Procedure 12(b)(6)...................................... 7

    B.    Federal Rule of Civil Procedure 9(b) ............................................ 8

ARGUMENT ........................................................................................................ 9

I.    RELATOR FAILS TO PLAUSIBLY PLEAD A VIOLATION OF THE
FALSE CLAIMS ACT, REQUIRING DISMISSAL OF ALL THREE
COUNTS UNDER RULE 12(b)(6)................................................................. 9

    A.    Relator Fails to Plausibly Allege that IBM Knowingly Made a
False Statement to the Government ............................................... 10

        1.    Relator Fails to Plausibly Plead that IBM Convinced the
IRS Not to Renew the Agreement ...................................... 10

        2.    Relator Fails to Plausibly Allege that IBM Made a False
Statement Via the Deloitte Independent Audit .................. 11

            a.    Contrary to Relator's Allegation that IBM "Falsely
Pitched" An Audit to the IRS, The 2007 Contract
Gave IBM the Right to Audit ................................. 11

            b.    Relator Improperly Imputes Deloitte's Audit Report
Onto IBM Without Factual Content or Support ..................... 12

                i.    The Complaint is Devoid of Any Well Pled
Allegation that Deloitte Was IBM's Agent
Rather than an Independent Auditor........................... 12

**TABLE OF CONTENTS—Continued**

Page(s)

          ii.     The Complaint is Devoid of Well Pled Allegations that IBM Controlled or Manipulated Deloitte's Audit ..................................... 13

       c.     Relator Fails to Plausibly Allege that the Independent Audit Findings were False ................................ 15

    3.     Relator Fails to Plausibly Allege IBM Made Any False Statements with Scienter .................................................... 17

  B.     Relator Fails to Plausibly Allege that Deloitte's Independent Audit Report was Material to the IRS's Decision to Enter into the 2012 Agreement ..................................................................... 18

  C.     Relator Fails to Plausibly Allege that Deloitte's Independent Audit Report And Resulting Overage Fees Induced or Caused the IRS to Enter into the 2012 Agreement .................................... 21

II.    RELATOR'S ALLEGATION THAT IBM FRAUDULENTLY BILLED THE IRS FOR "HIDDEN" COMPLIANCE CHARGES FAILS TO STATE A CLAIM UNDER RULE 12(b)(6) ........................................... 22

III.    RELATOR HAS NOT PLAUSIBLY PLED THE EXISTENCE OF A FALSE CLAIMS ACT CONSPIRACY UNDER RULE 12(b)(6) ........................... 24

IV.    ALL THREE COUNTS OF THE COMPLAINT MUST ALSO BE DISMISSED BECAUSE RELATOR FAILS TO PLEAD FRAUD WITH THE PARTICULARITY REQUIRED BY RULE 9(B) ........................................... 26

  A.     The Complaint Lacks Particularized Allegations of an FCA Violation Under the Fraud in the Inducement Theory ................................... 26

  B.     The Complaint Lacks Particularized Allegations Regarding the "Hidden" Compliance Charges that IBM Allegedly Billed to the IRS ....................................................................................... 29

  C.     The Complaint Lacks Particularized Allegations Regarding an FCA Conspiracy ..................................................................... 30

CONCLUSION ....................................................................................... 31

# TABLE OF AUTHORITIES

Page(s)

CASES:

*Abbas v. Foreign Policy Grp., LLC,*
    783 F.3d 1328 (D.C. Cir. 2015) ........................................................31

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ........................................................ 7, 13 ,14, 23

*Badwal v. Bd. of Trustees of Univ. of D.C.,*
    139 F. Supp. 3d 295 (D.D.C. 2015) ...............................................15

*Belizan v. Hershon,*
    434 F.3d 579 (D.C. Cir. 2006) .......................................................31

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ........................................................ 7, 13, 18, 25

*Boone v. MountainMade Found.,*
    684 F. Supp. 2d 1 (D.D.C. 2010) ...................................................8

*Busby v. Capital One, N.A.,*
    932 F. Supp. 2d 114 (D.D.C. 2013) ..........................................13, 18

*Chandamuri v. Georgetown Univ.,*
    274 F. Supp. 2d 71 (D.D.C. 2003) ................................................13

*D'Agostino v. ev3, Inc.,*
    845 F.3d 1 (1st Cir. 2016)..............................................................20

*Ey v. Office of Chief Admin. Officer of U.S. House of Reps.,*
    967 F. Supp. 2d 337 (D.D.C. 2013) ...............................................21

*Farah v. Esquire Magazine,*
    736 F.3d 528 (D.C. Cir. 2013).......................................................15

*In re 21st Century Holdings, Inc.,*
    591 B.R. 134 (Bankr. S.D.N.Y. 2018) ...........................................26

*Jefferson v. Collins,*
    905 F. Supp. 2d 269 (D.D.C. 2012) ...............................................12

*Kaempe v. Myers,*
    367 F.3d 958 (D.C. Cir. 2004).......................................................11

## <u>TABLE OF AUTHORITIES</u>—Continued

Page(s)

*Kolbeck v. LIT Am., Inc.*,
   923 F. Supp. 557 (S.D.N.Y.1996).........................................................................27

*Kowal v. MCI Commc'ns Corp.*,
   16 F.3d 1271 (D.C. Cir. 1994)................................................................................7

*Martin v. Arc of D.C.*,
   541 F. Supp. 2d 77 (D.D.C. 2008) ......................................................................30

*One-O-One Enters., Inc. v. Caruso*,
   668 F. Supp. 693 (D.D.C. 1987), *aff'd*, 848 F.2d 1283 (D.C. Cir. 1988) .............22

*\*Si v. Laogai Research Found.*,
   71 F. Supp. 3d 73 (D.D.C. 2014) ..............................................9-10, 18-20, 23-24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .................................................................................................3

*United States v. Comstor Corp.*,
   308 F. Supp. 3d 56 (D.D.C. 2018) .......................................................................17

*United States v. Kellogg Brown & Root Servs., Inc.*,
   800 F. Supp. 2d 143 (D.D.C. 2011) ........................................................8, 23, 26

*United States v. O'Connell*,
   890 F.2d 563 (1st Cir. 1989)................................................................................12

*United States v. Sci. App. Int'l Corp.*,
   626 F.3d 1257 (D.C. Cir. 2010) ...........................................................................17

*United States v. Toyobo Co.*,
   811 F. Supp. 2d 37 (D.D.C. 2011) ..........................................................8, 21, 25

*U.S. ex rel. Bender v. N. Am. Telecomms., Inc.*,
   686 F. Supp. 2d 46 (D.D.C. 2010) ......................................................................30

*U.S. ex rel. Conteh v. IKON Office Solutions, Inc.*,
   103 F. Supp. 3d 59 (D.D.C. 2015) .......................................................................25

*U.S. ex rel. Davis v. D.C.*,
   591 F. Supp. 2d 30 (D.D.C. 2008) ..................................................................29, 30

*U.S. ex. rel. Digital Healthcare, Inc. v. Affiliated Comput. Servs., Inc.*,
   778 F. Supp. 2d 37 (D.D.C. 2011) ......................................................................30

## TABLE OF AUTHORITIES—Continued

Page(s)

*U.S. ex rel. Folliard v. Hewlett-Packard Co.*,
    272 F.R.D. 31 (D.D.C. 2011)................................................................27

*\*U.S. ex rel. Head v. Kane Co.*,
    798 F. Supp. 2d 186 (D.D.C. 2011) ........................................... 7, 18, 24

*U.S. ex rel. Hutchins v. DynCorp, Int'l, Inc.*,
    342 F. Supp. 3d 32 (D.D.C. 2018) ...................................................11

*U.S. ex rel. Joseph v. Cannon*,
    642 F.2d 1373 (D.C. Cir. 1981) ......................................................8

*\*U.S. ex rel. Keaveney v. SRA Int'l, Inc.*,
    219 F. Supp. 3d 129 (D.D.C. 2016) ...................................... 11, 13, 21

*U.S. ex rel. Landis v. Tailwind Sports Corp.*,
    51 F. Supp. 3d 9 (D.D.C. 2014)...................................................... 17, 31

*\*U.S. ex rel. Lott v. Not-For-Profit Hosp. Corp.*,
    296 F. Supp. 3d 143 (D.D.C. 2017) ..................................................27

*U.S. ex rel. McBride v. Halliburton Co.*,
    848 F.3d 1027 (D.C. Cir. 2017) .......................................................20

*U.S. ex rel. McCready v. Columbia/HCA Healthcare Corp.*,
    251 F. Supp. 2d 114 (D.D.C. 2003) .................................................12

*U.S. ex rel. Purcell v. MWI Corp*,
    209 F.R.D. 21 (D.D.C. 2002).............................................................7

*U.S. ex rel. Sansbury v. LB & B Assocs., Inc.*,
    58 F. Supp. 3d 37 (D.D.C. 2014) ...................................................25

*U.S. ex rel. Scollick v. Narula*,
    No. 14-cv-01339-RCL, 2017 WL 3268857 (D.D.C. July 31, 2017) .....................27

*U.S. ex rel. Thomas v. Siemens AG*,
    991 F. Supp. 2d 540 (E.D. Pa. 2014)................................................21

*\*U.S. ex rel. Totten v. Bombardier Corp.*,
    286 F.3d 542 (D.C. Cir. 2002) .....................................................8, 29

*U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.*,
    685 F. Supp. 2d 129 (D.D.C. 2010) ..................................................24

<u>TABLE OF AUTHORITIES</u>—Continued

Page(s)

*U.S. ex rel. Westrick v. Second Chance Body Armor*,
　266 F. Supp. 3d 110 (D.D.C. 2017) ................................................................9, 21

*U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*,
　389 F.3d 1251 (D.C. Cir. 2004).............................................................8, 28-29

*U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
　525 F.3d 370 (4th Cir. 2008) ....................................................................8

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
　136 S. Ct. 1989 (2016) ...................................................................9, 17-20

*Warren v. District of Columbia*,
　353 F.3d 36 (D.C. Cir. 2004)........................................................................7

*Whittington v. United States*,
　867 F. Supp. 2d 102 (D.D.C. 2012) ................................................................10

S<small>TATUTES</small>:

*31 U.S.C. § 3729(a)(1)(A)...............................................................................6, 23

*31 U.S.C. § 3729(a)(1)(B)...................................................................................6

*31 U.S.C. § 3729(a)(1)(C)...............................................................................6, 24

*31 U.S.C. § 3729(b)(1)(A)...............................................................................17

R<small>ULES</small>:

*Fed. R. Civ. P. 8(a)(2) ....................................................................................7

*Fed. R. Civ. P. 9(b) .........................................................................8, 26-27, 29-31

*Fed. R. Civ. P. 12(b)(6) ....................................2, 7, 9, 12-13, 15, 18, 22, 24, 29-30

O<small>THER</small> A<small>UTHORITIES</small>:

Deloitte, Government & Public Services,
　https://www2.deloitte.com/us/en/industries/government-public-
　services.html?icid=top_government-public-services (last accessed Jan. 7,
　2018)................................................................................................................5

Federal Business Opportunities, CADE 2 Short Term Integration services and
　support, *available at*

**TABLE OF AUTHORITIES—Continued**

Page(s)

https://www.fbo.gov/index.php?s=opportunity&mode=form&id=60cdbc5e9e0
04cf0d8ae5e314d97a3c0&tab=core&tabmode=list&= (stating that Deloitte
Consulting LLP was awarded a $5.3 million contract from the Office of
Procurement for the IRS on June 1, 2013) ............................................................5

## INTRODUCTION

This declined False Claims Act action hinges entirely on the misguided notion that the Internal Revenue Service ("IRS") was so intimidated by audit results that it succumbed to a contract it did not want. Relator alleges that IBM fraudulently induced the IRS to agree to a new, several hundred million dollar, multi-year contract, for supposedly unwanted, unneeded software (that the IRS nonetheless had been using for years and continues to use), by somehow manipulating independent audit results prepared by a Big Four accounting firm—audit results that the IRS rejected. Relator's illogical allegations betray a fundamental misunderstanding of the contracts at issue and the sophistication of the parties involved. There was neither fraud nor inducement here; there were simply two parties performing under an old contract, and then negotiating a new one.

In 2007, the IRS entered into a five-year software licensing agreement with IBM. Toward the end of the contract, IBM exercised its right under the contract to engage an independent third party, Deloitte, to audit the IRS's compliance with the terms of the agreement. The audit found that the IRS owed IBM overage fees. The IRS rejected the audit's findings. The IRS and IBM then engaged in contract negotiations, which resulted in a new five-year agreement that was similar to the prior one. The 2012 agreement ran its course and was extended into 2018.

Relator nonetheless brings this False Claims Act ("FCA") case under what he calls a "fraud in the inducement" theory. All three counts of the Amended Complaint ("Complaint" or "Am. Compl.") rely on this "fraud in the inducement" theory, and all three counts fail to state a claim for at least four reasons.

*First*, Relator fails to plead that IBM made a false or fraudulent statement.  Relator instead alleges that *Deloitte*'s audit report was knowingly false or fraudulent.  But Deloitte is not IBM.  Relator does not plead any facts supporting his assertion that Deloitte was acting as IBM's "agent" or otherwise under IBM's control in preparing the audit report.  And if that were not enough, Relator does not even plausibly plead that Deloitte's audit report was false.

*Second*, the audit report could not have been material to the IRS's decision to enter into its contract with IBM.  The IRS *rejected* Deloitte's audit report, finding its conclusions unfounded.  Audit statements the IRS did not accept could not have been material to, much less induced, its later decision to enter into its software agreement with IBM.

*Third*, Relator fails to plausibly allege an FCA conspiracy claim.  All of Relator's conspiracy allegations involve IBM, and a corporation cannot conspire with its employees.

*Finally*, the Complaint should also be dismissed under Rule 9(b).  Rule 9(b) requires that a *qui tam* relator pleads the who, what, when, where, and how of any alleged fraud.  But Relator fails to plead with particularity any circumstances of IBM's allegedly fraudulent scheme, providing another independent reason to dismiss the Complaint.

The Court should dismiss Relator's Complaint with prejudice.  He has had two chances to plead plausible claims, but has not done so.  A third bite at the apple would be futile.

## FACTUAL BACKGROUND

### A.  The 2007 Agreement Between the IRS and IBM

In 2007, the IRS entered into an agreement with IBM—which Relator refers to as the "Existing Enterprise License"—that permitted the IRS to install numerous different types of IBM software on the IRS's computers for specified fees.  Am. Compl.  ¶¶ 13, 38; *see also* Exhibit

("Ex.") 1[1] at 17-18, 22-30.  The agreement lasted initially for one year, but the IRS had the

option to renew it for each of the next five years.  Am. Compl.  ¶¶ 13, 48-49; Ex. 1 at 1, 19.  IBM

and the IRS amended the agreement to allow the IRS to extend the agreement through September

2013.  Am. Compl. ¶ 49.

Under the 2007 agreement, the IRS had the right to terminate all or part of the agreement

"for its sole convenience" at any time.  Ex. 1 at 7.  IBM, in turn, had the right to audit the IRS's

"compliance with this [agreement] . . . for whatever purpose."  *Id.* at 18.  IBM could use an

independent auditor to conduct the audit, and only had to give the IRS reasonable notice of the

audit.  *Id.*  If an audit found that the IRS had installed or deployed more licenses than it was

paying for, an overage fee would apply.  *Id.* at 36.[2]

 The IRS exercised its annual renewal options through 2012, but opted not to extend its

renewal option through 2013.  Am. Compl.  ¶¶ 49, 68.  Instead, the IRS decided to negotiate a

new licensing agreement, which the parties executed on December 27, 2012.  *See id.* ¶ 128; Ex.

2[3] at 172.

## B.  The 2012 Agreement Between the IRS and IBM

The 2012 agreement was very similar to the 2007 agreement.  It also permitted the IRS to

use numerous different types of IBM software on the IRS's computers for a specified fee

---

[1]     Although it was not appended to the Complaint, Relator refers to the "Existing Enterprise License" throughout the Complaint, and it is integral to his claims.  "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  The 2007 contract (between the IRS and IBM via its contractor Presidio) is therefore attached as Exhibit 1.

[2]     Although Relator refers to a "compliance penalty" in the Complaint, the contract states that "[t]here is no penalty associated with the overage payment." Ex. 1 at 36-37.

[3]     The 2012 agreement was executed by the IRS and IBM (through its business partner, Signet Computers, Inc. (later Strong Castle, Inc.)).  Although it was not appended to the Complaint, it is the very agreement Relator alleges was procured by fraud.  It is integral to his claims and is therefore attached as Exhibit 2 for the same reasons as Exhibit 1.

schedule.  Ex. 2 at 8-10.  The 2012 agreement was also for one year, but granted the IRS the option to renew it annually for four more years.  *Id.* at 9.

The 2007 and 2012 agreements differ in two notable ways.  First, the IRS no longer had the unconditional right to terminate all or part of the agreement for no reason.  Second, IBM no longer had the unconditional right to audit the IRS's compliance with the contract.  *See, e.g.,* Ex. 2 at 184, 200.  The IRS exercised each of its renewal options, including an additional extension into 2018.  *See* Ex. 2 at 207; Am. Compl. ¶ 134.

### C.   Relator's Allegations

Relator alleges that by 2011, the IRS supposedly no longer wanted to use IBM software. *Id.* ¶ 12.  Relator alleges that in 2012, IBM concocted a two-part scheme to convince the IRS to decline to exercise its renewal option for 2013 under the existing contract and exercise IBM's contractual right to have an independent compliance audit performed.  *Id.* ¶ 59.

The first part of IBM's supposed scheme hinged on IBM "convincing the IRS to forego the upcoming option year on the Existing Enterprise License" to "provide[] the maximum leverage" for negotiating a new contract.  *Id.* ¶¶ 59, 61.  Confusingly, Relator alleges that "the IRS was not interested in renewing" the agreement, but that one part of IBM's two-part fraud scheme was to "convince" the IRS not to renew the agreement.  *Id.* ¶¶ 56, 59.

The second part of IBM's alleged scheme was to "coerc[e] IRS into a new" agreement by "falsely pitch[ing] the idea of" an audit.  *Id.* ¶¶ 66-67.  Relator claims that the IRS was "[c]onvinced" and "agreed to the audit."  *Id.* ¶ 68.  But IBM did not have to "pitch" an audit or "convince" the IRS to be audited.  IBM had the unilateral right to audit after giving reasonable notice.  Ex. 1 at 18.

Relator then alleges that although Deloitte was hired to be "an independent auditor, [it] did not operate independently," and instead acted as IBM's agent to conduct an audit that IBM "controlled."  Am. Compl. ¶¶ 18, 60.  Notably, the Complaint does not explain why or how Deloitte, a reputable accounting firm that is regularly engaged by the federal government, including by the IRS,[4] gave up its independence as an auditor to act as IBM's agent.

Relator nevertheless alleges that IBM "manipulated the audit assumptions" by citing a series of alleged internal IBM opinions about the audit.  Am. Compl.  ¶¶ 77-83.  But Relator never alleges that these IBM employees' purported opinions were ever communicated to Deloitte or that they impacted the audit report Deloitte presented to the IRS.  Nor does Relator allege how IBM's supposed opinions—even if they were used as audit assumptions—rendered Deloitte's audit report false.

Relator alleges that in September 2012, Deloitte presented its audit report to the IRS, "showing only the number of overdeployed licenses, not the dollar value of the" resulting overage fees.  *Id.* ¶ 87.  The IRS "rejected the audit findings because, in [the IRS's] words 'IBM cannot substantiate that the IRS is out of compliance.'"  *Id.* ¶ 88.

Relator then alleges that IBM "continued to manipulate the audit results" until the overage fee added up to $292 million.  *Id.* ¶¶ 90-91.  Relator next asserts that "IBM manipulated Deloitte's audit results" to "conclude that the IRS owed at least $67,880,189 in compliance penalties on [certain] licenses and $22,206,017.78 on licenses for other products (the 'Deloitte

---

[4]      *See, e.g.*, Federal Business Opportunities, CADE 2 Short Term Integration services and support, *available at* https://www.fbo.gov/index.php?s=opportunity&mode=form&id= 60cdbc5e9e004cf0d8ae5e314d97a3c0&tab=core&tabmode=list&= (stating that Deloitte Consulting LLP was awarded a $5.3 million contract from the Office of Procurement for the IRS on June 1, 2013); *see also See* Deloitte, Government & Public Services, https://www2.deloitte.com/us/en/industries/government-public-services.html?icid=top_government-public-services (last accessed Jan. 7, 2018) (showing that Deloitte has an entire practice dedicated to Government and Public Services).

Findings').” *Id.* ¶ 119.  Deloitte presented these overage fees to the IRS in November 2012.  *Id.* ¶ 121.  And the IRS *again* rejected the audit findings.  *Id.* ¶ 122.

Relator asserts that IBM did “internal audit” work related to one of the numerous software products “to validate and support Deloitte’s audit findings.”  Am. Compl. ¶¶ 94-118.  Relator does not allege why IBM needed to “validate” an audit he claims it controlled.  *See id.* ¶¶ 87-88.  And although the internal work was allegedly done to validate and support Deloitte’s findings, “IBM never released any of the Internal Audit Team’s work to the IRS.”  *Id.* ¶ 95.

After the November 2012 meeting in which the IRS again rejected Deloitte’s findings, *id.* ¶¶ 121-22, Relator alleges that IBM waited for an IRS employee to go on vacation, and then had Deloitte present the same audit findings to that employee’s superiors.  *Id.* ¶¶ 123-128.  IBM allegedly used Deloitte’s audit findings to “scare” the IRS into the new 2012 contract.  *Id.* ¶¶ 123-128.

### D.   Procedural History

Relator originally filed this action under seal on June 17, 2013.  ECF No. 1.  He filed the Amended Complaint over five years later, on July 27, 2018.  ECF No. 35.  The Amended Complaint asserts three causes of action under the FCA.  Count One alleges a violation of 31 U.S.C. § 3729(a)(1)(A), which imposes liability for knowingly presenting, or causing to be presented, a false or fraudulent claim for payment.  Am. Compl. ¶¶ 148-51.  Count Two alleges a violation of 31 U.S.C. § 3729(a)(1)(B), which imposes liability for knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.  *Id.*  ¶¶ 152-55.  And Count Three alleges a violation of 31 U.S.C. § 3729(a)(1)(C), which imposes liability for conspiring to commit a violation of the FCA.  *Id.* ¶¶ 156-58.

The government was on notice of all of Relator's allegations as of June 2013. The Department of Justice investigated the allegations. *See* Am. Compl. ¶ 146. Yet the IRS continued to renew its agreement with IBM year after year, even extending the agreement into 2018.

After conducting its investigation, the Department of Justice declined to intervene. ECF No. 38. The government's failure to intervene "deserves respect because the Government makes such a decision 'if, after assessing the evidence presented by relator and conducting its own preliminary investigation, it believes the action lacks merit.'" *U.S. ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 197 n.14 (D.D.C. 2011) (quoting *U.S. ex rel. Purcell v. MWI Corp,* 209 F.R.D. 21, 26 (D.D.C. 2002)). IBM now moves to dismiss.

## LEGAL STANDARD

### A.    Federal Rule of Civil Procedure 12(b)(6)

Under Rule 12(b)(6), in order to survive a motion to dismiss, a complaint must "plausibly give rise to an entitlement to relief" by pleading "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)) (internal quotation marks omitted). A facially plausible claim exists when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556). But the Court need not accept as true inferences unsupported by facts set out in the complaint or "legal conclusions cast [as] factual allegations." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994); *Warren v. District of Columbia,* 353 F.3d 36, 40 (D.C. Cir. 2004). If the Court cannot "infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is

entitled to relief," and the case should be dismissed.  *Iqbal,* 556 U.S. at 679 (internal quotation marks omitted) (citing Fed. R. Civ. P. 8(a)(2)).

### B.      Federal Rule of Civil Procedure 9(b)

FCA claims are subject to Rule 9(b)'s heightened pleading requirements.  *U.S. ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551-52 (D.C. Cir. 2002) ("Every circuit to consider the issue has held that, because the False Claims Act is self-evidently an anti-fraud statute, complaints brought under it must comply with Rule 9(b).").  The heightened standard requires that when alleging fraud, the pleader "must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Relator must therefore plead "the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud," and "identif[y] individuals allegedly involved in the fraud."  *U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004) (internal quotation marks and citation omitted).  "Put more colloquially, an FCA plaintiff must identify the 'who, what, when, where, and how of the alleged fraud.'"  *United States v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 153 (D.D.C. 2011) (quoting *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008)).

"Motions to dismiss for failure to plead fraud with sufficient particularity are evaluated in light of the overall purposes of Rule 9(b)" which include to "discourage 'suits brought solely for their nuisance value' or as 'frivolous accusations of moral turpitude[,]' and to 'protect reputations of . . . professionals from scurrilous and baseless allegations of fraud[.]'"  *United States v. Toyobo Co.*, 811 F. Supp. 2d 37, 44 (D.D.C. 2011) (quoting *U.S. ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 & n.103 (D.C. Cir. 1981)).  Failure to plead fraud with

particularity is grounds for dismissal. *See, e.g. Boone v. MountainMade Found.*, 684 F. Supp. 2d 1, 8 (D.D.C. 2010).

## ARGUMENT

**I.    RELATOR FAILS TO PLAUSIBLY PLEAD A VIOLATION OF THE FALSE CLAIMS ACT, REQUIRING DISMISSAL OF ALL THREE COUNTS UNDER RULE 12(b)(6)**

Relator's entire case relies on his specious theory that IBM fraudulently induced the IRS to enter into a contract it did not want by allegedly falsifying an independent audit it did not accept. *See* Am. Compl. ¶ 1.

To establish an FCA violation under a fraudulent inducement theory, Relator must show three things.  First, relator must plausibly allege that IBM knowingly made a false statement or representation to the government. *See Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 87 (D.D.C. 2014); *U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.*, 266 F. Supp. 3d 110, 129 (D.D.C. 2017) (requiring a "false representation" in fraudulent inducement FCA case); *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016) (requiring scienter).  Second, the Relator must plausibly plead that the "false information was material." *Westrick*, 266 F. Supp. 3d at 129 (internal quotation marks and citation omitted).  And third, the Relator must plausibly plead "that the United States was induced by, or relied on, the fraudulent statement or omission when it awarded the contract." *Id.* (internal quotation marks and citation omitted).  The fraudulent inducement theory thus "turns on the defendant's eligibility for payment by the government—had the government known about the fraud in the inducement, it never would have entered the contract, and no payments would have been made." *Si*, 71 F. Supp. 3d at 88 (internal quotation marks and citation omitted).

Relator fails to plausibly plead any of these three elements.

A.    **Relator Fails to Plausibly Allege that IBM Knowingly Made a False Statement to the Government**

Relator fails to plausibly allege that IBM made a false statement to the government, let alone that it did so knowingly.  The Complaint attempts to allege a false statement based on a purported two-part scheme to first convince the IRS not to renew its existing agreement with IBM, and second, have an independent "compliance audit" find the IRS owed money to IBM. *See* Am. Compl. ¶ 59; *see also* p. 4, *supra*.  But neither prong of this "scheme" is well pled.  *Si*, 71 F. Supp. 3d at 90-91 (dismissing fraudulent inducement FCA claims "because Relator has manifestly failed to craft a pleading that states any fraud.").

1.    **Relator Fails to Plausibly Plead that IBM Convinced the IRS Not to Renew the Agreement**

According to Relator, the first part of IBM's plan was to "convinc[e] the IRS to forego the upcoming option year on the Existing Enterprise License."  Am. Compl. ¶ 59.  But according to the Complaint, as early as 2011, the IRS did not want to renew the 2007 agreement a sixth time, preferring instead to negotiate a new agreement.  *See, e.g., id.* ¶¶ 54-56.  Thus, according to Relator, the first part of IBM's scheme consisted of trying to convince the IRS to do something that the IRS already wanted to do.  Relator's own allegations render entirely unnecessary the first part of the alleged scheme.  The Court must disregard these self-contradictory allegations.  *See Whittington v. United States*, 867 F. Supp. 2d 102, 106 (D.D.C. 2012) ("Because plaintiff has directly contradicted certain of his claims with his factual allegations, those claims must be dismissed.").  Accordingly, Relator fails to plausibly allege the first part of IBM's purported "scheme."

### 2. Relator Fails to Plausibly Allege that IBM Made a False Statement Via the Deloitte Independent Audit

The second part of IBM's scheme allegedly was convincing the IRS to submit to an independent compliance audit, which IBM believed would find that the IRS owed IBM money, which IBM could then use as leverage to drive a new deal. But, as set forth below, Relator does not plausibly allege that *Deloitte's* independent audit constitutes a false statement by *IBM*.

### a. Contrary to Relator's Allegation that IBM "Falsely Pitched" An Audit to the IRS, The 2007 Contract Gave IBM the Right to Audit

Although the Complaint is replete with assertions that IBM tricked the IRS into agreeing to an audit, Relator fundamentally misunderstands the contracts at issue, and his allegations are misguided as a result. IBM had the unilateral right to audit under the contract, and therefore did not need to resort to trickery to conduct an audit. *See* Ex. 1 at 18. The Court should therefore disregard Relator's gross mischaracterizations. *See U.S. ex rel. Keaveney v. SRA Int'l, Inc.*, 219 F. Supp. 3d 129, 144 (D.D.C. 2016) ("Relators' claim . . . is directly contradicted by the proposals themselves . . . ."); *U.S. ex rel. Hutchins v. DynCorp, Int'l, Inc.*, 342 F. Supp. 3d 32, 38 n.3 (D.D.C. 2018) ("Where allegations are contradicted by authentic writings incorporated into a complaint, the writings are credited."); *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004) ("Nor must we accept as true the complaint's factual allegations insofar as they contradict exhibits . . . . .").

**b.**     **Relator Improperly Imputes Deloitte's Audit Report Onto IBM Without Factual Content or Support**

**i.**     **The Complaint is Devoid of Any Well Pled Allegation that Deloitte Was IBM's Agent Rather than an Independent Auditor**

Relator states that the audit was conducted by independent audit firm Deloitte, but then summarily attributes the audit to IBM.  *See* Am. Compl. ¶ 71.  This is not sufficient.  Though a corporation may be liable under the FCA for the fraudulent statements of its agents (*see U.S. ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 114, 118 (D.D.C. 2003) (citing *United States v. O'Connell*, 890 F.2d 563, 569 (1st Cir. 1989)), Relator must still adequately plead an agency relationship between the parties.  "[A] plaintiff must plead facts that plausibly support an inference that an agency relationship existed in order to survive a Rule 12(b)(6) motion."  *Jefferson v. Collins*, 905 F. Supp. 2d 269, 285 (D.D.C. 2012).  Mere "conclusory allegations" do not "give rise to a reasonable inference of an agency relationship" at the motion to dismiss stage.  *Id.*

Relator fails to plead any facts to support his assertion that Deloitte acted as IBM's "agent" despite the contract identifying Deloitte's role as that of an "independent auditor."  Ex. 1 at 18; *cf.* Am. Compl. ¶¶ 18 ("IBM used Deloitte as its agent"), 87 ("IBM had its agent Deloitte present the audit results"), 124 ("Deloitte met with . . . the IRS . . . as IBM's agent.").  Relator only pleads "conclusory allegation[s]" which contain "[n]one of the indicia of an agency relationship."  *Jefferson*, 905 F. Supp. 2d at 285 (indicia of agency relationship includes evidence of the parties' consent to establish a principal-agent relationship and evidence that the activities of the agent are subject to the principal's control).  The Court should disregard these conclusory allegations.  "[A] plaintiff must furnish 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" in order to withstand a 12(b)(6) motion to

dismiss. *Busby v. Capital One, N.A.*, 932 F. Supp. 2d 114, 133 (D.D.C. 2013) (quoting *Twombly*, 550 U.S. at 555). Relator cannot simply assert an agency relationship into being.

ii.      **The Complaint is Devoid of Well Pled Allegations that IBM Controlled or Manipulated Deloitte's Audit**

Relator also pleads no facts plausibly alleging that Deloitte's audit was controlled and manipulated by IBM. To be sure, Relator repeatedly alleges that IBM "controlled" Deloitte and the audit, Am. Compl. ¶¶ 2, 60, and that Deloitte "was to act as IBM instructed," *id.* ¶ 89. But Relator pleads no facts supporting these conclusions. And Relator's conclusory allegations are directly contradicted by the contract's statement that the auditor be "independent." Ex. 1 at 18; *cf.*, *Keaveney*, 219 F. Supp. 3d at 144 (citing *Iqbal*, 556 U.S. at 677-78) (finding Relators' claims to be implausible when they were directly undermined by the source documents).

Deloitte is a highly sophisticated auditor, which itself contracts with the federal government, including the IRS. *See supra* n.4. Relator pleads no facts supporting its inference that Deloitte would jeopardize its business and reputation to become an instrument of IBM and engage in fraud for nothing in return. And without such facts, the Court should not make such an implausible leap. *See Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense").

Moreover, although Relator makes conclusory assertions that IBM "repeatedly manipulated the audit assumptions" Am. Compl. ¶ 77, and "imposed materially false assumptions on the audit," *id.* ¶ 91, these conclusions are irrelevant without the alleged facts to support them. *See Chandamuri v. Georgetown Univ.*, 274 F. Supp. 2d 71, 80-81 (D.D.C. 2003)

(refusing to accept "conclusory" inferences which are not supported by the facts in the complaint).  And Relator's conclusions do not follow from the facts he alleges.

All of Relator's allegations regarding "manipulations" come from internal communications among IBM employees.  *See* Am. Compl. ¶¶ 76-86.  Relator pleads no facts that IBM's internal musings were ever communicated to Deloitte.  As such, they cannot plausibly have impacted Deloitte's independent audit work.  To infer otherwise would require numerous logical leaps, unsupported by any facts.  *Cf. Iqbal*, 556 U.S. at 663 (the Court is only supposed to "draw [] reasonable inference[s]" from "pleaded factual content").  And even if the Court somehow inferred that IBM's alleged internal conversations reached Deloitte, there are no facts alleging that Deloitte *accepted* IBM's supposed assumptions and incorporated them into its independent audit report, which Deloitte presented to the IRS—a federal government agency well-known for its own audits.

Relator's allegations themselves undermine any notion that IBM was in control of Deloitte's audit.  On multiple occasions, Relator alleges IBM's dissatisfaction with Deloitte. *See, e.g.*, Am. Compl. ¶ 76 ("IBM was unhappy with Deloitte's initial findings"); *id.* ¶ 89 (IBM employees "communicated internally" their displeasure with Deloitte's presentation of its audit findings to the IRS).  The logical conclusion to draw from IBM's alleged dissatisfaction with the independent audit is that it was, in fact, independent.[5]

Moreover, the Complaint devotes 25 paragraphs to the work of the IBM "Internal Audit Team," *id.* ¶¶ 94-118, which Relator alleges IBM put together to "validate" Deloitte's

---

[5]    As Relator notes, the purpose of the compliance audit was to ascertain how many licenses the IRS was paying for and whether the IRS was deploying more or fewer than that number of licenses.  Am. Compl. ¶ 60.  The audit was conducted by an independent auditor.  *Id.*  To the extent Relator takes issue with the methodology employed in the audit, that is not an IBM issue.

independent audit findings.[6]  *Id.* ¶¶ 94, 96, 99.  Relator does not explain why IBM would need to validate Deloitte's findings if IBM was "manipulating" the audit in the first place.  It belies common sense.  *See Badwal v. Bd. of Trustees of Univ. of D.C.*, 139 F. Supp. 3d 295, 311 (D.D.C. 2015) ("[T]he Court cannot draw an inference that stands in direct conflict with the facts as alleged in the Complaint."); *see also Farah v. Esquire Magazine*, 736 F.3d 528, 537 (D.C. Cir. 2013) (applying common sense on a 12(b)(6) motion to dismiss).

### c.  Relator Fails to Plausibly Allege that the Independent Audit Findings were False

Relator not only fails to adequately allege that IBM controlled Deloitte or manipulated its independent audit, he does not plausibly allege that Deloitte's findings presented to the IRS were false.  That is, even if IBM's allegedly preferred assumptions made their way into Deloitte's audit, there are no facts alleged establishing that the so-called assumptions were false or led to a false audit report.  *See* Am. Compl. ¶¶ 76-93 (Complaint section entitled "IBM's Fraudulent Manipulations of the Audit Findings").

Specifically, though Relator alleges that IBM was unhappy with Deloitte's audit findings pertaining to one particular software brand—WebSphere—there are no facts alleged that IBM managed to alter or change the WebSphere portion of the audit.  *Id.* ¶¶ 71-75.  (The audit related to all of the different types of software products the IRS was licensing—WebSphere was just one.  *See id.* ¶¶ 48, 71.)  In addition, Relator alleges that IBM believed "software installations" rather than "software usage" should be counted in the audit, *id.* ¶ 78, but nowhere explains why that is not appropriate under the parties' agreement, which required the IRS to provide, "system

---

[6]  The IRS never saw this alleged internal work, so it could not have been material to the IRS, nor could it have induced the IRS to enter into the 2012 agreement.  *See* Am. Compl. ¶ 95.

information sufficient to provide auditable verification to IBM that [IRS's] installation and use of Eligible Programs is in compliance" with the agreement.  Ex. 1 at 18.

For another specific type of software license—Rational-brand floating licenses—Relator alleges (1) that certain data was hidden in a spreadsheet prepared by Deloitte, and (2) IBM stated that "we need to reach agreement [on a] compliance strategy . . . . "  Am. Compl. ¶¶ 79-81. Relator does not allege that IBM hid anything, and trying to "reach agreement" is not fraud. Further, Relator alleges that with respect to "deployed licenses," the IRS had its own "story which leads to $0" and IBM was pulling together its own "credible story."  *Id.* ¶ 82.  But there is nothing fraudulent about putting together a "credible" story.  If anything, Relator's allegations show two sophisticated parties who openly disagree—each with its own story.  *Id.*

Relator alleges that IBM believed that "licenses located on servers that had been discontinued and replaced" should be counted in the audit, and it should "be up to the customer to prove that those licenses were never touched."  *Id.* ¶ 83.  Again, Relator only cites internal IBM communications regarding this assumption, *see id.* ¶ 84, and again alleges no facts showing how it would produce a false audit to count licenses on discontinued servers unless the customer could show that those licenses were not used prior to the discontinuation.  In sum, even if the Court were to somehow make the leap that IBM's "assumptions" found their way into Deloitte's audit, there are no facts pled from which to conclude that those assumptions rendered the audit false.

Relator's entire theory of falsity relies on the misguided and unfounded notion that the IRS did not understand the audit or that Deloitte did not explain the audit's assumptions to the IRS.  Relator alleges that Deloitte met with the IRS in September 2018 "so that they could come to agreement on baseline findings" of "the number of overdeployed licenses."  *Id.* ¶ 87.  The

most plausible inference to be drawn from this is that Deloitte, an independent audit firm, would have had to explain how it counted "the number of overdeployed licenses." *Id.* Nowhere does Relator allege that Deloitte did not disclose its audit assumptions to the IRS.

In sum, there are no well pled facts suggesting that even if IBM somehow "controlled" or "manipulated" Deloitte, that the Deloitte audit findings constituted a false statement.

### 3. Relator Fails to Plausibly Allege IBM Made Any False Statements with Scienter

Relator's Complaint also falls short of the FCA's "strict" and "rigorous" scienter requirement. *See Escobar*, 136 S. Ct. at 2002. Under the FCA, "knowingly" means "actual knowledge," "deliberate ignorance of the truth or falsity of the information," or "reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). A Relator must plead sufficient facts from which the Court can infer knowledge of falsity. *United States v. Comstor Corp.*, 308 F. Supp. 3d 56, 88 (D.D.C. 2018). And the D.C. Circuit has expressly rejected the "collective knowledge" theory of corporate scienter under the FCA, where multiple employees' intents are cobbled together and attributed to the company. *See United States v. Sci. App. Int'l Corp.* ["*SAIC*"], 626 F.3d 1257, 1273-75 (D.C. Cir. 2010). But that is all Relator alleges here. Relator's allegations center around the actions of four IBM employees, but the supposed "knowledge" of these four isolated actors should not be imputed to IBM. *See, e.g., U.S. ex rel. Landis v. Tailwind Sports Corp.*, 51 F. Supp. 3d 9, 52 (D.D.C. 2014) ("[T]he Court declines to accept the theory that the FCA's scienter requirement can be established solely because an individual had a high-ranking position within the corporation that submitted an allegedly false claim.") (citing *SAIC*, 626 F.3d at 1275). For this reason, too, Relator has not satisfied the FCA's requirement that IBM has knowingly made a false statement to the IRS.

**B.     Relator Fails to Plausibly Allege that Deloitte's Independent Audit Report
        was Material to the IRS's Decision to Enter into the 2012 Agreement**

Relator's claims also fail because he does not plausibly allege that the Deloitte Findings
were material to the IRS's decision to enter into the 2012 agreement.  "[A]ll plaintiffs bringing
private actions under the FCA . . . are[] required to allege that the allegedly false claim was
material to the government's decision to make the payment at issue."  *Si*, 71 F. Supp. 3d at 86
(citing *Head*, 798 F. Supp. 2d at 194).  "[M]ateriality looks to the effect on the likely or actual
behavior of the recipient of the alleged misrepresentation."  *Escobar*, 136 S. Ct. at 2002 (internal
quotation marks and citation omitted).  The standard for materiality in an FCA case on a motion
to dismiss is a "rigorous one," *id.* at 2004 n.6., that Relator does not meet.

For starters, Relator's materiality allegations are not plausibly pled.  "[A] plaintiff must
furnish 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of
action'" in order to withstand a 12(b)(6) motion to dismiss.  *Busby*, 932 F. Supp. 2d at 133
(quoting *Twombly*, 550 U.S. at 555).  Relator asserts several times that the rejected Deloitte
findings were "materially false."  *See, e.g.*, Am. Compl. ¶¶ 60, 118, 125, 131, 142.  He also
claims that an IBM employee was somehow "aware" that the IRS was "scared" of the Deloitte
findings and that they were a "substantial factor" in the IRS's decision to enter into the 2012
agreement.  *Id.* ¶ 127.  But these conclusory allegations are both at odds with the facts—the IRS
rejected the audit—and common sense, as discussed below.

Relator claims that the "IRS's decision to enter into the [2012 agreement] was materially
influenced by the Deloitte Findings . . . ."  Am. Compl. ¶ 131.  But he also states that these very
same Deloitte Findings were "rejected" by the IRS on both of the occasions that they were
presented to it.  *Id.* ¶¶ 87-88 (IRS "rejected the audit findings" in September 2012); 121-22 (IRS
"rejected the Deloitte Findings" in November 2012).  Audit findings that were expressly rejected

and disregarded cannot possibly be material to the party rejecting them. *See Si*, 71 F. Supp. 3d at

93 ("Rule 12(b[)](6) is not satisfied because Relator fails to offer any factual basis, plausible or

otherwise, for thinking that such a misrepresentation was material to the government's funding

decision.").[7]

Even more telling, the IRS's actions *after* signing the 2012 agreement further foreclose

any possible inference of materiality. "[I]f the Government pays a particular claim in full despite

its actual knowledge that certain requirements were violated, that is very strong evidence that

those requirements are not material." *Escobar*, 136 S. Ct. at 2003. The 2012 agreement is

structured in a manner similar to its 2007 predecessor: a base year, followed by four option

years. *See supra* pp. 3-4. Relator filed this action on June 17, 2013, ECF No. 1, about six

months after the 2012 agreement went into effect. As such, the federal government was on

notice of Relator's allegations of fraud very early on during the 2012 agreement. Yet after

investigating Relator's claims, the government declined to intervene in his case. *See* ECF No.

38. Relator then filed his Amended Complaint in July 2018. ECF No. 35.

At no point in his Amended Complaint does Relator allege that the IRS terminated the

contract or declined to continue to renew the agreement during its option years. In fact, the

logical inference to be drawn from Relator's allegation that "[a]ll or a substantial portion of [the

2012 agreement] has been paid by the IRS" is that the IRS neither terminated the agreement nor

failed to renew any of its option years. Am. Compl. ¶ 134. And that inference is proven true by

---

[7]     Relator attempts to allege that IBM overcame the IRS's double rejection of the Deloitte
Findings simply by waiting until one IRS employee was on vacation and presenting the audit
results *to higher level officials* of the IRS in that one employee's absence. Am. Compl. ¶¶ 123-
25. Notably, Relator never alleges that the IRS—through *any* of its employees—accepted the
audit findings as valid or even took the audit results seriously.

the contract documents themselves, which show that the agreement continued into 2018.  Ex. 2 at 207 (extending the 2012 agreement into 2018).

This is fatal to Relator's materiality arguments.  Relator's fraudulent inducement theory "turns on the defendant's eligibility for payment by the government—had the government known about the fraud in the inducement, it never would have entered the contract, and no payments would have been made."  *Si*, 71 F. Supp. 3d at 88 (internal quotation marks and citation omitted).  But here the government "knew."  Despite being on notice of the entirety of IBM's purported "scheme" since 2013, the IRS continued to exercise option year after option year under the contract, and even extended it.  *See* Am. Compl. ¶ 127; Ex. 2.  The twice-rejected Deloitte findings could not have been material to the government's choice to renew.  *See D'Agostino v. ev3, Inc.*, 845 F.3d 1, 8 (1st Cir. 2016) (affirming dismissal of relator's claim that defendant fraudulently induced the Food and Drug Administration ("FDA") into approving their product where the FDA failed "to withdraw its approval" of the product "in the face of [Relator's] allegations"); *see also U.S. ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1034 (D.C. Cir. 2017) (finding that the government's decision not to disallow any charged costs after an investigation was "very strong evidence" that the requirements at issue were not material) (quoting *Escobar*, 136 S. Ct. at 2003).

Relator cannot plausibly allege that the alleged fraudulent scheme pertaining to the Deloitte Findings had a material impact on the IRS's decision to contract with IBM.  This is another independent basis to dismiss all three counts of the Complaint.

20

**C.**  **Relator Fails to Plausibly Allege that Deloitte's Independent Audit Report And Resulting Overage Fees Induced or Caused the IRS to Enter into the 2012 Agreement**

The Complaint should also be dismissed for the independent reason that Relator does not plausibly allege that the rejected Deloitte Findings induced the IRS into agreeing to the 2012 contract.  *See Keaveney*, 219 F. Supp. 3d at 141-42, 145 (granting motion to dismiss where relators "failed to allege how Defendants' alleged [fraud] induced the government to enter into the contract.").  "In essence, the essential element of inducement or reliance is one of causation." *See Westrick*, 266 F. Supp. 3d at 129 (quoting *U.S. ex rel. Thomas v. Siemens AG*, 991 F. Supp. 2d 540, 569 (E.D. Pa. 2014)).

Relator claims that IBM used the Deloitte Findings "as leverage against the IRS in the Existing Enterprise License renewal negotiations and to induce the IRS to sign the new License." Am. Compl. ¶ 108.  But there is nothing improper about parties coming to a negotiation table with "leverage."[8]  For all the same reasons that Relator fails to plausibly allege materiality, Relator also fails to plausibly allege inducement or causation.  *See supra* pp. 18-20.  *See Toyobo Co.*, 811 F. Supp. 2d at 48 (relator "must allege that the defendant's conduct was at least a substantial factor in causing, if not the but-for cause of, submission of false claims") (internal quotation marks and citation omitted).

Moreover, Relator's inducement premise as a whole—that IBM used the threat of $90 million in overage fees to induce a five-year, $265 million agreement that Relator claims the IRS did not want—is facially implausible.  It defies common sense that the IRS would spend money on a product that it did not want or need, because it was scared of spending much less.  *See Ey v.*

---

[8]      Indeed, the audit may have provided the IRS some leverage, as the 2012 agreement, which is otherwise very similar to the 2007 agreement, removed the audit provision. Ex. 2 at 184 ("The IRS and Treasury will not be subject to Audits of any kind which seek to validate compliance of prevailing terms and conditions.").

*Office of Chief Admin. Officer of U.S. House of Reps.*, 967 F. Supp. 2d 337, 346 (D.D.C. 2013) (dismissing complaint where the Court found that the allegations at issue "defie[d] common sense").

## II.    RELATOR'S ALLEGATION THAT IBM FRAUDULENTLY BILLED THE IRS FOR "HIDDEN" COMPLIANCE CHARGES FAILS TO STATE A CLAIM UNDER RULE 12(b)(6)

Relator alleges that, after the IRS was allegedly induced into the 2012 contract, IBM fraudulently charged the IRS for hidden fees.  *See* Am. Compl. at 32 (section I).  Because this allegation relates to supposed conduct *after* the 2012 contract was signed, it cannot be part of his fraudulent inducement claim, and it does not separately state a claim under the FCA.

*First*, Relator alleges that, despite IBM's representations that it would not bill the IRS for the alleged "compliance penalties," it did so anyway under the guise of billing the IRS for new licenses which it "concealed."  Am. Compl. ¶¶ 137-38.  Relator's misguided allegation is based on a fundamental misunderstanding of the 2012 contract.  For example, he claims that for one type of license, "IBM Rational Lifecycle Package Floating User," IBM asserted that the IRS was over-deployed by 2,353 licenses before the Existing Enterprise License expired.  *Id.* ¶ 139.  He then alleges that "IBM added those licenses to the bill as new, prospective licenses" in an effort to "conceal the fact that it was billing the IRS for licenses the IRS had allegedly over-used in previous years."  *Id.* ¶ 138.  But Schedule A to the 2012 contract clearly lists the 2,353 Rational Lifecycle Package Floating User licenses that were included in the agreement.  Ex. 2 at 21. There can be no "hidden fraudulent compliance charges" when the government was expressly made aware of what it was agreeing to and paying for before signing and entering into the 2012 agreement.  *See One-O-One Enters., Inc. v. Caruso*, 668 F. Supp. 693, 698-99 (D.D.C. 1987),

*aff'd*, 848 F.2d 1283 (D.C. Cir. 1988) (finding no fraudulent inducement where "Plaintiffs are sophisticated businesspersons who . . . had ample opportunity to read the Agreement").

*Second*, Relator suggests that IBM made a false statement when it allegedly said it would waive the overage fees. Am. Compl. ¶ 142. Similarly, Relator alleges that the IRS relied on this statement and that somehow it was "material" to the IRS's decision to enter into the 2012 agreement. *Id.* IBM's alleged statement that it would waive overage fees is only false if IBM then concealed and hid those overage fees in the 2012 agreement. But these "fees" appear in the contract. Ex. 2 at 14. Relator's assertion therefore fails for the same reason as his other— nothing was hidden. All the fees in the 2012 contract were set forth in detail and were the product of negotiations between two highly sophisticated parties. *See* Ex. 2.

*Third*, Relator alleges, based on "information and belief," that IBM "never actually provided [the software licenses] to the IRS on a prospective basis as the [2012 agreement] indicated." *See* Am. Compl. ¶ 140. In this lone sentence, Relator appears to assert that IBM submitted a factually false claim by billing for a license that it did not provide. *See Kellogg Brown & Root Serv., Inc.*, 800 F. Supp. 2d at 154 (a claim may be false for purposes of the FCA if it is factually false—if it includes "an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided.") (internal quotation marks and citation omitted). But this paltry sentence does not allege *any* facts that IBM knowingly submitted a false claim to the government, or that "the allegedly false claim was material to the government's decision to make the payment at issue." 31 U.S.C. § 3729(a)(1)(A); *Si*, 71 F. Supp. 3d at 86. "[C]onclusory statements of misconduct are not enough to make out a cause of action." *Si*, 71 F. Supp. 3d at 84 (quoting *Iqbal*, 556 U.S. at 678).

In sum, none of the allegations in section I of the Complaint—"The Hidden Fraudulent Compliance Charges Billed to the IRS"—state a claim for relief under the FCA.

## III.  RELATOR HAS NOT PLAUSIBLY PLED THE EXISTENCE OF A FALSE CLAIMS ACT CONSPIRACY UNDER RULE 12(b)(6)

In the third count of the Complaint, Relator alleges that IBM conspired "through the acts of one or more of its individual employees or agents, together with other conspirators known and unknown" to violate the FCA.  Am. Compl. ¶ 157.  31 U.S.C. § 3729(a)(1)(C) imposes liability for "conspir[ing] to commit a violation of" the FCA.  To state a claim under the FCA for conspiracy, Relator must allege "(1) that an agreement existed to have false or fraudulent claims allowed or paid to the government, (2) that each member of the conspiracy joined the agreement, and (3) that one or more conspirators knowingly committed one or more overt acts in furtherance of the object of the conspiracy."  *Si*, 71 F. Supp. 3d at 89 (internal quotation marks and citation omitted).

Of course, an FCA conspiracy claim requires an FCA violation.  "[T]here can be no liability for conspiracy where there is no underlying violation of the FCA."  *Id.*  Relator's conspiracy claim therefore fails for the simple reason that he has not plausibly pleaded a FCA violation by IBM.  *Supra* pp. 9-22.

In any event, the only supposed conspirators Relator identifies are IBM employees. Although "the FCA does not define the term 'conspiracy,'" courts "have held that general civil conspiracy principles apply to FCA conspiracy claims.'"  *Head*, 798 F. Supp. 2d at 201 (quoting *U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.*, 685 F. Supp. 2d 129, 140 (D.D.C. 2010)).  One civil conspiracy principle is the intra-corporate conspiracy doctrine, which instructs that "a corporation cannot conspire with its employees, and its employees, when acting within the scope of their employment, cannot conspire among themselves."  *Id.* (internal quotation

marks and citation omitted).  As a matter of law, IBM cannot "conspire" with its own employees

to violate the FCA.  Relator's conspiracy claim should therefore be dismissed.  *See id.* (holding

that the defendant corporation could not have conspired with two of its employees to violate the

FCA); *U.S. ex rel. Sansbury v. LB & B Assocs., Inc.*, 58 F. Supp. 3d 37, 58 (D.D.C. 2014)

(dismissing a conspiracy claim against the defendant corporation because "[t]here is no dispute

that [individual] Defendants . . . are or were employees of Defendant").

To be sure, Relator summarily alleges that IBM conspired "with other conspirators

known and unknown." Am. Compl. ¶ 157.  But no other, non-employee alleged conspirators are

identified in the Complaint and there are no well-pled allegations that any non-employees were

co-conspirators.  *Cf. id.* ¶¶ 55, 108, 157.  Notably, Deloitte is never identified as a co-conspirator.

Relator's assertion that there were unidentified non-employee co-conspirators is wholly

conclusory and does not "raise a right to relief above the speculative level."  *See Twombly*, 550

U.S. at 555.

Finally, Relator does not allege any kind of "agreement" among the alleged "co-

conspirators," nor that they "joined" such an agreement.  "[A]t the motion to dismiss stage of a

case, a plaintiff/relator must identify any agreement between the parties to defraud the

government."  *U.S. ex rel. Conteh v. IKON Office Solutions, Inc.*, 103 F. Supp. 3d 59, 68 (D.D.C.

2015) (internal quotation marks and citation omitted); *see also Toyobo Co.*, 811 F. Supp. 2d at 51

(dismissing the FCA conspiracy claim where "the complaint is devoid of factual allegations that

support the inference that Toyobo and the vest manufacturers entered into any agreements for the

purpose of getting the government to pay a claim.").  Here, Relator attempts to suggest that there

was a widespread conspiracy to defraud the IRS by pointing to internal communications among

IBM employees, including one supposed "agreement" between alleged "co-conspirators"—both

of whom were employees.  *See* Am. Compl. ¶ 61.  These are the only allegations about an agreement or any parties joining an agreement.  Relator's conspiracy count should therefore be dismissed.

## IV.    ALL THREE COUNTS OF THE COMPLAINT MUST ALSO BE DISMISSED BECAUSE RELATOR FAILS TO PLEAD FRAUD WITH THE PARTICULARITY REQUIRED BY RULE 9(B)

Rule 9(b) requires that Relator "state with particularity the circumstances constituting fraud."  Specifically, Relator "must identify the who, what, when, where, and how of the alleged fraud."  *Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d at 153 (internal quotation marks and citation omitted).  Here, Relator fails to plead the circumstances giving rise to the alleged FCA violation with the requisite particularity.  This is yet another independent reason to dismiss the Complaint.

### A.    The Complaint Lacks Particularized Allegations of an FCA Violation Under the Fraud in the Inducement Theory

Relator fails to offer any particularized facts to demonstrate *how* Deloitte's independent audit constitutes a false statement by IBM.  Relator attempts to "pin" the allegedly false Deloitte independent audit findings on IBM by summarily stating that Deloitte was IBM's "agent."  *See, e.g.,* Am. Compl. ¶¶ 18 ("IBM used Deloitte as its agent"), 87 ("IBM had its agent Deloitte present the audit results"), 124 ("Deloitte met with . . . the IRS . . . as IBM's agent.").  But as described in pp. 12-13, *supra*, there are no facts supporting this conclusory statement—and certainly no particularized allegations.  There are no facts alleged regarding *how* it came to be that Deloitte, an independent third party, agreed to act as an agent for IBM.  There are no facts alleging *who* at Deloitte agreed to act as IBM's agent, or *when* or *where*.  *See In re 21st Century Holdings, Inc.*, 591 B.R. 134, 143 (Bankr. S.D.N.Y. 2018) (finding that "mere conclusory allegations of agency should not suffice to establish an agency relationship [under Rule 9(b)],

especially where the (wrongful) scope of the agency is not apparent simply from an employee's job title."); *Kolbeck v. LIT Am., Inc.*, 923 F. Supp. 557, 570 (S.D.N.Y.1996) ("vague assertions of agency" do not pass muster on a motion to dismiss) (interpreting Rule 9(b)); *U.S. ex rel. Scollick v. Narula*, No. 14-cv-01339-RCL, 2017 WL 3268857, at *6 (D.D.C. July 31, 2017) (finding that relator failed to sufficiently allege facts showing that the alter-ego doctrine applied). In short, Relator does not come close to alleging with any degree of particularity that Deloitte acted as IBM's "agent."

Similarly, although Relator summarily states that IBM "controlled" Deloitte's audit, he nowhere explains *how* it came to be that Deloitte submitted to IBM's control. *Cf.* Am. Compl. ¶ 60. Relator does not allege *who* at IBM controlled Deloitte, or *who* at Deloitte allowed themselves to be controlled by IBM, or *when*, or *where*. Relator's conclusory statements like "IBM made clear to Deloitte that it was to act as IBM instructed," *id.* ¶ 89, and IBM "prepared Deloitte," *id.* ¶ 124, allege neither *who* spoke on IBM's behalf nor *who* from Deloitte listened, *what* they said, or *when* or *where* they said it. *U.S. ex rel. Folliard v. Hewlett-Packard Co.*, 272 F.R.D. 31, 34-35 (D.D.C. 2011) (dismissing the complaint under Rule 9(b) for failing to "plead[] . . . who made the false claims . . . and any additional details about the content of the claims").

The allegations surrounding IBM's supposed "manipulation" of the audit are similarly devoid of the required particularization. Relator generically claims that IBM "manipulated the audit assumptions," Am. Compl. ¶¶ 76-93, but nowhere does Relator allege *how* such assumptions found their way to Deloitte, or *how* they could have impacted Deloitte's audit. Relator never alleges *who* from IBM shared *what* assumptions with *whom* at Deloitte. *See U.S. ex rel. Lott v. Not-For-Profit Hosp. Corp.*, 296 F. Supp. 3d 143, 151 (D.D.C. 2017) (Mehta, J.) (dismissing an FCA complaint on Rule 9(b) grounds when it did not "identify who precisely was

involved in the fraudulent activity and their roles in the fraudulent scheme") (internal quotation marks and citation omitted).

Relator further fails to allege any facts regarding *how* such assumptions—even if they reached Deloitte—allegedly falsified Deloitte's audit results.  Relator throws around numerous dollar amounts:  $3.8 million, $18.9 million, $292 million, then $91 million, *see* Am. Compl. ¶¶ 86, 92, 119, but never explains *what* caused these figures to change, *who* changed them, *how*, and *where* these changes took place.

Significantly, the Complaint contains no particularized facts showing that the Deloitte audit findings that were presented to the IRS were false.  Though Relator quibbles with some alleged IBM assumptions, *see supra* pp. 15-17, he never alleges *who* at IBM communicated the assumptions to Deloitte, *who* at Deloitte agreed to use those assumptions in the audit, or *what* effect the assumptions had on the audit.  He notably never alleges *who* at Deloitte agreed not to tell the IRS about these assumptions, *what* Deloitte did tell the IRS about its audit assumptions, *who* at the IRS failed to question the audit assumptions—and *who* at IBM knew all of this.  In sum, Relator does not come close to alleging "the time, place and content of the false misrepresentations, the fact misrepresented" and the "individuals allegedly involved in the fraud." *Williams*, 389 F.3d at 1256 (internal quotation marks and citation omitted).

In addition, for all the reasons set forth in section I.B, pp. 18-20, *supra*, the Complaint fails to plead any particularized allegations that the twice rejected Deloitte Findings were material to the IRS's decision to enter into the 2012 agreement.  Relator does not allege *how* the IRS went from rejecting the audit twice to being "scared" by it.

Though Relator claims that an IBM employee knew the IRS was "scared" of the Deloitte Findings and that fear was a "substantial factor" in the IRS's decision to enter into the new

agreement, Am. Compl. ¶ 127, nowhere does Relator allege a factual basis for the employee's supposed knowledge of the IRS's fear, *who* from the IRS was scared, *what* he was scared of, *when* he became scared, and *how* the employee supposedly knew that the Deloitte Findings were a "substantial factor." "[I]n order to satisfy Rule 9(b), [Relator] must set forth an adequate factual basis for his allegations." *See Totten*, 286 F.3d at 552. Relator fails to do this with any degree of particularity. And finally, for all the same reasons, and the reasons set forth in section I.C, pp. 21-22, *supra*, there are no particularized allegations to show *how* the twice rejected Deloitte Findings induced or caused the IRS to enter into the 2012 agreement.

In sum, the Complaint does not contain particularized allegations of "what was retained or given up as a consequence of the fraud" and the "individuals allegedly involved . . . ." *Williams*, 389 F.3d at 1256 (internal quotation marks and citation omitted). For all of these reasons, the Complaint should be dismissed pursuant to Rule 9(b).

**B.    The Complaint Lacks Particularized Allegations Regarding the "Hidden" Compliance Charges that IBM Allegedly Billed to the IRS**

Relator's paltry allegations in section I of the Complaint—that IBM supposedly billed the IRS for "hidden" charges—not only fail to state a claim under Rule 12(b)(6), *see* section II, pp. 22-24, *supra*, but they are also not stated with particularity. Relator fails to explain *how* the compliance charges were "hidden," particularly when they appeared in plain sight in the contract, Ex. 2 at 14, 21, *who* hid them, *when* in the contracting process, or *where*. Am. Compl. ¶ 139.

Additionally, Relator's claim, based on "information and belief," that IBM "never actually provided [the software licenses] to the IRS . . .", Am. Compl. ¶ 140, is plainly insufficient under Rule 9(b). "As a general rule, pleadings made upon 'information and belief' do not satisfy Rule 9(b)'s particularity requirement." *U.S. ex rel. Davis v. D.C.*, 591 F. Supp. 2d

30, 37 (D.D.C. 2008).[9]  Just as these generalized allegations do not pass muster under Rule 12(b)(6), so too do they fail under Rule 9(b).

### C.   The Complaint Lacks Particularized Allegations Regarding an FCA Conspiracy

Relator fails to offer particularized facts alleging a conspiracy.  Other than the four IBM employees with whom IBM cannot conspire as a matter of law, *see* section III, pp. 24-26, *supra*, Relator's allegation that IBM conspired "with other conspirators known and unknown," Am. Compl. ¶ 157, is far from particularized.  "FCA cases in this circuit reveal that specificity regarding the identities of individual actors is required." *U.S. ex rel. Bender v. N. Am. Telecomms., Inc.*, 686 F. Supp. 2d 46, 53-54 (D.D.C. 2010) (internal quotation marks and citation omitted).  Relator does not specify who these "known and unknown" conspirators are. The conspiracy claim must therefore be dismissed under Rule 9(b).  *See U.S. ex. rel. Digital Healthcare, Inc. v. Affiliated Comput. Servs., Inc.*, 778 F. Supp. 2d 37, 53 (D.D.C. 2011) (noting that an FCA conspiracy claim which "fails to identify any individual" involved in the purported conspiracy does not pass muster under Rule 9(b) because "[s]uch imprecise pleading not only fails to give [defendant] sufficient information to respond to the conspiracy accusation, but also subjects [defendant]  'to vague, potentially damaging accusations of fraud,' which is precisely what Rule 9(b) seeks to avoid.").

Furthermore, Relator points to a handful of disjointed internal communications among IBM employees regarding the agreement with the IRS, but nowhere does he allege a particular

---

[9]     There is an exception in *qui tam* suits. *Id.*  "[W]hen a plaintiff is unable to meet the particularity standard because the defendant controls a relevant document, the standard for pleadings on information and belief must be construed consistent with the purposes of Rule 9(b) . . . ." *Martin v. Arc of D.C.*, 541 F. Supp. 2d 77, 83 (D.D.C. 2008).  However, "[a] relator invoking this exception must plead lack of access to necessary information in the complaint." *Davis*, 591 F. Supp. 3d at 37.  Here, Relator makes no attempt to plead lack of access to the relevant information, instead choosing to rely on blanket assertions.

"agreement" for IBM to defraud the IRS.  *See, e.g.*, Am. Compl. ¶¶ 61, 62, 66.  He does not allege the scope of such an agreement or its duration or objective—there is simply no *who*, *what*, *where*, *when* or *how*.  In order to satisfy Rule 9(b), a plaintiff must allege particularized facts that a party entered into a conspiracy.  *See Landis*, 51 F. Supp. 3d at 54 ("to satisfy Rule 9(b), the relator must be more than draw inferences of a conspiracy").

*    *    *

Relator fails to plead any of the three counts with particularity.  The Amended Complaint should be dismissed.

**CONCLUSION**

The Amended Complaint should be dismissed in its entirety with prejudice to Relator.  "Dismissal with prejudice is warranted when 'the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1340 (D.C. Cir. 2015) (quoting *Belizan v. Hershon*, 434 F.3d 579, 583 (D.C. Cir. 2006)).  More than five and a half years have passed since Relator filed his initial Complaint alleging that IBM fraudulently induced the IRS into the 2012 agreement.  The government investigated Relator's claims and declined to intervene.  There are no additional facts Relator could plead to cure his deficient claim that IBM forced the IRS into a contract for software it did not want or need on the basis of independent audit results that the IRS rejected.  This is particularly so in light of the fact that the IRS continued to remain in its contract with IBM well into 2018.  No additional allegations can change that.  Relator should not be given a third bite at the apple.

For the foregoing reasons, the Court should grant IBM's motion and dismiss the Amended Complaint in its entirety with prejudice as to Relator.

31

Dated:  February 4, 2019

Respectfully submitted,

HOGAN LOVELLS US LLP

/s/ Michele W. Sartori
Michele W. Sartori (D.C. Bar # 478772)
555 13th Street, N.W.
Washington, D.C.  20004
(202) 637-5600 (telephone)
(202) 637-5910 (facsimile)

Robert L. Toll (D.C. Bar # 1021934)
875 Third Avenue
New York, NY 10022
(212) 918-3000 (telephone)
(212) 918-3100 (facsimile)

Counsel for Defendant IBM