**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* PAUL A. CIMINO, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:13-cv-00907-APM |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | ) ) ) | |
| Defendant. | ) ) | |

**OPPOSITION OF PLAINTIFF PAUL CIMINO
TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Plaintiff-Relator Paul A. Cimino ("Relator" or "Cimino"), by and through undersigned counsel, opposes IBM's Motion to Dismiss Relator's First Amended Complaint (Docket No. 48, hereafter "Motion to Dismiss") as follows:

## INTRODUCTION

IBM's motion does not give a true impression of the gross fraud IBM perpetrated against the IRS in 2012. Concerned because the IRS—a large customer account responsible for over $23 million in revenue in 2012 alone—was migrating its software away from IBM's products and increasingly asking IBM for ways to purchase less of IBM's software and costly services, IBM resorted to drastic, fraudulent measures to force the IRS into signing a new long-term contract.

Most significantly, IBM—both directly through its employees and indirectly through its agent and co-conspirator Deloitte—falsely asserted to the IRS that the IRS owed $91 million in software compliance penalties (*i.e.*, penalties for allegedly using software beyond what the purchased software licenses permitted) and threatened to sue to recover that money. IBM promised it would waive the penalties, however, if the IRS agreed to enter into a new long-term contract—

thus forcing the IRS to either enter into a contract it did not want or need, or pay a significant and material compliance penalty. IBM fabricated the asserted compliance penalties by making false assumptions about the IRS's use of IBM software licenses, which IBM knew were false and which led to the inevitable, false conclusion that the licenses were being overused when they were not. IBM's internal communications show IBM knew the assumptions and the compliance penalties they generated and presented to the IRS were false. Yet IBM persisted because it knew this was the only way to see significant software license revenue at the end of its critical year-end financial reporting period.

When one IRS employee rejected the false compliance penalties IBM asserted, IBM waited for him to go on vacation and presented the compliance penalties to his supervisor, Jim McGrane. Faced with the decision to either pay IBM $91 million or enter into a new long-term deal with IBM, even if that deal included software and services the IRS did not need and would prefer to migrate away from, McGrane unsurprisingly agreed.

IBM attempts to downplay the severity of its conduct by characterizing the events as merely contract negotiations between sophisticated parties.  But these were contract negotiations riding on the back of threats of millions in fabricated penalties if they were not "successful." Fabricating and falsely representing the existence of a $91 million penalty in order to coerce a contract is not hard bargaining. It is fraud.

IBM's motion complains at length about the sufficiency of the allegations regarding IBM's control over Deloitte. But its complaints are not only illusionary—IBM has no doubt about what its instructions to Deloitte were at all times—they are of minimal significance because the false compliance penalty was not communicated to the IRS <u>only</u> by Deloitte. IBM independently, through its employees Mark Gruzin, Dermott Murray, and others, made the same false

representations Deloitte did, including telling the IRS that it owed $91 million, when it knew that was false.[1] Nevertheless, Relator can show—and has adequately alleged—that IBM directed and controlled Deloitte's audit. Numerous internal IBM communications indicate that, when IBM was displeased with Deloitte's audit, it forced Deloitte to get "in line" and "set the expectation that Deloitte will agree with our [IBM's] assessment." Those internal communications indicate that IBM's reprimands of Deloitte primarily took place over the telephone. Tellingly, not long after IBM required Deloitte to fall in line with IBM's assessment, Deloitte adopted the false assumptions that IBM had contrived internally, increasing the compliance penalty from the $500,000 initially found by Deloitte to an overwhelming $91 million.

IBM also attempts to attack the materiality of the compliance penalty, but $91 million is not a trivial amount. It is an amount that would be material to any rational actor and was material to the IRS. Faced with the unenviable position of arguing that $91 million is inconsequential, IBM attempts to muddy the water by misleadingly misstating the allegations of the Amended Complaint as asserting that "the IRS rejected" the audit. The reality, however, is that while the first IRS employee to whom IBM presented the audit rejected it, his supervisor did not, and was forced by IBM between a rock and a hard place—either pay IBM a $91 million penalty or support a contract IRS did not need. This is what is alleged in the Amended Complaint.

Further, the Amended Complaint plainly alleges who made the false statements to the IRS, what those false statements were, when they were made, and otherwise more than meets the particularity requirements of Rule 9(b).

Finally, IBM asserts all of Relator's claims are based upon fraud in the inducement, but that is incorrect. IBM also engaged in false billing by billing the compliance penalties to the IRS

---

[1]     Those employees were subsequently terminated by IBM.

as new prospective licenses after IBM represented to the IRS that the penalties would be waived if the IRS signed a new contract. IBM confirmed internally that the IRS was paying compliance penalties.

For all of the reasons discussed herein, the Court should deny IBM's motion.

**FACTUAL BACKGROUND**
**ALLEGED IN THE FIRST AMENDED COMPLAINT**

The following is a summary. More specific and detailed allegations are contained in the Amended Complaint and are discussed in the subsequent sections of this brief where appropriate.

IBM is a technology company that, among other things, licenses software to customers, including the United States Government. The IRS was a long-time customer of IBM, but by 2011 the IRS had begun to migrate off of IBM's software, seeking to replace the many IBM software licenses and support services it had purchased and renewed over the years with "open source" software licenses, in part because the IRS recognized it was not using the licenses and services based on its own internal tracking. Am. Compl. ¶ 12. At the time, the IRS was coming to the end of a long-term license agreement, entered into in 2007, obligating the IRS to purchase certain quantities of licenses from IBM through September 30, 2012.[2] Am. Compl. ¶ 13. The IRS had the right to exercise at least one option year to extend the life of the contract. Am. Compl. ¶ 13.

IBM was aware that the IRS was migrating off of IBM's software, and that IBM would lose a substantial amount of revenue if that happened. Am. Compl. ¶ 14. The IRS was to pay at least $23 million to IBM in fiscal year 2012 alone, and had paid similar amounts thereunder in each of the prior four years. Am. Compl. ¶ 14.

---

[2] IBM has attached a document as Exhibit 1 to its Memorandum that IBM states is a copy of that contract. The document attached by IBM, however, does not include several material portions of the agreement, including several Attachments and documents that are incorporated therein by reference, which materially modify its terms.

Recognizing that the IRS was moving away from its software, IBM devised an illegal, multi-faceted plan to create leverage over the IRS. Am. Compl. ¶ 15. First, IBM would convince the IRS to forego the final option year under the pretense that once the IRS was out of contract, it would not have to continue purchasing all of the products in the 2007 agreement and would be free to purchase only the software it actually used, thus realizing a net cost savings. Am. Compl. ¶ 15. IBM knew this was a false promise and had no intent to allow the IRS any net cost savings. Second, IBM would convince the IRS to allow IBM to conduct a baseline or "friendly" audit of IRS's software license usage that would identify what software the IRS was using and should continue to purchase and where it could realize savings. Am. Compl. ¶ 15. At all relevant times, however, IBM's expectation and intent was that the friendly audit would instead conclude the IRS was over-using its licenses, over-deploying its software, and owed substantial compliance penalties, and that IBM would be able to hold those penalties over the IRS's head to force it into a new long-term deal with IBM for software the IRS no longer wanted or needed.  Am. Compl. ¶ 16. The substantial net savings dangled by IBM were, at all times, a blatant lie. Am. Compl. ¶ 16.

Based on that lie, IBM succeeded in convincing the IRS to forgo the final option year of the 2007 agreement and to have its software usage audited by the accounting firm Deloitte on a cooperative or friendly basis. Am. Compl. ¶ 17. Thus, IBM succeeded in the first prong of its fraudulent scheme—it got the IRS out of contract—thereby opening the field for a brand new lucrative agreement for IBM.  While, by contract, any auditor was supposed to be "independent," Deloitte did not operate independently; rather, IBM used Deloitte as its agent to carry out the audit in a way that satisfied IBM's end goals. Am. Compl. ¶ 18.  Deloitte was at IBM's beck and call and answered only to it.

To IBM's surprise, the initial audit results prepared by Deloitte showed that the IRS owed very little in compliance—only $500,000—which was not nearly enough to create the leverage IBM needed for a new deal. Am. Compl. ¶ 19. Moreover, the audit results showed that the IRS was not even using many of the software licenses it had purchased (thus rendering them "shelfware"). IBM suppressed these initial audit results and never released them to the IRS. Am. Compl. ¶ 20.  Then IBM forced Deloitte to change the results.

Unsatisfied with the initial audit results, IBM began to look for ways to artificially inflate them. Am. Compl. ¶ 21. Over the course of several months, IBM tested false and impossible audit assumptions, striving not to find the truth but to come up with a "credible story" that it could use as a "hammer" to convince the IRS it owed significant compliance penalties. Am. Compl. ¶ 21. As stated by Murray of IBM:

> **We need one thing from the [IBM] Rational Team and one thing only** and so far I have not seen it. 1) **A credible story** around deployment at the GV value for the compliance products in the report that makes sense when you talk about it . . . . **When will we have our credible story around the deployed licenses**.

Am. Compl. ¶ 82 (emphasis added). The false assumptions tested by IBM included assuming that licenses on servers everyone knew were sunset (deactivated) were live and constantly in use and assuming that licenses that were supposed to be evaluated based on the number of concurrent users were instead to be evaluated based on the number of times the license had been installed on machines. Am. Compl. ¶¶ 78-85. IBM's efforts were not a search for the truth, but a search to find a "pain point" that IBM could press until the IRS capitulated and agreed to a deal. Am. Compl. ¶ 21. IBM's own internal communications disclose that IBM employees knew the assumptions and the results they were generating were false, not based on reality, and in IBM's own words, at times "ridiculous." Am. Compl. ¶¶ 23, 79-82, 85. IBM pressed them home nonetheless.

False assumptions, including those identified above, were then imposed by IBM on the audit, as discussed in greater detail in Section I(A)(2)(b)(i) - (ii). Am. Compl. ¶¶ 78, 83. The result was that the compliance penalty suddenly jumped from $500,000 to $91 million. Am. Compl. ¶¶ 19, 24.[3] IBM, both through its own employees and Deloitte, falsely and fraudulently presented the false audit results to the IRS, asserting that the IRS owed IBM approximately $91 million in compliance penalties. Am. Compl. ¶ 24. IBM and Deloitte knew that the $91 million penalty was based upon false assumptions and was not actually owed by the IRS. Am. Compl. ¶¶ 23, 79-82, 85.  It was in no way based in reality or on facts.

The audit results were initially presented to Adam Kravitz, the IRS employee who was IBM's point of contact in determining IRS's future needs for software licenses. Am. Compl. ¶ 28. Kravitz rejected IBM's assertion that the compliance penalties were owed. Am. Compl. ¶ 28. Undeterred, IBM waited until Kravitz was on vacation at year end to go over his head and present its fraudulent claim and fraudulent audit results to Kravitz's superior, James McGrane, the IRS's deputy-CIO and head of software acquisitions who had not been involved previously in these negotiations. Am. Compl. ¶ 29. After initially being softened up by Deloitte, IBM falsely represented to McGrane that if the IRS entered into a new long-term agreement with IBM, the IRS would not have to pay the threatened, false, and fabricated compliance penalties and IBM would make them "go away." Am. Compl. ¶ 30.

---

[3]    Although this brief focuses on the false $91 million compliance penalty that was presented to the IRS by IBM because that penalty was accepted by the IRS, it should not be overlooked that the audit results were manipulated on other occasions by IBM, and at least one other false result was presented to the IRS. In November 2012, false audit assumptions imposed by IBM generated the false result that $292 million in penalties was owed. Even though IBM internally referred to this as "an error based on the number of developers the IRS has" and "a ridiculous number," it was communicated to the IRS as owed. Am. Compl. ¶ 91-92. These extreme fluctuations demonstrate how removed from reality the false audit results were.

Unlike Kravitz, McGrane, gave credence to the false audit results, and in order to avoid having to pay the asserted penalties, agreed to support a new five-year deal with IBM[4] for software licenses the IRS was not using and did not want or need at a total cost to the United States Government of approximately $265,000,000. Am. Compl. ¶ 30. IBM booked the deal internally as a "compliance deal," meaning that the deal was driven by and consummated as a result of alleged compliance or audit findings—even though IBM promised the IRS those penalties would not be part of the deal. Am. Compl. ¶ 32.

To add insult to injury, despite IBM's representation that it would waive the compliance penalties, it did not. IBM surreptitiously billed the IRS for the compliance penalties by charging the IRS for licenses in the *exact quantity* by which IBM had asserted the IRS was over-using the licenses. Am. Compl. ¶ 33. These licenses are falsely and fraudulently identified in the 2012 contract as being new licenses, effective prospectively for the year after the deal was executed. Am. Compl. ¶¶ 135-140. IBM's internal communications explicitly confirm that these prospective licenses were actually the compliance penalties that IRS did not owe and was told it would not have to pay in the new deal. Am. Compl. ¶ 141.

Pleased with how successfully it defrauded the IRS, IBM then began training its employees internally on how to utilize the same fraudulent tactics against other federal agencies, and proceeded to use the same or similar fraudulent tactics, successfully, against several other federal agencies over the course of the next several years. Am. Compl. ¶ 34.

---

[4]     IBM has attached a document as Exhibit 2 to its Memorandum that it states is a copy of that contract. As with the 2007 contract, however, the document attached by IBM does not include several material portions of the agreement, including several Attachments and documents that are incorporated therein by reference, which materially modify its terms.

In August 2016, after the Government initiated document demands in connection with this matter, IBM terminated the specific individual employees who orchestrated this scheme, including Murray, Kathleen O'Leary, and Len Fleischmann, for unethical and fraudulent business practices. Am. Compl. ¶ 35.

## LEGAL STANDARD

### I.    Rule 12(b)(6)

Under Rule 12(b)(6), a complaint need only contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). A claim is facially plausible when the pleaded facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. And while plausibility requires "more than a sheer possibility that a defendant has acted unlawfully," it is not a "probability requirement." *Id.* "In resolving a Rule 12(b)(6) motion, the court must treat the complaint's factual allegations—including mixed questions of law and fact—as true and draw all reasonable inferences therefrom in the plaintiff's favor." *E.g.*, *Konah v. D.C.*, 815 F. Supp. 2d 61, 69 (D.D.C. 2011) (internal citations omitted); *Momenian v. Davidson*, 878 F.3d 381, 387 (D.C. Cir. 2017).

### II.    Rule 9(b)

"[C]omplaints brought under [the False Claims Act] must comply with Rule 9(b)." *U.S. ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551–52 (D.C. Cir. 2002). Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The circumstances that must be pled with specificity are "the time, place and content of the false misrepresentations, the fact misrepresented and what was

retained or given up as a consequence of the fraud." *United States v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 153 (D.D.C. 2011).

"Motions to dismiss for failure to plead fraud with sufficient particularity are evaluated in light of the overall purposes of Rule 9(b) to ensure that defendants have adequate notice of the charges against them to prepare a defense." *United States v. First Choice Armor & Equip., Inc.*, 808 F. Supp. 2d 68, 73 (D.D.C. 2011) (internal citation omitted). "Rule 9(b) does not abrogate Rule 8, and must be read in light of Rule 8's requirement that allegations be simple, concise, and direct, and short and plain statements of each claim." *Id.* at 74 (internal citations omitted).

Further, "in the context of the FCA, 'A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts.'" *E.g.*, *Kellogg*, 800 F. Supp. 2d at 154 (D.D.C. 2011) (J. Lamberth) (internal citation omitted); *First Choice*, 808 F. Supp. 2d at 74 (D.D.C. 2011) (J. Roberts).

## ARGUMENT

### I.     Relator Has Pled Violations of the False Claims Act.

IBM concocted and carried out a multi-faceted scheme to defraud the Government by (a) inducing the IRS not to exercise a contractual right it had to option into another reduced-cost year of software licenses and services on the promise that was the only way the IRS could realize net "savings" so IRS would be out of contract and ripe for a lucrative, unnecessary, new contract; (b) falsely inducing the IRS into a baseline or "friendly" audit to help IRS realize net savings when IBM had no present intention of allowing its customer any net savings; (c) falsifying audit results to show the IRS owed IBM $91 million in compliance penalties when it did not; (d) falsely

representing to the IRS that it owed IBM $91 million when IBM knew it did not; and (e) representing to the IRS that IBM would waive the $91 million in penalties if the IRS entered into a new contract with IBM, which IBM never did. The overt threat of a $91 million penalty was material to the IRS's decision to enter into a new contract with IBM, and all claims for payment "under a contract which was procured by fraud" give rise to "liability under the [False Claims] Act." *See, e.g.*, *U.S. ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005). IBM also engaged in false billing by surreptitiously billing the compliance penalties to the IRS as new, prospective licenses when it told IRS it would not.

## A.   IBM Knowingly Made False Statements to the Government

IBM made numerous false statements to the Government it knew were false when they were made. It represented to the IRS that it could realize net cost savings by forgoing the final low-cost option year of its contract and submitting to a friendly baseline audit, when IBM had no intention of allowing the audit to result in net cost savings or anything other than significant compliance penalties IBM could leverage into an expensive and unnecessary deal.   The culmination of this scheme was positioning IBM to represent to the IRS that it owed $91 million in compliance penalties that IBM knew were not actually owed and were based upon false and impossible audit assumptions developed by IBM.   Finally, IBM asserted it would waive the compliance penalties if the IRS entered into a new long-term contract, but billed the penalties to the IRS anyway, hidden as prospective, new licenses.

### 1.   IBM Convinced the IRS to Forgo the Final Option Year of the 2007 Contract by Falsely Promising that the IRS Would Realize Net Cost Savings if it Did.

By "2011, the IRS had begun to migrate off of IBM's software . . . and wished to cease purchasing many of the products it was purchasing from IBM at the time, in part because the IRS was not using the products." Am. Compl. ¶ 12. IBM was aware the IRS did not want many of the

products in the 2007 contract. Am. Compl. ¶¶ 55-56. Accordingly, in 2012 "Michelle Adams of IBM told Patricia Hoover and Adam Kravitz of the IRS that the IRS could realize savings by (1) choosing not to exercise the upcoming option year on the Existing Enterprise License [the 2007 contract] and (2) entering into a new deal with IBM in which the IRS could choose to purchase only the licenses it wanted to continue to use and not purchase those it was not using." Am. Compl. ¶ 65. IBM (Michelle Adams and others) represented to the IRS (Kravitz and others) that an audit would identify what software the IRS actually used and allow the IRS to obtain cost savings. Am. Compl. ¶ 66 IBM had no present intention to allow IRS to realize net savings.

Internal communications at IBM show IBM did not believe what it told the IRS, and that IBM believed the "friendly" compliance audit would, rather than identify net cost savings IRS could take advantage of, identify compliance penalties that IBM could use as leverage—a "hammer"—to compel the IRS to enter into a new long-term agreement for products IBM knew the IRS did not want to purchase. *See, e.g.*, Am. Compl. ¶ 61 (internal IBM communications: "Having IRS out of contract provides the maximum leverage on getting the deal done"), 62 (internal IBM communications referred to the compliance audit as a "hammer" IBM could use against the IRS). When Deloitte's initial audit only found a debatable $500,000 in compliance penalties, IBM could not believe it:

| | |
|---|---|
| IBM Employee 1: | "[T]he numbers are at the moment in Websphere at the approx $500K that Chad [McClure of Deloitte] mentioned last week." |
| IBM Employee 2: | "[A]nd that's it" |
| IBM Employee 1: | "[T]his whole review has me stumped! Hard to believe they are this clean!!" |
| IBM Employee 2: | "[S]eriously" |
| IBM Employee 1: | "[I]t's really unb[el]ievable" |
| IBM Employee 2: | "[A]greed" |
| IBM Employee 1: | "Deloitte has never seen anything like this before with an enterprise this large." |

Am. Compl. ¶ 74.

IBM asserts it did not convince the IRS to forego the final option year on the 2007 contract and that "according to the [Amended] Complaint, as early as 2011, the IRS did not want to renew the 2007 agreement a sixth time, preferring instead to negotiate a new agreement." Memo. at 10 (citing Am. Compl. ¶¶ 54-56). IBM wants to debate the facts as alleged, which is improper at this point, and misconstrues the allegations of the Amended Complaint to its own benefit.

As alleged, "the IRS was interested in renewing <u>a small part</u> of the . . . [2007 contract]" but "was <u>not interested in renewing the entire</u> [2007 contract] . . . ." Am. Compl. ¶ 54 (emphasis added). If it chose to forgo the option year, however, it would lose the substantial price discount it received in the high-volume, multi-year 2007 contract. As a result, while the IRS did not want many of the products (and IBM's own audit shows the IRS was not using them), continuing with the existing contract in the short term while it continued to migrate off of IBM's products would be less costly than purchasing the products it still wanted to use à la carte. This is demonstrated by the fact that after the IRS chose not to exercise the option year, IBM quoted the IRS $147 million to purchase one year of products that would have cost $30.5 million under the option period, had it not been cancelled. Am. Compl. ¶ 69. A staggering 500% increase in price. IBM cajoled the IRS into forgoing the option year by misrepresenting that after an audit was performed, the IRS could realize net cost savings with a right-sized contract. But IBM had no intention of allowing the IRS to enter into a smaller deal. Further, IBM believed the audit would find compliance penalties that IBM could use to force the IRS into another large deal, and when those penalties did not materialize, IBM fraudulently manipulated the audit results until they did.

### 2.    IBM Made False Statements Via the Audit.

The allegations and evidence show IBM imposed impossible assumptions that IBM knew were false after Deloitte's initial clean audit results came back in order to inflate the compliance

penalty from $500,000 to $91 million. Deloitte presented those false findings to the IRS at IBM's direction as though they were truth, and IBM knew they were being presented and supported that presentation. Further, regardless of Deloitte's actions, IBM also presented the false findings directly to the IRS on December 19, 2012. The foregoing and other false statements by IBM are fraud.

> ### a.   IBM Falsely Pitched the Audit to the IRS as a Means to Identify Net Cost Savings.

IBM falsely pitched the idea of a friendly or baseline audit to the IRS as a means to realize net cost savings by identifying the licenses the IRS was actually using and those it was not so the IRS could purchase only the licenses it used in the future. Am. Compl. ¶¶ 65-66. When IBM made these statements, it believed them to be false. Internal IBM communications show its employees believed an audit would not create any cost savings for the IRS but would instead show the IRS had overused the licenses and owed significant compliance penalties. Am. Compl. ¶¶ 65-66, 74. IBM believed the audit results would be a "hammer" that it could use against the IRS to force the IRS to agree to a new, large license contract for IBM's benefit. Am. Compl. ¶ 62.

IBM asserts in its brief that it had the right under the 2007 contract to conduct an audit. But IBM did <u>not</u> have the right to conduct the audit under false pretenses or the audit it actually conducted. Memo. at 11. The 2007 contract gives IBM the right to "verify [the IRS's] compliance," but does not elaborate upon what procedure IBM may employ. Memo. at Exh. 1 (incomplete 2007 contract) at 18. It does, however, require that any "auditor" used in connection with such verification be "independent." Memo. at Exh. 1 (incomplete 2007 contract) at 18. Deloitte was not "independent": Deloitte never released to the IRS its original audit results showing minimal compliance was owed, incorporated audit assumptions provided by IBM that had no basis in fact, and otherwise took direction from IBM and acted for IBM's benefit to the detriment of the IRS.

*See, e.g.*, Am. Compl. ¶¶ 72-85, 87. IBM's statements to the IRS that it expected the audit to generate net cost savings is just one of many examples of IBM's false statements to the IRS.

> **b.  IBM Imposed Assumptions It Knew to Be False on Deloitte's Initial Audit Results and Presented the Falsified Audit Results to the IRS Both on Its Own and Through Deloitte.**

As a threshold matter, whether Deloitte was IBM's agent is largely irrelevant because IBM knew the compliance penalty was false, yet asserted to the IRS through its own employees that it was owed. Am. Compl. ¶¶ 121-125. Similarly, IBM knew what Deloitte represented to the IRS was false. *See, e.g.*, Am. Compl. ¶¶ 77-78, 83, 91-92, 124. IBM was not searching for the truth and it was not looking to cut square corners with the Government. It was looking to impose "pain" on the Government for its own benefit. Nonetheless, Deloitte was IBM's agent and was acting on IBM's behalf and at its direction.

> **i.  Deloitte Was IBM's Agent, Not an Independent Auditor.**

"[T]he existence and extent of an agency relationship are factual questions" and a "plaintiff must plead facts that plausibly support an inference that an agency relationship existed. . . ." *Jefferson v. Collins*, 905 F. Supp. 2d 269, 285 (D.D.C. 2012). Contrary to IBM's assertions, Relator has more than sufficiently pled facts that support the inference that Deloitte was acting at IBM's direction and as its agent, including:

a.  Deloitte's initial audit results concluded the IRS owed only $500,000 in compliance; it provided those results to IBM but not the IRS. Am. Compl. ¶¶ 72-75.

b.  IBM imposed false assumptions on Deloitte, and Deloitte modified its audit results at the direction of IBM's management to achieve the results IBM was seeking—not the truth. Am. Compl. ¶¶ 77-83, 119.

c.  With respect to getting Deloitte to modify its initial findings, Denise Pirro of IBM stated on September 19, 2012, that she was going to have a "discussion" with Deloitte to "put [D]eloitte in their place," and then did have such a call on or about 11 a.m. that day. *See* Am. Compl. ¶ 89. Later that day, Chris Schumm of IBM sent an email to Fleischmann, Pirro, Murray, and others stating "[s]hould the IRS reach out to Deloitte

for confirmation [regarding the audit], Denise has set the expectation that Deloitte will agree with our assessment."

    d.  IBM met separately with Deloitte in advance of the December 11, 2012, meeting between Deloitte and the IRS at which the audit "results" were discussed to direct what Deloitte would and would not disclose to the IRS. Am. Compl. ¶ 124.

    e.  The false assumptions underpinning the audit results were never disclosed to the IRS. Am. Compl. ¶ 27.

There was nothing "independent" about this audit; it was an exercise designed, planned, and manipulated by IBM to achieve a desired result. Nothing more.

### ii. IBM Controlled and Manipulated Deloitte's Audit Findings.

IBM directed the false assumptions ultimately applied in Deloitte's audit in order to achieve IBM's goals. When Deloitte conducted its initial audit without IBM's interference, it did not make the false assumptions, and that audit was never disclosed to the IRS. Am. Compl. ¶¶ 72-75. IBM internally tested a number of false assumptions for the audit. *See, e.g.*, Am. Compl. ¶ 77-83, 89, 119. And the manipulated audit results ultimately presented to the IRS by IBM and Deloitte adopted several of them. Am. Compl. ¶¶ 76-87.

Numerous internal communications demonstrate that IBM compelled Deloitte to modify the audit to bring it in line with IBM's expectations. The following is an excerpt of a conversation from September 18, 2012:

> Schumm:    we need deloitte in line with the compliance team . . . the compliance team should have had an internal call with Deloitte prior to the meeting . . . **sit tight until we can [get] a handle on Deloitte . . . Denise is on with Deloitte now**

(Emphasis added). The next day, Steve Revesz of Deloitte sent an email to Pirro, a second IBM employee, and McClure of Deloitte seeking to confirm Deloitte was presenting the response IBM wanted, <u>even though that response could not be factually proven by Deloitte</u>:

> Adam Kravitz [of IRS] has requested a call tomorrow with Deloitte . . . . I want to make sure that we are in agreement as to the response. . . . if Adam poses the same

question as the other day "**Can Deloitte factually prove these products are used or deployed**" and requests a yes or no answer, **the answer is no** at this point in time.

(Emphasis added). Similarly, shortly before Deloitte presented the false audit findings to McGrane at IRS, Schumm emailed McClure to meet with him to ensure the findings were what IBM wanted:

"Patty [Hoover of IRS] called us . . . McGrane wants to talk with you next week on the compliance numbers. Can you set your meeting with McGrane early in the week. Also, we should connect prior to your meeting with him."

Likewise, one of the false assumptions imposed by IBM was that licenses on discontinued servers were constantly "in use." Am. Compl. ¶ 83. In a written conversation between IBM's Ann Marie Somerville and Schumm, Somerville explains the nature of the false assumption and then states she is going to have a telephone call that evening with the person who "manages the [D]eloitte team." Am. Compl. ¶ 83. Other documentary evidence, as well as testimony from witnesses, including Relator, will further establish IBM was responsible for the false audit assumptions. IBM's individual arguments are rebutted below.

First, IBM asserts that Relator's allegation that Deloitte did not act independently is "directly contradicted by the contract's statement that the auditor be 'independent.'" Memo. at 13. The language in the contract requiring that the auditor be "independent" is not evidence that the auditor was <u>actually</u> independent. Actual evidence, such as Deloitte's failure to disclose its initial audit results showing the IRS owed only minimal compliance, its concealment of the usage data it collected, IBM's pounding on Deloitte to get to a "pain point," and other materials discussed herein show that Deloitte was not acting "independently." All IBM has identified is that it also breached the contract in the course of committing fraud.

Second, IBM questions why Deloitte would "jeopardize its business and reputation to become an instrument of IBM" asserting that "Deloitte contracts with the federal government . . . ." Memo. at 13. IBM's speculation regarding Deloitte's motives is not a valid basis for a motion

to dismiss nor does it rebut the facts showing Deloitte was not independent. Nevertheless, an obvious and simple explanation is that the individual Deloitte employees involved benefited directly from their relationship with IBM and not from the other relationships Deloitte employees had with the federal government. As confirmed by written communications of IBM and Deloitte, this was not a one-off event for IBM, and IBM intended to and did apply the same audit-based fraud tactics against other federal agencies as well, meaning there were other IBM-Deloitte engagements. *See* Am. Compl. ¶¶ 143-145.

Third, IBM asserts there are no facts to show the false audit assumptions IBM generated (which IBM refers to as "internal musings") "were ever communicated to Deloitte." Memo. at 14. As discussed above, however, that is not true and those facts are alleged. IBM asks the Court to disregard the allegations of the Amended Complaint and draw the unwarranted inference that after Deloitte performed an audit concluding virtually no compliance penalty was owed, after IBM fabricated several false assumptions to be applied to the audit (assumptions which IBM communications show IBM knew were false), after IBM communicated internally that it was going to get Deloitte "in line" with respect to IBM's audit expectations and then did speak with Deloitte, Deloitte then independently arrived at the exact same false assumptions and applied them to the audit **and presented those audit findings and not its initial audit findings to IRS** with no involvement by IBM.  IBM's position must be rejected, particularly on a motion to dismiss where all inferences must be drawn in Relator's favor.

IBM's reliance on *Chandamuri* is misplaced. Memo at 13-14 (citing *Chandamuri v. Georgetown Univ.*, 274 F. Supp. 2d 71, 80-81 (D.D.C. 2003)). In *Chandamuri*, the plaintiff's only evidence was a comment by a university employee that the academic punishment imposed on the plaintiff was unusually severe. 274 F. Supp. 2d 71. The Court found the comment insufficient to

support the plaintiff's claim that the punishment was based upon his race, both because the comment said nothing about race and because the university employee was not a part of the punishment decision. *Id.* Here, on the other hand, there is significant evidence that IBM controlled Deloitte's audit assumptions and presented blatant falsehoods to the IRS.

Fourth, IBM asserts "Relator's allegations themselves undermine any notion that IBM was in control of Deloitte's audit" because Relator has alleged that "IBM[ was] dissatisf[ied] with Deloitte." Memo. at 14. IBM asserts this means Deloitte's audit must have been "independent." *Id.* IBM is grossly misleading. IBM's brief refers to the allegation that IBM was unhappy with Deloitte's *initial* audit results, which found virtually no compliance was owed and were never disclosed to the IRS (something that should have been done had Deloitte been independent). The audit results were manipulated by IBM *after* IBM received Deloitte's initial findings *because* IBM was not satisfied with them. IBM was unhappy with the *initial* findings because, as IBM stated internally, IBM expected Deloitte to find significant compliance penalties and was shocked when the initial results came back so clean. *See* Am. Compl. ¶¶ 72-74. It was because Deloitte did not find legitimate compliance penalties that IBM imposed the false audit assumptions to manipulate the results. IBM then refers to its dissatisfaction with Deloitte's first presentation of the audit results to the IRS in September 2012. Memo. at 14 (citing *id.* ¶ 89). As alleged, IBM was displeased because Deloitte failed to "defend the artificially-inflated audit results vigorously enough." Am. Compl. ¶ 89. It was at this point that IBM "put [D]eloitte in their place." Afterwards, including when the final false audit results were presented to Jim McGrane at the IRS, Deloitte toed the line. This was a process IBM controlled throughout, not a snapshot in time.

Fifth, IBM misrepresents the Amended Complaint, asserting that "Relator alleges IBM put together [the IBM Internal Audit Team] to 'validate' Deloitte's independent audit findings" and

asks "why IBM would need to validate Deloitte's findings if IBM was 'manipulating' the audit in the first place." Memo. at 14-15. That is not what is alleged. Am. Compl. ¶¶ 94-118.

Relator alleges that "[a]lthough the purpose of the Internal Audit Team was stated to be to validate and support Deloitte's audit findings, it was actually intended as a means for IBM to test various false assumptions in its ongoing attempts to find a 'credible story' that IBM could use to convince the IRS that it owed substantial compliance penalties." Am. Compl. ¶ 94. In other words, the Internal Audit Team was set up so that IBM could test various false assumptions to see how they would impact the results of the audit. *Id.* If IBM was pleased with how particular assumptions impacted the audit, IBM could then require Deloitte to apply the assumptions. Relator was a member of that team and is intimately familiar with its activities. Relator refused to comply with certain assumptions due to how outrageously unsupportable they were—such as assuming that every license was being used simultaneously by individuals at the IRS who were not even software developers and had no reason to use the licenses at all. Nevertheless, IBM persisted.

### c.   The Audit Findings Were False.

From the beginning, IBM viewed the compliance audit as a "hammer" it could use to create leverage against the IRS. It designed it to be such, and it was implemented as such. *See, e.g.*, Am. Compl. ¶¶ 62, 65-66. To create the leverage IBM desired, IBM needed to identify and impose audit assumptions that would cause the audit results to show the IRS owed significant compliance penalties—so it did. Am. Compl. ¶¶ 21-22. IBM was never interested in finding the truth, only a "credible story" showing that the IRS owed significant compliance. Am. Compl. ¶¶ 21, 82.

False audit assumptions imposed by IBM are discussed in detail in the Amended Complaint. Am. Compl. ¶¶ 78-85. The first involves IBM Rational brand software for which the IRS owned "floating user licenses." These licenses could be installed on any number of machines

20

but for each license owned, only one user could use the license at any given time. As explained on

IBM's own website:

> An IBM Rational Floating license is a license for a single software product that can
> be shared among multiple team members; however, **the total number of**
> **_concurrent_ users cannot exceed the number of Floating licenses you purchase**.
> For example, if you purchased one Floating license for an IBM Rational product,
> then any user in your organization may use the product at any given time. Any other
> person who wants to access the product must wait until the original user logs off.

Am. Compl. ¶ 79 (citing IBM's website (emphasis supplied)). "That is why, when conducting the

audit, Deloitte obtained data on the number of concurrent users for the Rational products that were

floating user licenses. That data showed that the IRS was not exceeding its allotted number of

concurrent users on the Rational products and, with respect to most of the Rational licenses, the

IRS was not using them at all." Am. Compl. ¶ 80. The audit results presented to the IRS, however,

evaluated the licenses based upon number of installations instead of concurrent users. Am. Compl.

¶¶ 78-79, 87. And the usage data Deloitte collected was concealed in a hidden column in the audit

spreadsheet. Am. Compl. ¶ 80. Internal IBM communications show the individuals involved in the

fraud knew this was not the correct way to evaluate the licenses. *See* Am. Compl. ¶¶ 81-82.

    A second false assumption imposed on the audit by IBM was that licenses on

deactivated/discontinued servers were constantly in use. Am. Compl. ¶ 83. Licenses cannot be in

use if they are on a deactivated or discontinued server, and IBM knew this:

> "Compliance audit drove a large part of the ELA [new software contract]. These
> were licenses that were installed on License Servers and therefore deployed, but
> **there were no users**. . . . **The Servers were discontinued by the customer, so**
> **these licenses will never be used**."

Am. Compl ¶ 85 (IBM communication, emphasis added). IBM's false assumption that the licenses

were constantly in use falsely inflated the number of licenses the IRS was "using" and generated

compliance penalties that were not actually owed. IBM knew this. Although this is straightforward,

IBM asserts Relator "alleges no facts showing how it would produce a false audit to count licenses

on discontinued servers . . . ." Memo. at 16. An IBM communication regarding this assumption expressly instructed, "Do not share this with IRS." Am. Compl. ¶ 84. As far as Relator is aware, the IRS was never told that licenses on discontinued servers had been counted in the audit. Am. Compl. ¶ 84. IBM was obviously not interested in presenting the facts or truth to IRS; it was not cutting straight corners.

The foregoing assumptions by IBM are false, they were applied in the final audit findings presented to IRS, and they are the basis for the $91 million compliance penalty IBM and Deloitte told the IRS it owed. IBM does not identify anything in its brief that would make the aforementioned assumptions true, but its arguments are addressed individually below. *See* Memo. at 15-17.

First, IBM misleadingly asserts that "though Relator alleges that IBM was unhappy with Deloitte's audit findings pertaining to . . . WebSphere . . . there are no facts alleged that IBM managed to alter or change the WebSphere portion of the audit." Memo. at 15. IBM's statement is misleading because Deloitte's initial audit did <u>not</u> only pertain to WebSphere and IBM <u>did</u> alter the WebSphere portion of the audit. The initial audit pertained to all products, and the only compliance that Deloitte found was approximately $500,000 on WebSphere products. IBM was not just unhappy about the audit's findings "pertaining to WebSphere," it was unhappy that the audit had only found $500,000 in compliance penalties. By imposing false assumptions on the audit, IBM increased that amount to $91 million, over $3 million of which ultimately was for WebSphere products.  IBM's assertion to this Court is false.

Second, IBM oddly asserts that Relator "nowhere explains why" usage, rather than installations, is the appropriate metric. Memo. at 16. It is explained in detail. Am. Compl ¶¶ 78-82. IBM then points to language in the 2007 contract that requires the IRS to provide IBM with

"system information sufficient to provide auditable verification to IBM that [IRS's] installation and use of Eligible Programs is in compliance" with the agreement. Memo. at 15-16 (citing Exh. 1 thereto at 18). That language applies to all of the licenses in the contract, some of which are measured by usage and others of which are not. Memo. at Exh. 1 (incomplete 2007 contract) at 18. It indicates nothing about what metric (*e.g.*, usage or installation) is appropriate for a particular license. If the licenses at issue were actually measured by something other than usage, IBM, who created the licenses, would be able to identify something to that effect.  It does not.

Third, IBM misleadingly quotes its own prior statement that "we need to reach agreement [on a] compliance strategy for something other then [sic] usage-based," by omitting the second half of the sentence and asserting that "trying to 'reach agreement' is not fraud." Memo. at 16. The significance of IBM's prior statement is that it realized there was no compliance owed when the licenses were properly evaluated based on usage and that some other metric would have to be used to create compliance penalties. It applied a metric that was not supported by its own license terms to further its fraud.

Fourth, IBM asserts "Relator does not allege that IBM hid anything" in reference to the hidden column of usage data contained in Deloitte's audit spreadsheet. Memo. at 16. But IBM knew that usage was the appropriate metric for certain of the licenses, knew that Deloitte had collected the usage data, knew the usage data was hidden in the spreadsheet, and knew that the audit of those usage-based licenses had been conducted with non-usage metrics, yet it allowed Deloitte to present the false results and then presented the false results itself as true. Am. Compl. ¶¶ 87, 121, 124-125.

Fifth, IBM asks the Court to assume the false audit assumptions were conveyed to the IRS. Memo. at 16-17. There is no basis for such an assumption (the only basis proffered by IBM is that

Deloitte met with the IRS), it is contradicted by IBM communications directing that the false assumptions not be disclosed to the IRS, and is not stated anywhere in the complaint.  The Court must draw all inferences in favor of Relator on a motion to dismiss. Moreover, even assuming *arguendo* the false audit assumptions were disclosed to the IRS, IBM knew the assumptions were <u>false</u> and would have to have presented them to the IRS as <u>true</u> in order to obtain monies IBM knew were not owed. That is a false claim. Finally, contrary to IBM's assertion, Relator has alleged that the false audit assumptions were not disclosed to the IRS. Am. Compl. ¶ 27.

### 3.   IBM Made Numerous False Statements with Scienter.

IBM's scienter argument is frivolous. As alleged in the Amended Complaint, IBM's employees made numerous false statements to the IRS that they knew were false, including:

- Representing that the IRS would obtain net cost savings by forgoing the final option year of its contract and submitting to an audit. Am. Compl. ¶ 65.

- Presenting the idea of an audit as a friendly, baseline review designed to be for IRS's benefit. Am. Compl. ¶ 66.

- Representing to the IRS that Deloitte was an "independent" auditor. Am. Compl. ¶¶ 2, 18.

- Presenting audit findings IBM knew were false. Am. Compl. ¶¶ 121, 125-127.

- Causing and allowing Deloitte to present audit findings IBM knew were false. Am. Compl. ¶¶ 87, 124.

- Representing to the IRS that if it entered into the 2012 contract, IBM would waive the compliance penalties. Am. Compl. ¶¶ 126, 135.

The IBM employees who made these false representations knew they were false at the time they were made. For example, they knew the audit assumptions were false. Am. Compl. ¶¶ 85.

IBM asserts Relator relies upon a "collective knowledge" theory to establish IBM's knowledge, Memo. at 17, but collective knowledge is not relied upon here. IBM's brief misstates both the law and the facts in this case.

Collective knowledge is a theory of corporate scienter under which multiple corporate employees each possesses a different piece of information, and while the combined knowledge of those employees would be sufficient to know that a false claim is being made, no individual employee possesses sufficient information to know. *See, e.g.*, *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257 (D.C. Cir. 2010). The D.C. Circuit rejected that theory in FCA cases because it would permit a finding of "knowledge" even when no individual actually knew a false statement was being made. *Id.*[5]

Collective knowledge is not relied upon here. Multiple individuals at IBM, including Murray, Somerville, Fleischmann, and others, all knew that false information regarding the IRS's compliance was being presented to the IRS as true for the purpose of obtaining a new contract with the IRS. Am. Compl. ¶¶ 76-85, 121, 124-127. Some of those individuals, including Murray, personally presented the false information to the IRS and requested the new contract based on the false information. Am. Compl. ¶ 125-127.

Lastly, IBM—understandably seeking to distance itself from the wrongdoing of its own employees (now that it has fired them)—asserts that it should not be held accountable for the knowledge of "four" of its employees. Memo. at 17. But a corporation only possesses the knowledge of its employees, and their knowledge is precisely what a corporation is accountable for. *See, e.g.*, *Sci. Applications*, 626 F.3d at 1276 ("If the jury found that these individuals knew or recklessly failed to know that SAIC, by having these conflicts and failing to disclose them, violated a requirement under its NRC contract that was material to the receipt of payment, then

---

[5]     If a corporation structures itself to prevent any one person "from learning facts that made [the company's] claims for payment false," however, then "the plaintiff may establish that the company acted in deliberate ignorance or reckless disregard of the truth of its claims." *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1276 (D.C. Cir. 2010).

that finding would be enough to establish SAIC's scienter.") There were also more than four IBM employees who were aware. In support of its argument, IBM misrepresents the holding of *United States ex rel. Landis v. Tailwind Sports Corporation*. Memo. at 17 (citing 51 F. Supp. 3d 9, 52 (D.D.C. 2014)). Contrary to what IBM implies, in *Landis* the question before the court was <u>not</u> whether a corporation should be imputed with the knowledge of a high-ranking employee but whether that employee, who was an individual defendant, should be imputed with the corporation's knowledge that false claims were being made. The relator alleged the employee must have known about the false claims because he held a high-ranking position in the company, and the Court found that insufficient to conclude the employee had knowledge. *Landis*, 51 F. Supp. 3d 9, 52 (D.D.C. 2014) (relator "relie[d] upon Mr. Weisel's high-ranking position in Tailwind to argue that he was likely aware of the doping. . . . [T]he Court declines to accept the theory . . . ."). For obvious reasons, that is not relevant here.

**B.      The False $91 Million Compliance Penalty Is Material.**

As stated by IBM, "all plaintiffs bringing private actions under the FCA . . . are[] required to allege that the allegedly false claim was material to the government's decision to make the payment at issue." Memo. at 18 (citing *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 86 (D.D.C. 2014)). The FCA defines the "term 'material' [to] mean[] having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C.A. § 3729. In other words, materiality can be found objectively. *See, e.g.*, *United States ex rel. Morsell v. Symantec Corp.*, 130 F. Supp. 3d 106, 123 (D.D.C. 2015) ("FCA materiality test . . . 'objective' and not requiring proof of actual reliance" and explaining that "a statement or omission is 'capable of influencing' a decision even if those who make the decision are negligent and fail to appreciate the statement's significance.") (internal citations omitted); *U.S. ex rel.*

*Feldman v. van Gorp*, 697 F.3d 78, 95 (2d Cir. 2012) ("even if a program officer does not subjectively consider a statement to be material, it can be found to be material from an objective standpoint because it is 'capable of influencing' the program officer."). Objective materiality was recently reaffirmed by the U.S. Supreme Court in *Escobar*, which explained that materiality in the context of the FCA could be found both objectively or subjectively:

> We need not decide whether § 3729(a)(1)(A)'s materiality requirement is governed by § 3729(b)(4) or derived directly from the common law. Under any understanding of the concept, materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." . . . . In tort law, for instance, a "matter is material" in only two circumstances: (1) "[if] a reasonable man would attach importance to [it] in determining his choice of action in the transaction"; or (2) if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter "in determining his choice of action," even though a reasonable person would not. . . . Materiality in contract law is substantially similar. . . .

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2002–03 (2016). Accordingly, while the $91 million penalty was material to the IRS, it is sufficient for Relator to show that a reasonable person would have found it material.

IBM refers to a description of the materiality requirement as "rigorous" in *Escobar* without providing the appropriate context. Memo. at 18 (citing 136 S. Ct. 1989). The Supreme Court in *Escobar* was considering the materiality requirement for implied false certification claims:

> This case concerns a theory of False Claims Act liability commonly referred to as "implied false certification." According to this theory, when a defendant submits a claim, it impliedly certifies compliance with all conditions of payment. But if that claim fails to disclose the defendant's violation of a material statutory, regulatory, or contractual requirement, so the theory goes, the defendant has made a misrepresentation

136 S. Ct. at 1995. It rejected the position of the Government "that any statutory, regulatory, or contractual violation is material so long as the defendant knows that the Government would be entitled to refuse payment were it aware of the violation," and noted that this would allow the imposition of liability under the FCA for trivial matters, such as "use of foreign staplers" while

performing a contract with "a requirement that contractors buy American-made staplers." *Id.* at 2004. This case, however, is not an implied false certification case, and $91 million is not a trivial matter.

IBM, both through its employees and through its agent Deloitte, falsely represented to the IRS that the IRS owed over $91 million in compliance penalties and that IBM would waive those penalties if the IRS entered into the 2012 contract. Am. Compl. ¶¶ 125-127. The threat of a $91 million penalty would be material to any reasonable person and—though it does not need to be for purposes of Relator's claims—was material to the IRS's decision to enter into the 2012 contract. Am. Compl. ¶¶ 125-131. IBM's own internal correspondence shows that before it asserted the false compliance penalty, the IRS did not want to enter into a new long-term contract. *See* Am. Compl. ¶ 65 (quoting statements from IBM employees, including that "we [IBM] are in a stand still, where they [IRS] won't invest in more products because they feel they're in a bad deal . . . . Adam Kravitz seems content to wait it out and encourage the programs to move off of IBM."). By fraudulently threatening the IRS with a $91 million penalty, IBM changed the IRS's mind.

Further, IBM asserts the IRS was aware it was paying the $91 million compliance penalty. Memo. at 29-30. If that were true, IBM's false statement to the IRS that the penalty was owed must have been material, as that is the only reason the IRS would have agreed to pay such a penalty. If the IRS did not know it was paying compliance penalties, then IBM surreptitiously billed the IRS for compliance it said it would not bill. Either way, IBM engaged in fraud.

IBM repeatedly makes the misleading assertion that the audit findings could not have been material because they were rejected "by the IRS." Memo. at 18-19. IBM's assertion is misleading because while the first IRS employee to whom the compliance audit results were presented, Kravitz, objected to them, IBM circumvented him by waiting until he was on vacation to present

the findings to his superior, Jim McGrane, and McGrane accepted the findings and caused the IRS to enter into the 2012 contract. Am. Compl. ¶¶ 121-127. IBM acknowledges this in a footnote of its brief. Memo. at n. 19. An IBM employee even stated in writing at the time, "Adam is out all next week and this is a good time to keep the pressure on." Am. Compl. ¶ 123. IBM's claim that Relator alleged the audit findings "were 'rejected' by the IRS on both of the occasions that they were presented to it," Memo. at 18, is simply false and a blatant misstatement.

IBM also takes issue with Relator's allegation that IBM employee Chris Schumm "was aware that the IRS was very concerned and 'scared' of the false Deloitte Findings, and that those findings were a substantial factor in the IRS's decision to . . . enter[] into the [2012 contract]." Am. Compl. ¶ 127. Schumm was present when IBM presented the false audit results to McGrane, and that was his impression from the meeting. *See id.*

Finally, IBM seeks to direct the Court's attention to the events that transpired *after* IBM fraudulently induced the IRS to enter into the 2012 contract. Memo. at 19-20. As a threshold matter, post hoc events do not factor into an objective evaluation of whether or not a $91 million penalty would be material to a reasonable person deciding whether to enter into the contract. Moreover, IBM's speculation as to what the IRS's subsequent actions could indicate about the IRS's mentality at the time it entered into the 2012 contract must be rejected on a motion to dismiss, where the well pleaded allegations and the reasonable inferences therefrom must be drawn in Relator's favor. Nevertheless, IBM's assertions are rebutted below.

IBM asserts that its threat of $91 million in compliance penalties could not have been material to the IRS's decision to enter into the 2012 contract because the IRS did not terminate the contract after Relator filed his original complaint in this matter. However, deciding whether to terminate the contract while the fraud described in Relator's complaint is being contemplated by

the Department of Justice in a case filed under seal is a different decision from whether to enter into the contract to begin with.[6]

The reasoning relied upon by IBM from *Escobar* does not apply here because *Escobar* is an implied false certification case. Memo. at 19. When a contractor provides goods or services to the Government, it makes an implied certification that applicable statutory and contractual requirements were complied with. When the Government pays a claim for those goods or services, knowing that the goods or services do not comply with a statutory or contractual requirement, that is treated as a representation by the Government that the requirement was not material to the Government's decision to purchase the goods or services. But the issue here is not whether the licenses provided by IBM under the contract complied with applicable requirements, and the IRS's acceptance of licenses under the 2012 contract makes no representation about the actual issue: whether or not the IRS would have entered into the contract to begin with had it known that the $91 million penalty was fraudulent. This distinction is drawn into further relief by the fact that there are a myriad of reasons why terminating the contract in or after 2013 may have been disadvantageous that are unrelated to the decision whether to enter into the contract initially, such as changes to the IRS's technology infrastructure made in reliance upon the long-term 2012 contract with IBM.  IBM's position would also require the Court to speculate about when the IRS learned about the assertions made in Relator's sealed initial complaint, and there is nothing in the record to indicate when that occurred.

---

[6]     The IRS may not have been aware of the allegations and, even if it was, "mere awareness of allegations concerning noncompliance with regulations is different from knowledge of actual noncompliance." *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 112 (1st Cir. 2016).

The Ninth Circuit Court of Appeals rejected an argument similar to IBM's in *United States ex rel. Campie v. Gilead Sciences, Inc.*, 862 F.3d 890 (9th Cir. 2017), *cert. denied sub nom.*, 139 S. Ct. 783 (2019). In *Campie*, Gilead submitted false information about the manufacturing of a drug to obtain FDA approval. *Id.* Gilead argued that its fraud was not material because the Government learned of the fraud but did not revoke FDA approval or cease paying for the medications at issue. *Id.* The court rejected that argument, noting that "to do so would allow Gilead to use the allegedly fraudulently-obtained FDA approval as a shield against liability for fraud. . . . [And] there are many reasons the FDA may choose not to withdraw a drug approval, unrelated to the concern that the government paid out billions of dollars for nonconforming and adulterated drugs." *Id.* at 906. Likewise, here there are many reasons IRS may have elected not to terminate the contract in subsequent years and the mere fact that it did not should not be taken as a shield for IBM's original fraud.

Further, it is unclear whether the IRS actually exercised any "option years" on the 2012 contract. While the subsequent years of the 2012 contract are referred to as "option years," and IBM states the IRS renewed the 2012 contract, the 2012 contract appears to renew itself automatically—it provides that it "remains in effect up to . . . 12/30/2017 . . . unless earlier terminated as provided herein" and provides no means or bases for terminating it. Memo. at Exh. 2 (incomplete 2012 contract) at 5.

IBM also notes that the Government declined to intervene in this case. Memo. at 19. But the Government's election to decline to intervene does not exculpate IBM (*see* Docket No. 38), and in fact, the Government expressly stated that its "decision to decline . . . should not be construed as a statement about the merits of the case" and it "retain[ed] the right to intervene at a later date." *See* Exh. 1 (August 30, 2018, letter from the U.S. Department of Justice) at 1. And as

stated by the very case cited by IBM, "the Government's failure to intervene in a case is not dispositive." *U.S. ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 197 (D.D.C. 2011). Notably, the statistics published by DOJ show that hundreds of millions of dollars are recovered annually in cases in which the Government declines to intervene. *See* Fraud Statistics, available at https://www.justice.gov/civil/page/file/1080696/download?utm_medium=email&utm_source=govdelivery ($118 million, $599 million, $108 million, and $514 million recovered in 2018, 2017, 2016, and 2015, respectively, in qui tam cases in which the Government did not intervene).

Finally, as discussed herein, IBM billed the compliance penalties to the IRS after representing that it would not. At an absolute minimum, if the IRS was aware it was paying penalties, as IBM asserts in its brief, then IBM's statements to the IRS that the penalties were owed were material to the IRS's decision to pay those penalties.

## C.    The False Audit Results Induced the IRS to Enter into the 2012 Agreement.

IBM falsely asserted to the IRS that it would have to pay $91 million in compliance penalties if it did not enter into the 2012 contract. Am. Compl. ¶ 126.   Contrary to IBM's contention, Relator has plainly alleged how IBM's fraud induced the Government to enter into the contract.

The case cited by IBM, *Keaveny*, is inapposite. *See* Memo. at 21. In *Keaveny*, the plaintiff alleged that the "[d]efendants implied that Mr. Keaveney was a Triton employee" but "failed to allege how this distinction fraudulently induced the government to enter into the contract." 219 F. Supp. 3d 129, 145 (D.D.C. 2016). The manner in which the threat of a $91 million penalty would motivate the Government is not difficult to understand.

IBM also asserts "there is nothing improper about parties coming to a negotiation table with 'leverage.'" Memo. at 21. That may be true. But it *is* improper to fabricate leverage by making

false and fraudulent claims—such as falsely asserting that the other party at the table will be required to pay a $91 million penalty if they do not enter into a new deal and cloaking those claims in the false shroud of an "independent" audit.

IBM also argues that its fraudulent threat of a $91 million penalty could not have induced the IRS to enter into a contract worth $265 million over five years. Memo. at 21. IBM's argument, however, is specious. But for IBM's fraud, the IRS could have purchased the few IBM products it continued to use while continuing to migrate off of IBM's software. Instead, if the IRS did not enter into a new, large, long-term deal, it faced paying IBM a $91 million penalty, having no software, and still needing to find a way to support its technology needs with $91 million less in its budget. The alternative under IBM's threats was to agree to pay IBM $265 million over five years, roughly $53 million per year, and continue to receive IBM's software licenses and support. Just because the IRS did not want to continue purchasing most of IBM's software, and wanted to migrate to other programs, Am. Compl. ¶¶ 54-56, does not mean that the IRS could afford to undertake such a migration *and* pay a $91 million penalty.

## II.      Relator Has Separately Stated a Claim Based Upon IBM's Fraudulent Billing of Hidden Compliance Charges.

IBM represented to the IRS that IBM would waive the $91 million false compliance penalty if the IRS entered into the 2012 Contract. Am. Compl. ¶ 126. However, IBM then billed the compliance penalties to the IRS anyway under the guise of new, prospective licenses and support. This gives rise to at least two claims under the FCA.

The first is fraudulent inducement. Even if the compliance penalties had been owed (which they were not), IBM falsely represented that it would waive them to induce the IRS to enter into a new contract. But it did not.

Second, IBM's billing of the compliance penalties was fraudulent billing because while IBM billed the IRS for prospective licenses, *i.e.*, licenses the IRS would be able to use in the future, the payment was really a compliance penalty, and no net new licenses were ever actually provided. IBM's internal communications confirm IBM falsely billed compliance penalties to the IRS under the guise of charges for prospective licenses: "IRS has a huge ELA [license agreement] that is being signed. Period revenue is about $97mm and $74mm of compliance licenses for an overdeployment situation. **The compliance licenses are being sold to them [the IRS] as net new licenses with no retroactive S&S**." Am. Compl. ¶ 141.

In the context of an IBM license agreement, compliance penalties are owed when the customer uses more licenses than it owns. The amount of the penalty is the cost of the licenses that were used in excess of what the customer owned, sometimes referred to as "compliance licenses."

IBM asserts it did not surreptitiously bill the Government for the penalties; it states that the "government was expressly made aware of what it was agreeing to and paying for," and refers to Schedule A of the 2012 contract. Memo. at 22. Schedule A lists the licenses sold to the IRS in the 2012 contract. *See* Memo. at Exh. 2 (incomplete 2012 contract) at 21. Among the licenses listed in Schedule A are the <u>same</u> licenses IBM asserted the IRS had overused or overdeployed in the <u>same</u> quantities IBM asserted they had been overused.[7] In other words, they are the compliance licenses that comprise the penalty IBM represented it would waive. However, Schedule A does <u>not</u> identify the licenses as a compliance penalty. Instead, Schedule A of the 2012 contract falsely

---

[7]     An example of this is laid out in paragraph 139 of the Amended Complaint: For example, with respect to one license, "IBM Rational Lifecycle Package Floating User," IBM asserted that the IRS: owned 892 licenses; deployed 3,245 licenses prior to the expiration of the 2007 contract in late 2012; and was, therefore, over-deployed by 2,353 licenses. In the 2012 contract, IBM billed the IRS for exactly 2,353 of these licenses, with prospective support for each license for the period from 12/31/2012 to 12/31/2013. For every subsequent year, however, the IRS purchased only 25 of that license per year.

states and mislabels the licenses as prospective licenses for the IRS to use in the future period of 12/31/2012 to 12/31/2013 and identifies them as "New Distributed Program License[s]." In other words, it would not have been apparent to the IRS that they were being billed for compliance penalties.

IBM's citation to *One-O-One Enterprises, Inc. v. Caruso*, is inapposite because the compliance penalty was concealed as new licenses. Memo. at 22 (citing 668 F. Supp. 693, 699 (D.D.C. 1987), *aff'd,* 848 F.2d 1283 (D.C. Cir. 1988)). Nothing in the contract in this case is identified as a compliance penalty and in fact, the licenses that are compliance penalties for alleged past overuse are falsely labeled as prospective licenses. *See, e.g.*, *Owen v. Schwartz*, 177 F.2d 641, 645 (D.C. Cir. 1949) ("doctrine that where both parties have equal means of judging there is no fraud" does not apply where "concealment is made or attempted" by the party who made the misrepresentation). Moreover, *Caruso* concerned an agreement between two private parties, while individuals are held to a higher standard of conduct when contracting with the Government. *Rock Island A. & L.R. Co. v. United States*, 254 U.S. 141, 143 (1920) ("Men must turn square corners when they deal with the Government.").

IBM's position amounts to asserting that even if it told the IRS blatant falsehoods about the contract, the IRS has no recourse because it should have read the agreement more closely to discover that IBM was lying. That is not the law. And reviewing the agreement would not have revealed IBM's fraud, as the licenses were falsely labeled as prospective, new licenses, not compliance. Further, Relator has alleged, and should be allowed to prove, that IRS believed it was obtaining 100% new value for its contract—not paying a penalty for something IBM asserted the IRS had already done.

Next, IBM asserts that even if it stated it would waive the compliance penalties, its assertion was not material because the IRS was aware it was being billed for the compliance. Memo. at 23. IBM contradicts itself here. If the IRS knew it was being billed for the compliance, it must have believed IBM's false statements that compliance was owed. In which case, IBM's false statements had to be material to the IRS's agreement to pay the compliance penalties. And again, IBM ignores the fact that the contract states the IRS would receive prospective licenses in return for paying millions of dollars, as opposed to nothing.

Finally, IBM discusses Relator's allegation that while the 2012 contract sold the IRS the compliance licenses as new, prospective licenses, IBM never provided such licenses to the IRS. Memo. at 23.[8] Tellingly, IBM does not dispute that it did not provide the licenses, and instead asserts that no facts are alleged "that IBM knowingly submitted a false claim to the government" or that the claim was "material to the government's decision to make the payment at issue." *Id.* Contrary to IBM's assertions, IBM's representation that it would provide prospective licenses when it knew no such licenses would be provided because they were really a concealed compliance penalty is a false statement. IBM's prior statement that "[t]he compliance licenses are being sold to them as net new license with no retroactive S&S" shows IBM did not intend to provide these prospective licenses. IBM's assertion that whether or not the Government would actually receive the licenses was not material to the Government's decision to pay millions of dollars to purchase them is frivolous and tantamount to asserting the Government did not care if it received anything for its money. No rational actor would pay millions of dollars in exchange for nothing.

---

[8]     A simple discovery request will flesh out this fact.

## III. Relator Has Pled a False Claims Act Conspiracy.

IBM discusses at length the intra-corporate conspiracy doctrine and argues that Relator's conspiracy claim should be dismissed because no co-conspirator is identified who is not an IBM employee. The Amended Complaint, however, plainly describes Deloitte's role with IBM. As alleged, Deloitte agreed to adopt materially false audit assumptions at IBM's insistence (as evidenced by the fact that the audit it performed without interference did not adopt such assumptions, the written communications indicating that IBM was thereafter controlling the audit, and the fact that it then adopted IBM's assumptions) and present materially false audit results to the IRS (as evidenced by the fact that it did present the false audit results to the IRS) to assist IBM in obtaining a large new contract with the IRS. Am. Compl. ¶¶ 72-75, 77, 89. Accordingly, there is no basis to dismiss count three.[9] Notably, even indirect evidence is sufficient to support Relator's claim. *U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 608 F.3d 871, 901 (D.C. Cir. 2010) ("[I]n most civil conspiracy cases," the jury "ha[s] to infer an agreement from indirect evidence.").

## IV. Relator Has More than Adequately Pled Fraud with Particularity.

"Motions to dismiss for failure to plead fraud with sufficient particularity are evaluated in light of the overall purposes of Rule 9(b) to ensure that defendants have adequate notice of the charges against them to prepare a defense." *First Choice*, 808 F. Supp. 2d at 73 (D.D.C. 2011) (internal citation omitted). "[I]n the context of the FCA, 'A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts.'" *E.g.*, *Kellogg*, 800 F. Supp. 2d at

---

[9]    IBM also asserts count three should be dismissed because Relator has failed to plead an underlying violation of the FCA. As discussed herein, however, Relator has pled several.

154 (D.D.C. 2011) (J. Lamberth) (internal citation omitted); *First Choice*, 808 F. Supp. 2d at 74

(D.D.C. 2011) (J. Roberts).

The circumstances that must be pled with specificity are "the time, place and content of the

false misrepresentations, the fact misrepresented and what was retained or given up as a

consequence of the fraud." *Kellogg*, 800 F. Supp. 2d at 153. Here, Relator has made detailed

allegations of the fraud. He has identified the false statements made by IBM and Deloitte,[10] who

made them,[11] when they were made,[12] and the actions taken by the IRS as a consequence.[13] In

short, all of the information that Relator is required to plead is set forth.

The information that IBM argues must be pled goes far beyond what is actually required.

Compare the laundry list of ancillary information that IBM asserts must be provided at the pleading

stage in pages 26 through 31 of its brief with this Court's analysis (in a case relied upon by IBM

no less):

> an FCA plaintiff must identify the "who, what, when, where, and how of the alleged
> fraud." . . . The government meets that test. The complaint adequately alleges the
> "who" (KBR, Compl. ¶ 4), the "what" (claims for expenses based on private
> security, *id.* ¶ 12), the "when" (between 2003 and 2006, *id.* ¶ 7), the "where" (in
> Iraq, *id.*), and the "how" (by submitting claims for expenses it knew were prohibited
> by the contract, *id.* ¶¶ 22–32) of the alleged fraud. The government specifically
> alleges that KBR "awarded subcontracts to three companies solely for the purpose

---

[10]     IBM falsely represented to the IRS that forgoing the final option year of the 2007 contract would allow the IRS to realize cost savings. Am. Compl. ¶ 3. IBM imposed audit assumptions that it knew to be false and rendered the audit's results materially false, and presented the audit results to the IRS as true, and caused Deloitte to present the false audit results to the IRS as well. Am. Compl. ¶¶ 24, 77. IBM falsely represented to the IRS that the IRS would not have to pay compliance penalties if it entered into the 2012 contract, but then charged the compliance to the IRS anyway as new, prospective licenses. Am. Compl. ¶ 126.

[11]     The individuals are identified in the Amended Complaint, including Gruzin, Murray, Schumm, and others of IBM and McClure of Deloitte. Am. Compl. ¶¶ 124-126.

[12]     The dates are identified in the Amended Complaint, including at the December 11, 2012, and December 19, 2012, meetings. Am. Compl. ¶¶ 124-126.

[13]     The IRS entered into the 2012 Contract and paid $265 million, including millions of dollars in compliance penalties. Am. Compl. ¶¶ 134, 137.

of providing private security to its executives and other personnel," *id.* ¶ 26, "armed four of its own employees," *id.,* and "awarded subcontracts to more than 30 companies that used private armed security in connection with performing dining facilities management and other services," *id.* ¶ 27, all without obtaining the approval required by the contract. *Id.* ¶¶ 26–27. The complaint also excerpts quotations from internal KBR e-mails that substantiate the allegation that KBR submitted the claims knowing that they were not allowed by the contract.

*Kellogg*, 800 F. Supp. 2d at 153. Relator has provided considerably more information. IBM's individual assertions are addressed below.

**A.   The Amended Complaint Contains Particularized Allegations of FCA Violations.**

IBM asserts that Relator has not provided sufficient information regarding the interactions between IBM and Deloitte. As a threshold matter, that could not be a basis to dismiss the Amended Complaint because IBM, through Gruzin, Murray, and others, presented the $91 million compliance penalty, which they knew to be false, to the IRS on December 19, 2012. Am. Compl. ¶ 125. IBM's argument is, nonetheless, addressed in greater detail below.

First, IBM asserts Relator has not established that the false audit results were a false statement by IBM. Memo. at 26. As discussed, however, IBM knew that the audit used false assumptions to generate a compliance penalty that was not actually owed, and IBM represented that the audit results were true and the compliance penalty owed. Detailed allegations regarding the false assumptions are discussed herein, as are IBM's own internal communications stating that it knew the assumptions were false.

Second, IBM argues that it has not been established that Deloitte imposed the false assumptions because of IBM. As discussed elsewhere herein, however, when Deloitte initially ran the audit results, it did <u>not</u> impose those assumptions and found virtually no compliance was owed. Am. Compl. ¶ 72. The results of that audit were never provided to the IRS, but should have been if Deloitte were actually "independent." Am. Compl. ¶ 75. IBM's internal communications show IBM then came up with false assumptions to apply to the audit to create the $91 million penalty.

Am. Compl. ¶¶ 76-85. They also show that IBM spoke with Deloitte to get Deloitte "in line" with IBM's compliance expectations, Am. Compl. ¶ 89, including conversations between Pirro and Schumm of IBM and McClure of Deloitte, as discussed herein. After those conversations, Deloitte then imposed the false assumptions on the audit. Am. Compl. ¶¶ 76-85. In short, Relator has more than adequately identified "how" Deloitte came to implement IBM's false audit assumptions.

Third, IBM asserts that it is not sufficiently alleged "how" the false audit assumptions "could have impacted" the audit. Memo. at 27-28. Contrary to IBM's assertion, however, this is described in detail in the Amended Complaint. For example, certain of the licenses owned by the IRS were required to be evaluated based upon usage. Am. Compl. ¶¶ 78-79. When Deloitte initially gathered the usage data and evaluated the licenses based upon usage, it found only minimal compliance was owed because the IRS was not using the software. Am. Compl. ¶¶ 72, 80. When the licenses were evaluated under the false assumption that installation, rather than usage, was the proper metric, the audit concluded that millions of dollars in compliance was owed. Likewise, IBM knew that licenses on deactivated servers were not being used, but counted them as constantly in use. Am. Compl. ¶¶ 83-85. By improperly treating those licenses as in use, IBM fabricated further millions of dollars in compliance penalties.

IBM refers to cases, such as *United States ex rel. Lott v. Not-For-Profit Hosp. Corp.*, 296 F. Supp. 3d 143 (D.D.C. 2017) (J. Mehta), which are readily distinguishable. In *Lott*, for example, this Court dismissed an FCA claim where the plaintiff failed to allege who had submitted allegedly false Medicare and Medicaid claims and what laws were violated by the claims:

> Plaintiff's substantive FCA claim alleges that Defendant "violated the Federal False Claims Act by submitting claims for reimbursement from federal healthcare programs, including Medicare and Medicaid," despite knowledge that Defendant was ineligible for reimbursement because it was not in compliance with "the Office of Inspector General guidelines and other federal laws regarding healthcare facilities and nursing programs." Am. Compl. ¶ 70.[2] This general accusation is not,

> however, supported by specific factual allegations contained elsewhere in the Amended Complaint. The complaint does not, for instance, "identify ... who precisely was involved in the fraudulent activity" and their roles in the fraudulent scheme. *Williams*, 389 F.3d at 1257. Worse, Plaintiff fails to identify the precise OIG guidelines or federal laws that Defendant allegedly violated when submitting claims for reimbursement and consequently does not allege the "fact[s] misrepresented" that form the basis of his substantive FCA claim.

296 F. Supp. 3d 143. Here, on the other hand, Relator has specifically identified the individual IBM employees, as well as employees of Deloitte who acted on IBM's behalf, who presented false audit results to the IRS, when they presented them, to whom they were presented, and how they were false. IBM is fully aware of the basis of the claim against it.

Fourth, IBM asserts that Relator did not adequately plead that the false, $91 million penalty was material to the IRS's decision to agree to the 2012 contract. This is discussed in detail above. (IBM also continues to misleadingly conflate the rejection of the false audit by Kravitz with rejection by the entire IRS and ignore that the audit findings were ultimately accepted by McGrane, who then supported the new contract based on them. Memo. at 28.)

Fifth, IBM oddly attacks again Relator's allegation that IBM's "Schumm was aware that the IRS was very concerned and 'scared' of the false Deloitte Findings, and that those findings were a substantial factor in the IRS's decision to renew the Existing Enterprise License by entering into the new License." Memo. at 28. As alleged, Schumm "was present along with other senior employees of IBM's Federal Software sector when IBM presented the Deloitte Findings to the IRS on December 19, 2012," and his knowledge is based upon the reaction of the IRS at that meeting as well as comments made to him by IRS and IBM employees at the time. Am. Compl. ¶ 127.

In short, Relator has more than adequately alleged the who, what, where, when, and how of the fraud. Further, additional information in support of Relator's claims is uniquely in the possession of IBM and Deloitte. *Martin v. Arc of D.C.*, 541 F. Supp. 2d 77, 83 (D.D.C. 2008).

**B.      The Hidden Compliance Penalties Billed to the IRS by IBM are Described in Detail in the Amended Complaint.**

As alleged in the Amended Complaint, IBM, individually and through Deloitte, presented false audit results to the IRS. Am. Compl. ¶¶ 124-126. Those audit results falsely stated that the IRS had overdeployed and overused the licenses it had purchased from IBM and that the IRS owed compliance penalties to IBM. Am. Compl. ¶¶ 124-126. Schedule A to the 2012 contract is a twenty-seven page list of the licenses and quantities purchased in the contract. Memo. at Exh. 2 (incomplete 2012 contract) at 21-47. As relevant here, the licenses listed in Schedule A include the same licenses IBM asserted the IRS had overused in the same quantities IBM asserted the IRS had overused them. However, Schedule A does not identify those licenses as "compliance," instead it falsely states that they are prospective licenses for use the following year. (IBM's own internal communications acknowledge that they were, in fact, compliance penalties and that was how the overall contract was accounted for at IBM. Am. Compl. ¶ 141.)

IBM next asserts that Relator failed to identify "who hid them, when in the contracting process, or where." Memo. at 29. With respect to "where," as described above, they were hidden in the 2012 contract by intentionally mislabeling them as new, prospective licenses. With respect to who and when, the contract states on its face that Fleischmann of IBM submitted the document on December 28, 2012. Memo. at Exh. 5 (incomplete 2007 contract) at 1-2.

Finally, IBM asserts that Relator's allegation that "upon information and belief" the new licenses were never actually provided to the IRS is "insufficient under Rule 9(b)." Memo. at 29. Relator's understanding is that no such licenses were provided to the IRS under the 2012 contract. And IBM's internal statement that these licenses are "compliance," not actually new licenses, supports Relator's assertion that no such licenses were provided. This is sufficient. *See U.S. ex rel. Davis v. D.C.*, 591 F. Supp. 2d 30, 38 (D.D.C. 2008) ("Although plaintiff uses the phrase 'upon

information and belief' several times in his complaint . . . the actual basis of plaintiff's allegations is stronger. . . . [plaintiff] had several meetings with defendants that confirmed the facts forming the basis of this suit. For these reasons, plaintiff has pleaded with sufficient particularity."). Tellingly, IBM does not claim that it did provide the new licenses to the IRS. Further, as IBM acknowledges, a relator may assert lack of access where the relevant information is in the control of another. Memo. at n. 9 (citing authority). While not required in this instance, the information is in the control of IBM, making the exception appropriate.

**C.     The Amended Complaint Contains Particularized Allegations Regarding an FCA Conspiracy.**

The Amended Complaint describes, in detail, how individual employees at IBM fabricated audit assumptions to falsely inflate the results of the audit, how IBM coordinated with Deloitte so that Deloitte would present the false audit results to the IRS under the imprimatur of "independence," and how IBM and Deloitte both presented the false audit results to the IRS. *See, e.g.*, Am. Compl. ¶¶ 78-85, 89, 124-126. It further identifies specific employees of IBM (Gruzin, Murray, and others) and Deloitte (McClure) involved. Am. Compl. ¶¶ 124-126. This more than meets the applicable pleading standard. *See, e.g.*, *Kellogg*, 800 F. Supp. 2d at 153. Notably, indirect evidence is sufficient to establish a conspiracy. *U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 608 F.3d 871, 901 (D.C. Cir. 2010) ("[I]n most civil conspiracy cases," the jury "ha[s] to infer an agreement from indirect evidence.").

## CONCLUSION

For all of the foregoing reasons, Plaintiff-Relator Paul A. Cimino respectfully requests that the Court deny Defendant's Motion to Dismiss and provide such other and further relief as it deems just and appropriate. A proposed order is submitted herewith.

Dated: March 29, 2019                    Respectfully submitted,

                                         */s/ Louis E. Dolan, Jr.*

                                         _____
                                         Louis E. Dolan, Jr. (D.C. Bar No. 442881)
                                         NIXON PEABODY LLP
                                         799 Ninth Street, NW, Suite 500
                                         Washington, D.C. 20001-4501
                                         (202) 585-8000 (telephone)
                                         (202) 585-8080 (facsimile)
                                         ldolan@nixonpeabody.com
                                         *Counsel for Plaintiff-Relator Paul A. Cimino*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 29, 2019, I caused a true and correct copy of the foregoing Opposition and the accompanying proposed order to be served on all counsel of record by the court's CM/ECF system.

*/s/ Louis E. Dolan, Jr.*
_____
Louis E. Dolan, Jr.