UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br>  *ex rel*. Paul A. Cimino<br><br>           Plaintiff,<br><br>      v.<br><br>INTERNATIONAL BUSINESS MACHINES<br>CORPORATION,<br><br>           Defendant. | Case No. 1:13-cv-00907-APM |

**IBM'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS
RELATOR'S FIRST AMENDED COMPLAINT**

Despite a host of allegations asserted for the first time in Relator's opposition, Relator fails to state a claim under the False Claims Act. Relator's opposition, like his First Amended Complaint, asks this Court to believe the unbelievable: that the IRS would spend *hundreds of millions* of dollars on a contract it did not want or need to avoid paying *tens of millions* of dollars in overage fees based on an audit whose findings it rejected. Moreover, Relator asserts the IRS had only those two choices: either pay the full overage charges or enter into a five year contract for three times that amount.

Relator further asserts that the alleged fraud was accomplished by duping just one IRS official—the agency's Deputy Chief Information Officer no less—into making this binary choice while another IRS employee—his subordinate—was on vacation. And, lastly, that the IRS then accepted—and even extended the term of—its undesirable contract, even after the government became aware of Relator's allegations of tens-of-millions-of-dollars of fraudulent charges. At the pleading stage, Relator must allege a *plausible* scheme (with particularized facts) to defraud

the government.  And here, where the IRS elected to contract with IBM for software year after year—even after IBM's supposed scheme was laid bare—the only plausible explanation is that the IRS wanted the software that IBM provides, not that the IRS was deceived.

The motion to dismiss this declined *qui tam* should be granted.

## ARGUMENT

**I.  The Alleged False Audit Could Not Have Been Material To The IRS's Decision To Enter Into A Contract It Renewed For Years, Including After Relator's Complaint Revealed The Supposed Fraud.**

It is undisputed that "all plaintiffs bringing private actions under the FCA . . . are[] required to allege that the allegedly false claim was material to the government's decision to make the payment at issue." *Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 86 (D.D.C. 2014) (citing *U.S. ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 194 (D.D.C. 2011)).  Relator attempts to water down the "rigorous" materiality standard made plain in *Universal Health Services, Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2002, 2004 n.6 (2016), by arguing that he need only show that the alleged false statement would be material to "a reasonable person." Opp. 27.  But the Supreme Court has held that a court deciding materiality "look[s] to the effect on the likely or actual behavior of the recipient of the actual misrepresentation." *Escobar*, 136 S. Ct. at 2002 (quoting 26 Williston on Contracts § 69:12 (4th ed. 2003)).  And this Court has accordingly held that relators must "allege that the allegedly false claim was material to the government's decision to make the payment at issue." *Si*, 71 F. Supp. at 86; *see also United States v. Raza*, 876 F.3d 604, 617 (4th Cir. 2017) ("More precisely, when the victim is the government, the prosecution must prove materiality by reference to the particular government agency or public officials that were targeted."), *cert. denied*, 138 S. Ct. 2679 (2018).  In short,

"[materiality] is a 'demanding' standard," *D'Agostino v. ev3, Inc.*, 845 F.3d 1, 7–8 (1st Cir. 2016),[1] one which Relator cannot meet.

Relator makes five arguments regarding materiality in his opposition. Opp. 26-32. None succeed.

First, Relator argues that a $90 million penalty[2] is material by definition. *Id.* 27-28. But "materiality cannot rest 'on a single fact or occurrence as always determinative.'" *Escobar*, 136 S. Ct. at 2001 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 (2011)). Materiality is a fact specific inquiry that requires a "holistic approach." *U.S. ex rel. Scutellaro v. Capitol Supply, Inc.*, No. CV 10-1094 (BAH), 2017 WL 1422364, at *20 (D.D.C. Apr. 19, 2017) (quoting *U.S. ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 109 (1st Cir. 2016)).

Second, Relator argues that because he has alleged that the IRS did not want to enter into a new contract and then did, the audit must have been material. Opp. 28. In short, Relator contends that because the contract happened, the audit was material. Relator's logic would write materiality right out of the FCA. The truth is far more plausible—the IRS entered into the 2012 agreement with IBM because it wanted and needed IBM's software. That the IRS entered into the contract does not establish that the audit findings were material.

---

[1]   *See also United States v. Strock*, No. 15-CV-0887-FPG, 2018 WL 647471, at *12 (W.D.N.Y. Jan. 31, 2018) (applying the Second Circuit's post-*Escobar* case law to hold "that *Escobar*'s materiality standard applies to all of Plaintiff's claims brought under [31 U.S.C.] § 3729(a)(1)(A) regardless of whether those claims were brought under a theory of implied false certification, express false certification, or fraudulent inducement."), *reconsideration denied*, No. 15-CV-887-FPG, 2018 WL 4658720 (W.D.N.Y. Sept. 28, 2018); *U.S. ex rel. Forcier v. Comput. Scis. Corp.*, No. 12 Civ. 1750, 2017 WL 3616665, at *7 (S.D.N.Y. Aug. 10, 2017) (applying the *Escobar* materiality standard to 31 U.S.C. § 3729(a)(1)(A) claims regardless of "[w]hether [the claims are] asserted on a theory of factual falsity or legal falsity.").

[2]   Although Relator repeatedly refers to a "compliance penalty," Opp. 2-3, 7, 15, 18, 22, 26, 28, 33-36, 39, the 2007 contract states that "[t]here is no penalty associated with the overage payment" stemming from an audit. Motion to Dismiss ("MTD") Exhibit ("Ex.") 1 at 36-37.

Third, Relator argues that because the IRS was aware of the software licenses it was purchasing by virtue of the licenses being explicitly listed in the 2012 agreement—licenses that Relator calls "compliance penalties"—the audit findings must have been material or the IRS would not have agreed to pay these "penalties." Opp. 28, 32; First Amended Complaint ("Am. Compl.") ¶ 142.³ Relator is simply repackaging his argument that the contract itself proves materiality.

Fourth, in an attempt to refute IBM's argument that rejected findings cannot be material, Relator argues that the IRS did not reject the audit findings. Opp. 28-29. But the Complaint plainly alleges that the IRS twice "rejected" the audit findings. *See* Am. Compl. ¶ 88 (in September 2012, the IRS "rejected the audit findings because, in [an IRS employee's] words, 'IBM cannot substantiate that the IRS is out of compliance.'") & ¶ 122 ( in November 2012, the IRS again "rejected the Deloitte Findings"). Audit findings that were twice rejected cannot have been material to the agency that rejected them.

In an effort make sense of his own pleadings, Relator claims that IBM waited for an IRS employee to go on vacation so it could deceive his supervisor, the IRS's deputy-CIO and head of software acquisitions. Opp. 7, 29. Relator's claim that IBM could scam the IRS out of $90 million by waiting for an IRS employee to take vacation strains credulity. *See id.* 29. The IRS is a huge, complex government agency renowned for its auditing capabilities—the notion that the IRS can be fooled by simply waiting for one line level employee to go on vacation, and that in his absence, a higher ranking officer would cave to an audit rejected by his subordinate defies common sense. Even at the pleading stage, the Court need not leave common sense at the door. *See Farah v. Esquire Magazine*, 736 F.3d 528, 537 (D.C. Cir. 2013) (applying "common sense"

---

³ In his complaint, Relator alleged the exact opposite, that the fees were hidden, but IBM cannot hide fees that are on the face of the contract. *See* MTD at 22-23.

on a motion to dismiss); *Ey v. Office of Chief Admin. Officer of U.S. House of Reps.*, 967 F. Supp. 2d 337, 346 (D.D.C. 2013) (dismissing complaint where the Court found that the allegations at issue "defie[d] common sense").

Even still, Relator never alleges that the supervisor *accepted* the audit as true and correct. *Cf.* Am. Compl. ¶ 127. If the IRS repeatedly rejected the audit's findings and never accepted them, the only reasonable inference is that the audit's findings were not material to the IRS's decision to enter into a new contract with IBM. This is true even if the IRS deputy CIO was troubled by the audit findings while his subordinate was on vacation.

Fifth and finally, Relator disputes IBM's argument that the Court should consider the IRS's actions after it entered into the 2012 contract. In so doing, Relator argues that the Court should ignore the fact that the IRS continued its contractual relationship with IBM long after he supposedly blew the whistle on the fraud in 2013.[4] Opp. 29-32.[5] But this is not the law. In *United States ex rel. Nargol v. DePuy Orthopaedics, Inc.*, 865 F.3d 29, 35 (1st Cir. 2017), *cert. denied sub nom. Med. Device Bus. Servs. v. U.S. ex rel. Nargol*, 138 S. Ct. 1551 (2018), the First Circuit held that the relators did not prove materiality where the Food and Drug Administration ("FDA") did not withdraw or suspend its approval of the defendant's medical devices after learning of the defendant's alleged misrepresentations. "Even in an ordinary situation not involving a misrepresentation of regulatory compliance made directly to the agency paying a

---

[4]   Relator's footnoted assertions that the contract documents IBM attached as exhibits to its Motion to Dismiss are not the full and complete contract documents are baseless. Opp. 4 n.2 & 8 n.4. Notably, Relator does not contest the veracity of the documents IBM attached. If Relator believes there are different versions of the contracts available, then he could have attached them to his Complaint or his opposition. He did neither.

[5]   Relator claims that "the 2012 contract appears to renew itself automatically," providing "no means or bases for terminating it." Opp. 31. But the IRS could have decided at any time not to renew the contract, in which case it would not have renewed automatically. *See* MTD Ex. 2 at 16 (discussing contract termination). And Relator fails to account for the undisputable fact that the IRS elected to extend the agreement past even its original term. *Id.* at 206-08.

5

claim, when 'the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material.'" *Id.* at 34-35 (quoting *Escobar*, 136 S. Ct. at 2003). That "very strong evidence becomes compelling when an agency armed with robust investigatory powers to protect public health and safety is told what Relators have to say, yet sees no reason to change its position." *Id.* at 35. Likewise, the Third Circuit similarly held that "a misrepresentation is not 'material to the *Government's payment decision*,' when the relator concedes that the Government would have paid the claims with full knowledge of the alleged noncompliance." *U.S. ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 490 (3d Cir. 2017) (quoting *Escobar*, 136 S. Ct. at 1996) (emphasis in original). The same is true here: the IRS knew of IBM's alleged malfeasance and yet paid the claims—without dispute—for years following.

*United States ex rel. Campie v. Gilead Sciences, Inc.*, 862 F.3d 890 (9th Cir. 2017), is not to the contrary. *Cf.* Opp. 31. The defendant there argued that the FDA's continued approval of the defendant's prescription drugs after learning of alleged misrepresentations of compliance with FDA regulations was proof that the fraud was immaterial. *See Campie*, 862 F.3d at 906. The Ninth Circuit acknowledged the strength of this argument, particularly in light of *Escobar*, noting that Relators faced "an uphill battle in alleging materiality." *Id* at. 905. But the Court ultimately rejected this argument in large part because the defendant *previously corrected* its noncompliance with FDA regulations. "Once the unapproved and contaminated drugs were no longer being used, the government's decision to keep paying for compliant drugs does not have the same significance as if the government continued to pay despite continued noncompliance." *Id.* at 906. Relator does not allege IBM "corrected" anything at any time during the five-plus-year agreement, and thus, his reliance on *Campie* is misplaced.

6

At bottom, Relator's fraudulent inducement theory "turns on the defendant's eligibility for payment by the government—had the government known about the fraud in the inducement, it never would have entered the contract, and no payments would have been made." *Si*, 71 F. Supp. 3d at 88 (internal quotation marks and citation omitted). But here the government knew. The government has known the entirety of IBM's purported secret scheme since 2013, yet the IRS continued to exercise option year after option year under the contract, even extending it. *See* Am. Compl. ¶ 127; MTD Ex. 2. Against that backdrop, the twice-rejected audit findings could not have been material to the government's contracting decisions. *See D'Agostino*, 845 F.3d at 8 (affirming dismissal of relator's claim that defendant fraudulently induced the FDA into approving their product where the FDA failed "to withdraw its approval" of the product "in the face of [Relator's] allegations"); *see also U.S. ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1034 (D.C. Cir. 2017) (finding that the government's decision not to disallow any charged costs after an investigation was "very strong evidence" that the requirements at issue were not material) (quoting *Escobar*, 136 S. Ct. at 2003). Relator's failure to plausibly allege materiality is fatal to his FCA case as a whole. The Complaint should be dismissed.

## II. The Allegedly False Audit Did Not Induce Or Cause The IRS To Enter Into The 2012 Contract.

FCA complaints alleging a fraud-in-the-inducement theory must also plausibly allege "that the United States was induced by, or relied on, the fraudulent statement or omission when it awarded the contract." *U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.*, 266 F. Supp. 3d 110, 129 (D.D.C. 2017) (internal quotation marks and citation omitted); *see also U.S. ex rel. Keaveney v. SRA Int'l, Inc.*, 219 F. Supp. 3d 129, 141-42, 145 (D.D.C. 2016) (granting motion to dismiss where relators "failed to allege how Defendants' alleged failure to notify the government of the existence of the subcontractors induced the government to enter into the contract").

7

Relator makes no such showing. Relator uses strong rhetoric, claiming even that IBM "forced" the IRS into signing the 2012 contract. Opp. 1-2. But conclusory statements aside, he cites no plausible allegations that IBM's conduct was "at least a substantial factor in causing, if not the but-for cause of, submission of false claims." *See United States v. Toyobo Co.*, 811 F. Supp. 2d 37, 48 (D.D.C. 2011) (internal quotation marks and citation omitted). Relator's claims are entirely dependent on the specious theory that the IRS had only two choices: pay $90 million in overage charges or enter into a new contract for $265 million. Relator alleges no facts to explain why the IRS was unable to dispute the alleged overages, or negotiate a new, favorable, contract. The Court need not draw "all inferences," from Relator's allegations—as he contends, *see* Opp. 18, 24—only "reasonable" ones. *See Ashcroft v. Iqbal*, 556 U.S.662, 663 (2009). Like materiality, Relator's failure to *plausibly* allege inducement or causation is fatal to his FCA case as a whole and requires dismissal of the entire Complaint.

### III.   IBM Did Not Make A False Statement To The IRS.

A FCA fraud-in-the-inducement theory also requires Relator to plead that IBM knowingly made a false statement or representation to the IRS to cause it to enter into the contract. *See, e.g., Si*, 71 F. Supp. 3d at 87. The alleged false statement here is the audit report. But the audit report was not IBM's statement, and Relator does not even plausibly allege that it was false.

To distract from these fatal deficiencies, Relator points to alleged false statements purportedly made by IBM that are not *the* false statement. Opp. 11. For example, Relator alleges that IBM told the IRS that an audit would likely save it money, when in truth IBM thought an audit would show that the IRS owed money. *Id.* 11-12. Relator claims that IBM used this false statement to "trick" the IRS into agreeing to an audit. But Relator never says to what

8

end.  The 2007 contract gave IBM the unconditional, unilateral right to audit the IRS's compliance with the terms of the agreement at any time.  MTD Ex. 1 at 18.  Therefore, even if IBM made the purportedly false statement, it induced nothing.  IBM always had the right to audit the IRS, regardless of its reasons.[6]

### A. IBM Did Not Produce The Audit Report.

Relator cannot plausibly allege that *Deloitte's* independent audit constitutes a false statement by *IBM*.  Although Relator repeatedly calls Deloitte IBM's "agent," repetition does not make it so.  "[A] plaintiff must plead facts that plausibly support an inference that an agency relationship existed in order to survive a Rule 12(b)(6) motion."  *Jefferson v. Collins*, 905 F. Supp. 2d 269, 285 (D.D.C. 2012).  Mere "conclusory allegations" do not "give rise to a reasonable inference of an agency relationship" at the motion-to-dismiss stage.  *Id.*

Relator points to conclusory allegations that IBM "imposed audit assumptions" on Deloitte and also notes that IBM and Deloitte communicated during the audit process.  Opp. 15-16.  But neither creates an agency relationship.  Consistently, Relator's logic assumes the conclusion:  IBM manipulated the audit, therefore Deloitte must have been its agent, which is what allowed IBM to manipulate the audit.  *See id.*  Without alleged facts to support Relator's claims that Deloitte was, for example, at IBM's "beck and call," *id.* at 5, the conclusory allegation is meaningless.

---

[6] Relator also points to contradictory allegations that (1) the IRS did not want to extend the term of the 2007 agreement and that (2) IBM purportedly convinced the IRS not to extend the term of the 2007 agreement.  Opp. 11-12.  Though Relator accuses IBM of "want[ing] to debate the facts as alleged," Opp. 13, it is Relator's Complaint that contains the two contradictory statements.  *See, e.g.*, Am. Compl. ¶¶ 55 ("By late 2011, Defendant IBM . . . [was] also aware that the IRS was not interested in renewing its Existing Enterprise License with IBM") & 59 ("IBM's plan consisted of . . . convincing the IRS to forego the upcoming option year on the Existing Enterprise License").  But ultimately, IBM's and the IRS's motivations regarding the 2007 contract are beside the point.

At most, the Complaint contains IBM's alleged internal musings about Deloitte's audit process, not any exertion of control over Deloitte. *See* Am. Compl. ¶¶ 76-93. Relator's reliance on communications, seen for the first time in his opposition, are not to the contrary, but also must not be given any weight. *See* Opp. 16-17 ("sit tight until we can [get] a handle on Deloitte"; "Can Deloitte factually prove these products are used or deployed?"; IBM wanted to understand the audit results and "compliance numbers").

These purported communications, as well as Relator's newfound allegation that "IBM's reprimands of Deloitte primarily took place over the telephone," *id.* 3, are not alleged in the Complaint. Likewise, in his attempt to explain away why a Big Four accounting firm like Deloitte would throw away its reputation to do IBM's bidding, Relator claims for the first time that Deloitte's employees benefitted from doing as IBM said. *Id.* 18. But, "[a] complaint may not be amended by the briefs in opposition to a motion to dismiss." *Konah v. D.C.*, 815 F. Supp. 2d 61, 71 (D.D.C. 2011) (internal quotation marks and citation omitted); *see also id.* ("Because a motion to dismiss requires courts to test the sufficiency of the factual allegations contained within the four corners of the complaint, the court disregards any additional factual allegations contained within the plaintiff's opposition to the defendant's motion."). Relator alleges no facts demonstrating that Deloitte was anything but the independent auditor it was contracted to be. MTD Ex. 1 at 18.

In addition, so far as the Complaint reveals, IBM's internal musings about Deloitte's audit were not communicated to Deloitte and therefore could not have manipulated Deloitte's audit. Assuming the conclusion again, Relator argues that because Deloitte's audit found what IBM anticipated, IBM must have controlled the audit. Opp. 18. Such conclusory allegations

10

cannot form the basis for a plausible allegation of control sufficient to establish an agency relationship.[7]

Moreover, Relator's own allegations of control contradict themselves. *Compare id.* 19 ("[t]his was a process IBM controlled throughout"), *with id.* ("[t]he audit results were manipulated by IBM *after* IBM received Deloitte's initial findings"). The Complaint fails to allege facts to support its leap from IBM being internally displeased with Deloitte's audit to Deloitte supposedly lying in its audit report and then lying to the IRS to make IBM happy. For example, Relator claims that for one type of software product, WebSphere, Deloitte's audit initially reached one number and then later reached another. Am. Compl. ¶¶ 72, 126; Opp. 22. But Relator does not allege any facts to show that IBM dictated the second number or that Deloitte only accepted it to benefit IBM. Without allegations to connect the dots from IBM being unhappy with the audit results to Deloitte abandoning its independence and working at IBM's direction, the audit is simply Deloitte's statement.

Finally, apparently realizing that his allegations that the IBM Internal Audit Team tasked with "validating" Deloitte's findings suggested that IBM was *not* controlling Deloitte's audit, Relator argues that IBM "could . . . require Deloitte to apply" the Internal Audit Team's assumptions. Opp. 20. But again, Relator does not make this allegation in the Complaint, and cannot tack it on through his opposition. *See Konah*, 815 F. Supp. 2d at 61. In any event, Relator's new allegation is also conclusory. It again requires the Court to assume that IBM could control Deloitte's audit without any plausible facts to support it.

---

[7] Relator quibbles with IBM's reliance on *Chandamuri v. Georgetown University*, 274 F. Supp. 2d 71 (D.D.C. 2003). *See* Opp. 18-19. But *Chandamuri* stands for the well-established rule that conclusory allegations are insufficient to withstand a motion to dismiss, *see* 274 F. Supp. 2d at 80-81. *See* MTD 13-14.

11

### B. There are No Well Pled Allegations that the Alleged Statement At Issue—the Audit Report—Was False.

Relator pleads no facts showing that IBM communicated the allegedly false assumptions to Deloitte—much less "imposed" them on Deloitte's audit. MTD at 14. To be sure, Relator asserts that IBM was testing the audit assumptions, but does not allege that this was actually communicated to Deloitte.[8]

Moreover, there are no well pled facts from which the Court could find that IBM's desired assumptions would have rendered the audit false had they been conveyed to Deloitte. For example, Relator concedes in his opposition that the contract does not specify whether the relevant licenses should be measured by usage or installation, and instead looks to IBM to clarify the proper metric. Opp. 23. Relator points to a nefarious "hidden" column of data in a Deloitte spreadsheet, but provides no factual basis from which the Court could conclude that the usage data in the "hidden" column was the only possible measure to be applied in the audit, rendering all other metrics false. *Id.* 23. And IBM seeking a "credible story around deployment" is not evidence of attempted audit falsification, particularly when the same purported communication references the IRS as having its own "story." *See id.* 6 & 20; Am. Compl. ¶ 82.[9]

---

[8] For example, Relator cites an assumption regarding "floating user licenses" but the paragraphs of the Complaint he points to (¶¶ 79-82) reference only internal IBM emails, not IBM communications to Deloitte. *See* Opp. 21. Relator also references an assumption concerning licenses on discontinued servers, but, again, the paragraphs of the Complaint he points to (¶¶ 83-85) reference only internal IBM emails. *See* Opp. 21. Nowhere does the Complaint allege that IBM communicated these, or any other, assumptions to Deloitte.

[9] Relator ratchets up the rhetoric in his opposition, repeating the term "hammer," which the Complaint attributes to unnamed IBM employees pre-audit, and "pain point," a term not attributed to anyone at IBM or anywhere else in the Complaint. *See* Opp. 6, 12, 14, 17, 20; Am. Compl. ¶¶ 22, 62. Relator's own characterizations are no substitute for well pled facts.

There are simply no well pled facts showing that Deloitte's audit was legally false.[10]

Finally, even if Relator had properly pled facts alleging that IBM's preferred audit assumptions were false, those assumptions were communicated to Deloitte, and the assumptions were imposed on Deloitte's audit, Relator's theory is still fatally flawed. The Complaint does not allege that the IRS did not understand the audit's assumptions. Generally accepted auditing principles require that auditors make assumptions in their audits, and that they disclose those assumptions in the resulting audit report.[11] And Relator nowhere pleads that Deloitte's audit report failed to include its assumptions—or that the IRS, the nation's foremost auditor, did not ask for them—or that the IRS somehow did not understand the assumptions that Deloitte made. For that reason, too, Relator's falsity theory fails.

## IV. Any Allegedly False Statements Made By IBM Were Not Made With Scienter.

Relator never alleges that the false statement was made with scienter. Relator attempts to show, in his opposition, that he alleged scienter under the FCA, but without success. Relator can point only to alleged statements that are not within the Deloitte audit (the alleged false statement), and are therefore beside the point, or he simply recites the same conclusory allegations regarding IBM's purported control over Deloitte. Opp. 24. Relator must allege more than "this was all a fraud and they knew it." For all the reasons stated in the Motion to Dismiss and herein, the Complaint should be dismissed on this basis as well.

---

[10] For the same reason, it does not matter that Relator alleges that IBM discussed the audit report with the IRS after Deloitte presented it, because Relator has not plausibly alleged that Deloitte's audit report was false.

[11] *See, e.g.*, U.S. Gov't Accountability Off., GAO-12-331G, Government Auditing Standards §§ 2.11, 7.08, 7.10 (Dec. 2011) (stating that in a compliance audit, "Auditors should prepare audit reports that contain [] the objectives, scope, and methodology of the audit" and "Auditors should communicate audit objectives in the audit report in a clear, specific, neutral, and unbiased manner that *includes relevant assumptions*.") (emphasis added), *available at* https://www.gao.gov/assets/590/587281.pdf.

**V.     Relator's Hidden-Compliance-Charge Theory Fails to State a Claim.**

Relator's hidden-compliance-charge theory fails to state either a fraud-in-the-inducement FCA claim or a distinct FCA claim. The Complaint dedicates only eight paragraphs to Relator's claim of hidden fraudulent compliance charges, and unsurprisingly fails to plead the necessary elements of the FCA. Am. Compl. ¶¶ 135-42.

First, regarding his fraud in the inducement claim, although Relator summarily alleges in his Complaint that IBM said it would waive the overage charges stemming from Deloitte's audit if the IRS entered into a new contract, he does not allege that IBM knew this statement was false when it was made. *U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287 (D.C. Cir. 2015) ("To be liable under the FCA, a defendant must have made the false claims knowingly."). For this reason, Relator fails to plead the first two elements of a FCA claim—a false statement made knowingly, with scienter. *See Si*, 71 F. Supp. 3d at 86 (citing 31 U.S.C. § 3729(a)(1)). And for all the reasons explained above, Relator has not plausibly pled materiality, inducement or causation sufficient to sustain a fraud in the inducement claim. *See supra* pp. 2-8.

Second, Relator's hidden-compliance-fees allegations also fail to state a distinct FCA claim. The fees that Relator claims were hidden were, in fact, listed on the face of the contract. MTD Ex. 2 at 14 (showing the payment schedule); 21-142 (showing license schedule and quantities). The Complaint contains no allegations concerning the negotiation of the 2012 agreement—and therefore no allegations that the hidden-in-plain-sight-fees were falsely or fraudulently represented or added into the agreement without the knowledge and acquiescence of the IRS.[12] Relator therefore fails to allege the first element of a FCA claim—a false statement.

---

[12]     Relator claims "IBM does not dispute that it did not provide the licenses." Opp. 36. That is simply not so. *See* MTD 23. IBM disputes Relator's entire case as a matter of fact. As Relator well knows, however, IBM must take all of Relator's well pled facts as true for purposes

14

There are also no allegations of scienter with regard to this claim—there are no allegations at all of the state of mind of IBM when adding these "hidden fees" to the face of the contract.[13] And further, there are zero allegations of materiality or causation with respect to the "hidden fees" claim. It should be dismissed, along with the rest of Relator's claims.

## VI. Relator's FCA Conspiracy Count Fails To State A Claim And Should Be Dismissed.

Because Relator's Complaint fails to state a FCA claim, it necessarily fails to state a conspiracy claim. "[T]here can be no liability for conspiracy where there is no underlying violation of the FCA." *Si*, 71 F. Supp. 3d at 89.

But the conspiracy claim also fails on its own accord. The Complaint does not contain a single allegation identifying Deloitte as a co-conspirator. Again, for the first time in his opposition, Relator summarily refers to Deloitte as IBM's "agent and co-conspirator" on the first page. Opp. 1. That is the entirety of the discussion regarding a co-conspirator. Relator does not cite a single paragraph in his Complaint alleging facts that establish a co-conspirator relationship between IBM and Deloitte. *See Konah*, 815 F. Supp. 2d at 71 ("A complaint may not be amended by the briefs in opposition to a motion to dismiss.").

Even if Relator could add this allegation via his opposition brief, he cannot have it both ways—Deloitte cannot be both IBM's agent and its co-conspirator. The intra-corporate conspiracy doctrine "is based on the notion that a corporation and its agents constitute a single legal entity that cannot conspire with itself." *Tabb v. D.C.*, 477 F. Supp. 2d 185, 190 (D.D.C.

---

of a motion to dismiss. *See, e.g.*, *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004). That is not conceding anything; it is simply the procedural posture.

[13] As noted previously, Relator's tortured attempt to twist IBM's words here should be ignored by the Court. Opp. 36. IBM has not contradicted itself or failed to dispute Relator's allegations concerning the "hidden fees." As very clearly set forth in the Motion to Dismiss and herein, IBM disputes that fees listed in a contract are hidden, and disputes any notion that the IRS was duped into a contract or signed a contract it did not understand.

15

2007); *see also Martin v. D.C.*, 968 F. Supp. 2d 159, 169 (D.D.C. 2013) (holding that because defendants were agents of the D.C. government during the alleged events giving rise to the litigation, the intra-corporate conspiracy doctrine applied). Relator's own assertions of an agency relationship are fatal to his conspiracy claim.

Relator's conspiracy claim further fails because it does not allege an agreement between IBM and Deloitte. *U.S. ex rel. Conteh v. IKON Office Sols., Inc.*, 103 F. Supp. 3d 59, 68 D.D.C. 2015) ("[A]t the motion to dismiss stage of a case, a plaintiff/relator must identify any agreement between the parties to defraud the government.") (internal quotation marks and citation omitted). Without a co-conspirator or an agreement, there can be no conspiracy.

### VII. The Complaint Should Also Be Dismissed For Failure To Plead Fraud With Particularity As Required By Rule 9(b).

Relator fails to plead "the who, what, when, where, and how of the alleged fraud," as required under Rule 9(b). *United States v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 153 (D.D.C. 2011) (internal quotation marks and citation omitted). "[I]n order to satisfy Rule 9(b), [Relator] must set forth an adequate factual basis for his allegations." *See U.S. ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 552 (D.C. Cir. 2002). For all of the reasons set forth above, and for all of the reasons detailed in IBM's Motion to Dismiss (at pp. 26-31), Relator fails to plead any fraud by IBM with the particularized detail required to survive dismissal.

### CONCLUSION

This *qui tam* action was filed nearly six years ago. The United States—the allegedly defrauded party—has declined to intervene and prosecute the case. Relator has already amended his Complaint once. A third attempt would be futile. The Court should grant IBM's motion and dismiss the First Amended Complaint in its entirety with prejudice as to Relator.

Dated:  April 12, 2019

Respectfully submitted,
HOGAN LOVELLS US LLP

/s/ Michele W. Sartori
Michele W. Sartori (D.C. Bar # 478772)
555 13th Street, N.W.
Washington, D.C.  20004
(202) 637-5600 (telephone)
(202) 637-5910 (facsimile)

Robert L. Toll (D.C. Bar # 1021934)
875 Third Avenue
New York, NY 10022
(212) 918-3000 (telephone)
(212) 918-3100 (facsimile)

Counsel for Defendant IBM