UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| PAUL A. CIMINO, | ) ) ) | |
| Plaintiff-Relator, | ) ) | |
| v. | ) ) | Case No. 13-cv-00907 (APM) |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | ) ) ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiff-Relator Paul Cimino is a former employee of Defendant International Business Machines Corporation ("IBM"). His job was to sell IBM's Rational brand of software to the Internal Revenue Service ("IRS"). Relator brought this action against IBM under the federal False Claims Act in June 2013. He alleges that IBM, with the assistance of the professional services firm, Deloitte LLP, fabricated audit findings concerning the IRS's software usage, and then presented these false findings to the IRS in order to coerce the agency into renewing a software enterprise license in the amount of $265 million. According to Relator, the IRS renewed the software license under the threat of a $91 million penalty, which was supported by the false audit findings. After a multi-year investigation, the United States declined to intervene. Relator nevertheless elected to prosecute the action.

IBM now moves to dismiss Relator's First Amended Complaint. For the reasons below, the court grants Defendant's Motion.

## II. BACKGROUND

### A. Factual Background

Defendant IBM is a multinational corporation that offers computer hardware, software, and business solutions to organizations and government agencies. First Am. Compl., ECF No. 35 [hereinafter Am. Compl.], ¶¶ 44–45. Relator Paul A. Cimino was a senior sales representative in IBM's Federal Sector unit during the relevant time period and was primarily responsible for promoting sales of IBM's Rational brand of software to the IRS, a bureau of the U.S. Department of the Treasury. *Id.* ¶ 42. In late 2011, the IRS appointed Relator to a fifteen-member IBM board—the Development Tools Assessment Group—tasked with evaluating the IRS's software and licensing needs. *Id.* ¶ 51.

The IRS and IBM signed a license agreement in 2007 ("Initial License") authorizing the IRS to use IBM software products, including the Rational, WebSphere, and Tivoli brands. *Id.* ¶ 48. The term of the Initial License was for one base year with the right to exercise several option years. *Id.* ¶ 49. As a result of exercising these options, the Initial License was set to expire on September 30, 2012, though "the IRS had the right to exercise at least one additional option year." *Id.* ¶ 49. As of 2012, the annual cost to the IRS for IBM's software was approximately $23 to $30 million. *Id.* ¶¶ 14, 69.

Sometime in 2011, through communications with IRS employees, Relator learned that the IRS was not interested in renewing the entire Initial License. *Id.* ¶ 54. The IRS was not using all of the products it had purchased from IBM, *see id.* ¶ 12, and it had begun migrating away from some IBM products to open-source software, *see id.* ¶ 54. The IRS nevertheless would need to continue using some of IBM's software for the upcoming tax season, *see id.* ¶ 70, so it intended to negotiate an extension only for the software that it actually needed, *id.* ¶¶ 54–56.

Relator alleges that "IBM stood to lose significant revenue if the IRS stopped purchasing the software" in the Initial License, a potential outcome which prompted IBM to formulate a plan to pressure the IRS into a new, long-term deal. *Id.* ¶¶ 57–59. The first phase of the alleged scheme would be to convince the IRS that it should forgo the final option year. *Id.* ¶¶ 59, 61, 65. IBM did so by suggesting a friendly compliance audit that would provide the IRS with software usage data, allowing the IRS to realize cost savings in a new agreement by choosing only the software it needed. *Id.* ¶ 66. The Initial License authorized IBM to audit the IRS's software deployment. *Id.* ¶ 18; see also Def.'s Mot. to Dismiss, ECF No. 48 [hereinafter Def.'s Mot.], Def.'s Ex. 1, ECF No. 48-2 [hereinafter Def.'s Ex. 1], at 18 ("IBM may verify your compliance with this [Software Relationship Offering] . . . . IBM may use an independent auditor.").[1] IBM expected, however, that the compliance audit would reveal that the IRS had overutilized software and therefore would be subject to steep compliance charges allowed under the Initial License. Am. Compl. ¶ 67; *see also id.* ¶ 62 (IBM employee referring to compliance audit as "hammer" to use against the IRS). IBM expected that once the IRS declined the option year, the agency would be compelled to enter into a large new contract that included products it did not need, due to the press of the approaching tax season and threat of stiff overage fees. *Id.* ¶ 70.

Relator cites several statements by IBM employees to this effect. *See id.* ¶ 61 (July 2012 email between IBM's Dermot Murray, Senior Director of Federal Civilian Software, and Len Fleischmann, Manager of Enterprise Sales for IBM's Federal Sector, that the "[o]nly way to work a new deal is for IRS to cancel the contract. . . . Having IRS out of contract provides the maximum

---

[1] IBM attaches both the Initial License and the license renewal to its Motion to Dismiss. Although Relator protests that IBM has failed to attach the full new agreement, *see* Opp'n of Relator to Def.'s Mot. to Dismiss First Am. Compl., ECF No. 51, at 2 n.2, it identifies no absent portion that is material to the issues in dispute. The court therefore may consider these agreements without converting Defendant's motion into a motion for summary judgment. *See Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).

leverage on getting the deal done."); *id.* ¶ 62 (IBM employee describing compliance audit in April 2012 as IBM's "only . . . shot at making money this year"); *id.* ¶ 65 (IBM's Michelle Adams telling the IRS in May 2012 that it could realize savings by choosing not to exercise the option year); *id.* ¶ 66 (July 2012 conversation between Adams and the IRS's Patricia Hoover, Adam Kravitz, Greg Rosenman, and others explaining how an audit could benefit IRS).

The IRS eventually agreed to the audit and declined to exercise the option year "in favor of a three-month 'bridge' ending in December 2012." *Id.* ¶ 68. IBM engaged Deloitte LLP to conduct the audit. *Id.* ¶ 17. After Deloitte's audit showed only $500,000 in possible compliance charges—to Deloitte, a result almost unheard of with an entity as large as the IRS, *see id.* ¶ 74— "IBM suppressed these initial audit results and never released them to the IRS," *id.* ¶ 20. Instead, IBM management requested that Deloitte manipulate the audit by basing it on assumptions "that were either without basis or . . . impossible" in order to create leverage over the IRS. *Id.* ¶¶ 76– 77. One way that IBM purportedly drove up overage fees was to have the audit premised on the assumption that licenses deployed on discontinued servers, and thus never used, *see id.* ¶ 85, were in constant use, *see id.* ¶ 83. By September 2012, IBM's changes to Deloitte's audit assumptions resulted in approximately $18.9 million in overage fees. *Id.* ¶ 86.

On September 18, 2012, Deloitte presented the over-deployment statistics—though not the associated compliance penalties—to IBM's point of contact at the IRS, Adam Kravitz, "so that they could come to agreement on baseline findings." *Id.* ¶ 87. Kravitz rejected the figures because IBM could not substantiate them. *Id.* ¶ 88. In November 2012, IBM changed the audit assumptions yet again—this time, resulting in $292,000,000 in overage fees. *Id.* ¶ 91. Although IBM's Murray considered the number "ridiculous" and Fleischmann "'was not comfortable

4

representing' that number to the IRS[, . . . the number] was represented to the IRS anyway." *Id.* ¶¶ 91–92.

IBM also created an internal audit team (of which Relator was a member) to validate Deloitte's findings. *Id.* ¶ 94. Where Deloitte had found $27 million of Rational brand software over-deployment, the internal audit team found at most $3 million of over-deployment. *Id.* ¶ 101; *see also* Am. Compl., Relator's Exs. 1 & 2, ECF No. 35-1. Unsatisfied, Relator's supervisor, Ann Marie Somerville, and Dermot Murray instructed the audit team to employ impossible assumptions. Am. Compl. ¶ 110. For example, although technically impossible, Somerville instructed the team to assume that numerous IRS employees were using certain Rational brand "floating user" licenses concurrently—including employees who did not develop software and had no need to use the Rational brand. *Id.* Eventually, the team came up with $9.3 million in overage fees. *Id.* ¶ 116. Still too low to create leverage, IBM did not disclose these numbers to the IRS. *Id.* ¶¶ 117–18.

On November 29, 2012, IBM presented $91 million in compliance charges to the IRS's Kravitz. *Id.* ¶ 121. The charges included both overutilized licenses and retroactive technical support for those licenses. *Id.* ¶ 120. Kravitz again rejected the audit findings. *Id.* ¶ 122.

Undeterred, IBM went over Kravitz's head. When Kravitz was out on vacation in early December 2012, IBM thought "this [was] a good time to keep the pressure on." *Id.* ¶ 123. On December 11, 2012, Deloitte presented its inflated findings to Kravitz's superior, the IRS's Deputy Chief Information Officer, James McGrane and others. *Id.* ¶ 124. Deloitte's presentation included a spreadsheet that contained a hidden column that, if revealed, would have showed that there was minimal to no usage of the products purportedly overutilized. *Id.* IBM's Mark Gruzin, Dermot Murray, and others presented the same Deloitte findings to McGrane the following week on

5

December 19, 2012, when Kravitz remained out of the office. *Id.* ¶ 125. IBM told McGrane that it had retained lawyers to collect the $91 million overage payment, but that IBM would agree to waive the payment if the IRS entered a new contract. *Id.* ¶ 126. According to Chriss Schumm, an IBM employee who attended the meeting with McGrane, the IRS was "scared" of the Deloitte findings. *Id.* ¶ 127.

The IRS then signed a five-year, $265 million license with IBM in late December 2012 ("New License"). *Id.* ¶ 128; *see also* Def.'s Mot., Def.'s Ex. 2, ECF No. 48-3 [hereinafter Def.'s Ex. 2] (New License signed for the United States by Brian Carper on December 27, 2012). The New License contained a "Base Year" plus four additional "Option Years," with an agreement end date of December 30, 2017. Def.'s Ex. 2 at 5, 14. The IRS paid all or a substantial portion of the $265 million contract price. *Id.* ¶ 134. According to Schumm, the Deloitte findings were a "substantial factor" in the IRS's decision to renew the licensing agreement. Am. Compl. ¶ 127.

But there is more. According to Relator, IBM broke its promise to forgo the overage fees and secretly included at least $86.9 million in such fees in the New License under the guise of costs for prospective licenses and technical support. *Id.* ¶ 137. As support, Relator notes that IBM included the exact same number of purportedly over-deployed Rational floating user licenses— 2,353, to be precise—as prospective licenses for first year of the New License. *Id.* ¶ 139; *see also* Def.'s Ex. 2 at 21 (New License showing 2,353 "IBM Rational Lifecycle Package Floating User" licenses from December 31, 2012 to December 31, 2013). By contrast, for each subsequent option year, the IRS purchased only 25 such licenses. Am. Compl. ¶ 139. "Upon information and belief," IBM never supplied the IRS with these 2,353 new licenses. *Id.* ¶ 140.

On September 30, 2015, the IRS amended the New License to add an additional six months, so that the contract would terminate on June 30, 2018. Def.'s Ex. 2 at 207–10. The IRS agreed to pay $16,147,772 for this additional six-month extension. *See id.* at 207.

**B.      Procedural Background**

Relator initiated this suit on June 17, 2013, raising claims under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"). *See generally* Compl., ECF No. 1. As required by the FCA, *see* 31 U.S.C. § 3730(b)(2), Relator filed the Complaint under seal to provide the United States the opportunity to investigate the claims and decide whether to intervene. Thereafter, over the course of four years, the United States sought, and the court granted, multiple extensions of time to investigate and to decide whether to intervene. *See* Sealed Orders, ECF Nos. 3, 5, 7, 11, 15, 17, 19, 21, 23, 25, 27, 29, 31, 33; Sealed Min. Order July 4, 2018.

On July 27, 2018, while the matter remained under seal, Relator filed the First Amended Complaint, which is the operative pleading in the case. *See* Am. Compl. The First Amended Complaint advances three claims under the FCA: that IBM (1) knowingly presented or caused to be presented a fraudulent claim for payment to the IRS, *see id.* § 3729(a)(1)(A) (Count I); (2) made, used, or caused to be made or used a false record or statement material to IBM's fraudulent claim, *see id.* § 3729(a)(1)(B) (Count II); and (3) conspired to commit violations of §§ 3729 (a)(1)(A) and (1)(B) (Count III).

On August 31, 2018, the United States notified the court that it declined to intervene. *See generally* Notice of Election to Decline Intervention, ECF No. 38. Thereafter, the court ordered the First Amended Complaint be unsealed and served upon IBM. *See* Order, ECF No. 39. Defendant filed a Motion to Dismiss Relator's First Amended Complaint on February 4, 2019,

7

pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6). *See generally* Def.'s Mot. The court held a hearing on IBM's Motion on September 13, 2019.

### III. LEGAL STANDARD

To withstand a motion to dismiss under Rule 12(b)(6), the court must find that the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "[N]aked assertion[s] devoid of further factual enhancement" are not sufficient to support a complaint. *Id.* (alteration in original) (internal quotation marks omitted) (citing *Twombly*, 550 U.S. at 557). Factual allegations are not required to be "detailed," but pursuant to the Federal Rules, they must be more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Twombly*, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief," and the case can be dismissed. *Id.* at 679 (cleaned up) (citing FED. R. CIV. P. 8(a)(2)).

When, as here, a complaint contains allegations of fraud, Rule 9(b) requires the plaintiff to "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* "Together, Rules 8 and 9(b) require a plaintiff to plead the time, place, and content of the fraud and to identify the individuals allegedly involved." *United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923, 936 (D.C. Cir. 2017) (citing *United States ex rel. Williams v. Martin-Baker Aircraft*

*Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004)). Further, the complaint must identify "the fact misrepresented and what was retained or given up as a consequence of the fraud." *Williams*, 389 F.3d at 1256 (D.C. Cir. 2004) (internal quotations and citation omitted).

Rule 9(b)'s particularity requirement "safeguards potential defendants from frivolous accusations of moral turpitude . . . [and] guarantee[s] all defendants sufficient information to allow for preparation of a response." *Id.* at 1256 (internal quotation marks and citation omitted). A court should, however, dismiss a complaint with prejudice for failure to plead fraud with particularity "only if it determines the plaintiff could not possibly cure the deficiency by alleging new or additional facts." *Shea*, 863 F.3d at 936 (internal quotation marks omitted) (finding district court did not abuse discretion by granting leave to amend where relator "outlined the basic mechanics" of the fraud and "could potentially provide more detail about the 'who,' 'what,' 'where,' and 'when' of the fraud as to each individual contract").

## IV. DISCUSSION

The FCA was borne of Congress's desire to stop the "plundering of the public treasury" in the wake of sensational reports of fraud against the government as it purchased necessities for the Civil War. *United States v. McNinch*, 356 U.S. 595, 599 (1958). The FCA allows private parties, known as "relators," to bring a qui tam action—that is, an action on behalf of the United States— to recover civil penalties and damages for fraud. *See* 31 U.S.C. §§ 3729(a), 3730(b). The United States may elect to intervene in the qui tam action. *See U.S. ex rel. Hampton v. Columbia/HCA Healthcare Corp.*, 318 F.3d 214, 217 (D.C. Cir. 2003) (stating that "the Government may intervene or bring a related action based on the facts underlying the [*qui tam*] action") (citing 31 U.S.C. § 3730(b)(5)). Even if does not, the relator still may choose to prosecute the case. That is what occurred here.

Relator's FCA claims are predicated primarily on what is known as a fraud-in-the-inducement theory of liability. Under a fraud-in-the-inducement theory, a defendant violates the FCA if it submits claims to the government "under a contract which was procured by fraud, even in the absence of evidence that the claims were fraudulent in themselves." *United States ex. rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005) (internal citation omitted); *see also United States ex rel. Westrick v. Second Chance Body Armor Inc.*, 128 F. Supp. 3d 1, 18 (D.D.C. 2015). Secondarily, Relator asserts that IBM presented a false claim for payment, namely, the overage fees disguised as the cost of new licenses. Under such theory, the allegation is that the defendant made an explicitly false or fraudulent demand for payment. *See Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 87 (D.D.C. 2014) (cleaned up). The Amended Complaint's pleaded factual allegations do not, however, plausibly support either of these theories.

### A. Fraud in the Inducement

Relator alleges that IBM fraudulently induced the IRS to renew the Initial License by presenting it with false audit findings that the IRS was responsible for $91 million in overage penalties, when in fact it was not, and falsely promising to forgo those penalties if the IRS agreed to a new licensing agreement. Put differently, Relator claims that IBM coerced the IRS into paying $265 million for software that the agency did not want, to avoid $91 million in fabricated penalties. But that is not all. Relator's allegation that IBM surreptitiously inserted nearly $91 million in penalties into the contract under a false specification for new licenses means the IRS purportedly signed a contract to pay $265 million for only $174 million worth of software.

Even accepting the well-pleaded facts as true, the Amended Complaint does not give rise to plausible violations of the FCA. It falls short on two critical elements: causation and materiality. The court discusses each element in turn.[2]

### 1. Causation

As the name of the theory implies, a plaintiff alleging fraud in the inducement must plead "not only that the omitted information was material but also that the government was *induced by*, or relied on, the fraudulent statement or omission." *Westrick*, 128 F. Supp. 3d at 18 (citation omitted) (emphasis added); *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 491 (3rd Cir. 2017) ("Collapsing the materiality analysis into a causation inquiry would render the materiality element 'surplusage[.]'"); *D'Agostino v. ev3, Inc.*, 845 F.3d 1, 7–8 (1st Cir. 2016) (distinguishing between elements of materiality and causation). The parties disagree as to what the verb "induce" means in this context. Relator argues that it need only plead facts showing that the false audit findings were a "substantial factor" in the agency's decision to renew the licensing agreement. Draft Hr'g Tr. at 22–23. IBM, on the other hand, argues for a stricter "but for" standard, such that Relator in this case must plead that, absent IBM's presentment of the false audit findings, the IRS would not have entered into a new agreement. *See id.* at 23.

IBM is generally correct, but even it understates the stringency of the FCA's causation standard. The clear weight of authority among the circuit courts is that the element of causation for an FCA claim requires a showing that the alleged false statement is not only the actual, or but-for, cause of the government harm, but also the legal, or proximate, cause for the loss. *See United States v. Luce*, 873 F.3d 999, 1009–14 (7th Cir. 2017) (surveying cases and joining the Third and Fifth Circuits in adopting a "proximate cause" standard); *Petratos*, 855 F.3d at 491 ("And even

---

[2] The court need not examine Defendant's other arguments to dismiss, as Relator's failure to establish both materiality and causation warrant dismissal.

the causation element cannot be met merely by showing 'but for' causation."); *cf. United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006) (requiring the false claim to be an "integral to [the] causal chain leading to payment") (citations omitted). This legal standard is confirmed by the Supreme Court's decision in *Universal Health Services, Inc. v. United States ex rel. Escobar*, in which the Court explained that Congress intended to import common law concepts into the FCA. *See* 136 S. Ct. 1989, 1999 (2016). Proximate cause is the usual common-law understanding of causation in fraud cases. *See Luce*, 873 F.3d at 1012.

The D.C. Circuit appears to share in this view. In *United States ex rel. Schwedt v. Planning Research Corp.*, the court embraced the Third and Fifth Circuit's "restrictive standard" for causation. 59 F.3d 196, 200 (D.C. Cir. 1995) (citing *United States v. Miller*, 645 F.2d 473, 475–76 (5th Cir. 1981); *United States v. Hibbs*, 568 F.2d 347, 351 (3d Cir. 1977)). The court explained that "the submitter of a false claim should be liable only for those damages that arise because of the *falsity* of the claim, i.e., only for those damages that would not have come about if the defendant's misrepresentations had been true." 59 F.3d at 200. The D.C. Circuit did not refer to the causation standard as "proximate cause" in *Schwedt*, but instead used the "but for" formulation. *See id.* That is a distinction without a difference in this case, however, where there is no dispute that the alleged actual cause of the IRS's injury—the false audit findings—is also the legal, or proximate, cause. What is critical, however, is that for purposes of causation under the FCA, an allegation like the Relator makes here—that a false statement is merely a "substantial factor" in causing loss—is not enough to give rise to FCA liability under *Schwedt*. He must plausibly allege facts establishing but-for causation. *See United States v. DynCorp Int'l*, 253 F. Supp. 3d 89, 107 (D.D.C. 2017) (stating that the court "must evaluate whether the alleged false statements could plausibly have induced the government's agreement"); *United States ex rel. Kolchinsky v. Moody's*

*Corp.*, No. 12CV1399, 2018 WL 1322183, at *5 (S.D.N.Y. Mar. 13, 2018) (stating that the relator must "'plead facts demonstrating that the government relied on the statement'—*i.e.*, that it was so induced") (citation omitted).

A decision from the First Circuit is helpful in illustrating how the causation standard operates when the plaintiff asserts a fraud-in-the-inducement theory. In *D'Agostino v. ev3*, the relator alleged that the defendant made multiple fraudulent representations to the FDA to obtain approval for a medical device. *See* 845 F.3d at 7. To plead causation, the court held, it was not sufficient for the plaintiff to allege that "the fraudulent representations 'could have' influenced the FDA . . . and the payments made by [the Centers for Medicare and Medicaid Services ("CMS")]." *Id.* Rather, "the defendant's conduct must cause the government to make a payment or to forfeit money owed." *Id.* at 8. Thus, the court explained, "[i]f the FDA would have approved [the device] notwithstanding the alleged fraudulent representations, then the connection between those representations to the FDA and a payment by CMS relying on FDA approval disappears." *Id.* In finding that the relator's pleading had come up short, the First Circuit relied on the fact that the FDA had taken no action with respect to the device even after the relator had made his claims of fraud: "The FDA's failure actually to withdraw its approval of [the device] in the face of [the relator's] allegations precludes [the relator] from resting his claims on a contention that the FDA's approval was fraudulently obtained." *Id.* The court concluded: "We hold only that causation is an element of the fraudulent inducement claims [the relator] alleges and that the absence of official action by the FDA establishing such causation leaves a fatal gap in this particular proposed complaint." *Id.* at 9.

*D'Agostino* and similar cases make clear the burden Relator faces in this case. He must plead facts demonstrating that but for the falsity of Deloitte audit's findings, the IRS would not

13

have entered into a $265 million licensing agreement with IBM.  Or, in other words, Relator must plead that had the IRS known the truth about the audit findings, it would not have entered into the contract.  *See, e.g., Pencheng Si*, 71 F. Supp. 3d at 88 (holding that a fraudulent inducement theory "turns on the defendant's eligibility for payment by the government—had the government known about the fraud in the inducement, it never would have entered the contract, and no payments would have been made")  (internal quotation marks and citation omitted); *United States ex rel. Keaveney v. SRA Int'l, Inc.*, 219 F. Supp. 3d 129, 145 (D.D.C. 2016) (holding that "Relators here have failed to allege how Defendants' alleged omission of the subcontractors' identities *induced* the government to initially enter into the contract") (citation omitted); *cf. United States ex rel. Landis v. Tailwind Sports Corp.*, 234 F. Supp. 3d 180, 196 (D.D.C. 2017) (finding a fraudulent inducement claim viable on summary judgment where several agency decision-makers "indicated that if they had known about the [misrepresentations], they would not have recommended continuing or renewing the [contract]") (citation omitted).

Relator's allegations do not satisfy the FCA's "restrictive" causation standard.  *Schwedt*, 59 F.3d at 200.  The conclusory allegation that Deloitte's findings were a mere "substantial factor" in the decision to renew the licensing agreement is by itself fatal.  Am. Compl. ¶ 127.  The complaint's well-pleaded factual allegations are likewise deficient.  Relator claims that the IRS's Deputy Chief Information Officer, McGrane, agreed to a new contract after his direct-report, Kravtiz, twice rejected the audit findings.  *Id.* ¶¶ 88, 122.  Even if the court were to suspend belief and accept that IBM could secure a $265 million contract by capitalizing on Kravitz's vacation plans, nowhere does Relator assert that McGrane (unlike Kravitz) actually accepted the audit's findings.  The FCA "requires a causal rather than a temporal connection between fraud and payment," or in this case, the fraudulently induced agreement.  *United States ex rel.*

*Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005) (citation omitted). At most, Relator sets out a timeline establishing that McGrane authorized the new contract after IBM presented him with the false audit findings. That is not enough.

Relator also avers that an IBM employee, Chris Schumm, knew that the IRS was "concerned and 'scared' of the false Deloitte findings." Am. Compl. ¶ 127. But mere concern and fear on the part of the IRS, even if true, cannot equal causation. To satisfy the causal element, Relator must plead facts establishing that the false audit findings actually induced the IRS to enter into the new licensing agreement when it would not have otherwise. A generalized "concern," of the kind articulated by Relator, does not satisfy the rigorous element of causation.

### 2. Materiality

Relator also has not plausibly established the element of materiality. The Supreme Court has emphasized that the materiality standard under the FCA is "demanding" and not "too fact intensive" for courts to resolve on a motion to dismiss. *Universal Health Servs.*, 136 S. Ct. at 2003, 2004 n.6. The FCA defines information as material if it has a "natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Importantly, "courts need not opine in the abstract when the record offers insight into the Government's actual payment decisions." *United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1032 (D.C. Cir. 2017) (citation omitted). As the Supreme Court has instructed: "[I]f the Government regularly pays a particular type of claim in full despite its actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *Universal Health Servs.*, 136 S. Ct. at 2003–04.

Here, there is "strong evidence" that the IRS did not view the alleged false audit findings to be material. IBM's new licensing agreement with the IRS commenced on January 1, 2013.

15

*See* Def.'s Ex. 2 at 166. Relator filed this suit only six months later in June 2013, putting the IRS on notice of IBM's alleged fraud.[3] Yet, the IRS has paid IBM "[a]ll or substantial portion" of the $265 million new licensing agreement, much of which was paid after this case was filed. Am. Compl. ¶ 134. It also agreed to add six months to the agreement for an additional cost of $16,147,772. *See* Def.'s Ex. 2. at 207–10. The court finds it implausible that the IRS sat on its hands upon learning that IBM had tricked it into signing a contract for $265 million for software that it did not need. *See* Am. Compl. ¶¶ 54–56. In fact, it agreed to pay even more money to IBM. The claimed falsity therefore cannot be material. To hold otherwise would require the court to ignore "what actually occurred." *McBride*, 848 F.3d at 1034.

Nor is it lost on the court that, after a multi-year investigation, the United States declined to intervene in this case. Although the decision to intervene is not "dispositive," it is entitled to some "respect," *U.S. ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 197 n.14 (D.D.C. 2011), especially as here when the government conducted an extensive investigation spanning four years. The court therefore concludes that Relator has not plausibly established the element of materiality.[4]

### 3. "Hidden" compliance fees

In addition to claiming that IBM's presentation of the false audit findings led the IRS to enter into a new licensing agreement, Relator advances a second, related fraud-in-the-inducement theory. He maintains that IBM enticed the IRS to enter into the new contract with the false promise of waiving the $91 million in penalties, but then secretly reneged on that promise by including the penalties in the new contract under the guise of a line item for new licenses. Am. Compl. ¶¶ 137–

---

[3] At oral argument, Relator suggested that it was "completely unknown" whether or not the IRS knew of this lawsuit. Having been privy to the government's ex parte filings, the court knows that the IRS was made aware of this case not long after its filing. *See, e.g.*, Mem. of P&A in Support of Def.'s Unopposed Ex Parte Mot. for Sixth Month Extension of Time to Consider Election to Intervene, ECF No. 4 (sealed), at 4. Relator knows that, too, as his counsel received the government's sealed filings.

[4] Perhaps to state the obvious, the court has not accepted as true Relator's repeated assertions of "materiality" throughout his Amended Complaint. *See, e.g.*, Am. Comp. ¶¶ 31, 36, 118, 131.

38.  For, example, he specifically alleges that IBM asserted that the IRS was over-deployed by 2,353 "IBM Rational Lifecycle Package Floating User" licenses before the Initial License expired, *id.* ¶ 139, then "IBM added those licenses to the bill as new, prospective licenses" in an effort to "conceal the fact that it was billing the IRS for licenses the IRS had allegedly over-used in previous years," *id.* ¶ 138.  This theory, however, suffers from the same shortcomings as Relator's other one.

First, Relator fails to plead causation.  There are no allegations in the Amended Complaint that the IRS accepted the false audit findings, let alone relied on a promise by IBM not to assess penalties if the IRS entered into a new agreement.  Second, the Amended Complaint falls short on materiality.  Again, the court cannot ignore "what actually occurred." *McBride*, 848 F.3d at 1034.  The IRS learned long ago about IBM's alleged wrongdoing, including its alleged disguising of penalties as the costs of new licenses, yet the IRS took no corrective action, but in fact extended the agreement.  Indeed, if what Relator alleges is true, it would mean that the IRS paid $265 million for $174 million worth of actual software licenses.  The court finds it implausible that the IRS has not attempted, in some way, to recover the nearly $90 million for which it received nothing in return, if the claimed false promise were material.  Relator's additional fraud-in-the-inducement theory therefore fails.

### B.    Presentation of False Claim

Relator also asserts that the disguised $91 million in penalties separately supports false presentment liability under the FCA.  *See* 31 U.S.C. § 3729(a)(1)(A).  Such a theory has four elements:  (1) the defendant submitted a claim for payment to the government; (2) the claim was false; (3) the defendant knew the claim was false; and (4) the alleged falsity was material.

17

*See Pencheng Si*, 71 F. Supp. 3d at 87; *Universal Health Servs.*, 136 S. Ct. at 2002–03. Relator's presentment theory fails on the element of materiality.

Realtor again asks the court to "ignore what actually occurred," *McBride*, 848 F.3d at 1034, which it cannot do. The IRS knew, not long after entering the contract, about Relator's accusation that IBM had disguised the $91 million in penalties it promised it would forgo as the cost of new licenses. If Relator's accusation were true, it would mean that more than one third of the contract price was in fact penalties, and that the IRS never received the value of new software licenses. Yet, the IRS paid the $91 million, and made no effort to recoup it, and it continued to pay IBM for the duration of the contract and beyond. It is not plausible that the IRS would have sat by idly in the face of such an allegation.

Relator's contention "upon information and belief" that IBM "never actually provided [new licenses and support] to the IRS on a prospective basis as the License indicated" cannot save his Complaint. Am. Compl. ¶ 140. It is not plausible that the IRS failed to recognize that IBM had not delivered on one-third of its new licensing agreement, or that it did recognize that shortcoming, but still continued to pay IBM. And, while "information and belief" pleading remains available to a plaintiff claiming fraud, Realtor must assert that he lacked access to relevant records to affirmatively plead the factual contention. *See United States ex rel. Davis v. District of Columbia*, 591 F. Supp. 2d 30, 37 (D.D.C. 2008); *see also Williams* 389 F. 3d at 1258. Relator has not done so here.

Thus, having failed to plead materiality of the alleged "hidden" penalties, Relator's presentment claim cannot survive.

## V. CONCLUSION

For the reasons set forth above, the court grants Defendant's Motion to Dismiss Plaintiff-Relator's Complaint, ECF No. 48. A separate final Order accompanies this Memorandum Opinion.

Dated: September 30, 2019

Amit P. Mehta
United States District Court Judge